PT:MEC
F.#2010R01744

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    -against-

SANT SINGH CHATWAL,

           Defendant.

- - - - - - - - - - - - - - - X

**FILED**
IN CLERK'S OFFICE
U.S DISTRICT COURT E.D.N.Y.

★ APR 17 2014 ★

BROOKLYN OFFICE

I N F O R M A T I O N

Cr. No. 14-00143 (ILG)
(T. 18, U.S.C., §§ 371,
1512(b)(3) and 3551 et seq.)

THE UNITED STATES ATTORNEY CHARGES:

       At all times relevant to this Information, unless otherwise indicated:

    I.   The Limits on Federal Campaign Contributions

       1.  The Federal Election Campaign Act of 1971, as amended, Title 2, United States Code, Sections 431 et seq. (the "Election Act"), limited financial influence in the election of candidates for federal office, including the offices of President, Senator and Member of the House of Representatives.

       2.  In order to restrict the influence that any one person could have on the outcome of a federal election, the Election Act, under Section 441a, limited the amount and source of money that could be contributed to a federal candidate or to an individual candidate's political campaign committee and

multi-candidate political campaign committees, commonly referred to as "political action committees" ("PACs").

3.   To promote transparency and prevent individuals from circumventing these rules, under Section 441f, the Election Act prohibited an individual from making a campaign contribution in the name of another person, including giving funds to a "straw donor" or a "conduit" for the purpose of having the straw donor or conduit pass the funds on to a federal candidate as the straw donor or conduit's own contribution.

4.   In 2008 and 2010, the Election Act limited contributions from any one individual to a particular PAC in a calendar year to a total of $5,000.  In 2008, the Election Act limited primary and general election campaign contributions in a calendar year to $2,300 per campaign, for a total of $4,600, from any one individual to any one candidate.  In 2010, the Election Act limited primary and general election campaign contributions in a calendar year to $2,400 per campaign, for a total of $4,800, from any one individual to any one candidate.

5.   The Federal Election Commission ("FEC") was an agency and department of the United States with jurisdiction to enforce the limits and prohibitions of the Election Act and to compile and publicly report accurate information about the source and amount of contributions to federal candidates and their political committees.  Pursuant to the Election Act, the

FEC required campaign committees and PACs to file with the FEC
periodic reports ("FEC Reports") of receipts and disbursements
identifying, among other things, each individual who made a
contribution to such committee during the relevant reporting
period whose contribution or contributions had an aggregate
amount or value in excess of $200 within the calendar year,
together with the date and the amount of such contributions.

6.   In preparing the FEC Reports, federal
candidates and political committees relied on the information
provided by donors, including the donor's name, address, and
occupation ("Donor Information").  The political campaign
committees frequently provided forms for the donors to complete,
which forms included the Donor Information along with the amount
of the donors' contributions ("Donor Forms").  The FEC Reports
were made publicly available and were intended to provide
citizens with a transparent record of all reportable
contributions to candidates for federal office.  As such, the
FEC Reports constituted the public's window into the sources of
funding for federal election campaigns.

II.  The Defendant

7.   The defendant SANT SINGH CHATWAL managed,
operated and controlled several businesses, including

3

restaurants, hotels and a hotel management company, through a
complex business structure of trusts and limited liability
corporations.

### III.  The Conspiracy To Violate The Election Act

#### A.  The Participants

8.  The following individuals participated in a
conspiracy with the defendant SANT SINGH CHATWAL to violate the
Election Act:

a.  A cooperating informant, an individual
whose identity is known to the United States Attorney
(the "CI"), was a business associate of CHATWAL.

b.  John Doe #1, an individual whose
identity is known to the United States Attorney, was a
contractor whose construction company contracted with entities
operated by CHATWAL to perform millions of dollars in
construction work at CHATWAL's business properties and at one of
CHATWAL's personal residences in Old Brookville, New York ("Old
Brookville").

c.  John Doe #2, an individual whose
identity is known to the United States Attorney, was the CI's
associate.

d.  A group of specific employees and other
contractors, individuals whose identities are known to the
United States Attorney, (the "CHATWAL Associates"), whom CHATWAL

4

designated to solicit campaign contributions on CHATWAL's behalf in support of various candidates for federal office and PACs, collect these contributions and pay reimbursements for these contributions, in violation of the Election Act.

### B. Overview Of The Conspiracy

9. In or about and between March 2007 and August 2011, the defendant SANT SINGH CHATWAL, together with the CI, John Doe #1, John Doe #2, the CHATWAL Associates and others, conspired to recruit from the New York City metropolitan area Straw Donors, or "conduits," all individuals whose identities are known to the United States Attorney (the "Straw Donors"), who were paid reimbursements as inducements to make contributions to the political committees of the following candidates for federal office and PACs, individuals and entities whose identities are known to the United States Attorney:

> Committee and PAC for Candidate A (collectively "Candidate A");
>
> Committee for Candidate B ("Candidate B"); and
>
> Committee for Candidate C ("Candidate C")

(collectively, the "Candidates"). As the central figure in this conspiracy, CHATWAL recruited, directly and indirectly, numerous Straw Donors to make campaign contributions to the Candidates.

C.   The CI's Role In CHATWAL's Scheme

i. The Campaign Contributions
To Candidate A

10.   In or about March 2007, the defendant SANT SINGH CHATWAL told the CI that CHATWAL wanted the CI to raise campaign contributions for Candidate A.  The CI told CHATWAL that the CI did not have much money, but might be able to raise $100,000.  CHATWAL told the CI to give cash to donors in order to raise the money.  CHATWAL informed the CI that CHATWAL would reimburse the CI for any reimbursements that the CI made to such Straw Donors and also cautioned the CI to be "careful" about the fundraising (the "March 2007 Instructions").

11.   In or about June 2007, the defendant SANT SINGH CHATWAL asked the CI to raise money for one of Candidate A's fundraising events with the understanding between the CI and CHATWAL that, pursuant to the March 2007 Instructions, the Straw Donors for this event (the "Group A1 Straw Donors") would be reimbursed by the CI and that the CI, in turn, would be reimbursed by CHATWAL.

12.   In or about June 2007, in Nassau County, New York, the CI gave John Doe #2 approximately $55,000 in cash with which to reimburse the Group A1 Straw Donors, along with an additional minimal sum as John Doe #2's "commission."  John Doe #2 obtained campaign contributions and Donor Forms from the

6

Group A1 Straw Donors and also reimbursed each Group A1 Straw Donor using the funds the CI provided. Subsequently, John Doe #2 gave the CI the completed Donor Forms and the Group A1 Straw Donors' contribution checks. The CI gave these items to one of the CHATWAL Associates, in the defendant SANT SINGH CHATWAL's presence.

13. As a result of this arrangement, the defendant SANT SINGH CHATWAL caused Candidate A to submit FEC Reports that falsely reported the sources and amounts of contributions to Candidate A by the Group A1 Straw Donors. As a further consequence of these contributions, CHATWAL knowingly and willfully made, and caused to be made, contributions of money to Candidate A, aggregating $25,000 and more in a calendar year, in the names of the Group A1 Straw Donors.

14. In or about April 2008, the defendant SANT SINGH CHATWAL asked the CI to raise $50,000 for another event for Candidate A. CHATWAL made this request pursuant to the March 2007 Instructions, meaning that CHATWAL and the CI understood that the Straw Donors for this event (the "Group A2 Straw Donors") would be reimbursed by the CI, and the CI, in turn, would be reimbursed by CHATWAL. The CI again used John Doe #2 to obtain campaign contributions from Straw Donors, this time the Group A2 Straw Donors. Again, the CI gave cash to John Doe #2 to use to reimburse the Group A2 Straw Donors. After

John Doe #2 obtained the contributions and Donor Forms from the
Group A2 Straw Donors, he reimbursed them.  CHATWAL subsequently
told the CI that because the CI took too much time to raise the
campaign contributions from the Group A2 Straw Donors, these
contributions were no longer needed.  At the CI's direction,
John Doe #2 returned the Group A2 Straw Donors' contributions.
John Doe #2 also returned the reimbursement funds to the CI,
less John Doe #2's "commission" for obtaining these
contributions.

15.  In or about August 2008, the defendant SANT
SINGH CHATWAL again asked the CI to raise money for Candidate A.
CHATWAL made this request pursuant to the March 2007
Instructions, meaning that CHATWAL and the CI understood that
the Straw Donors for this event (the "Group A3 Straw Donors")
would be reimbursed by the CI and that the CI, in turn, would be
reimbursed by CHATWAL.  In or about August or September 2008, in
Nassau County, New York, the CI gave approximately $35,000 in
cash to John Doe #2 to reimburse the Group A3 Straw Donors,
along with an additional minimal sum as John Doe #2's
"commission."  John Doe #2 obtained, by check and credit card,
campaign contributions from the Group A3 Straw Donors and also
reimbursed each Group A3 Straw Donor using the funds provided by
the CI.

8

16. John Doe Number #2 also obtained from each of the Group A3 Straw Donors a completed Donor Form for Candidate A that contained the following statement: "All contributions must be made from the contributor's personal funds. Corporations and individuals are strictly prohibited from reimbursing another person for making a contribution to ... [name of Candidate A's PAC]." John Doe #2 gave these campaign contributions and Donor Forms to the CI who, in turn, personally gave the contributions and Donor Forms to the defendant SANT SINGH CHATWAL.

17. As a result of this arrangement, the defendant SANT SINGH CHATWAL caused Candidate A to submit FEC Reports that falsely reported the sources and amounts of contributions to Candidate A by the Group A3 Straw Donors. As a further consequence of these campaign contributions, CHATWAL knowingly and willfully made, and caused to be made, contributions of money to Candidate A, aggregating $25,000 and more in a calendar year, in the names of the Group A3 Straw Donors.

ii. CHATWAL's Reimbursement Of The CI

18. In or about September 2008, the defendant SANT SINGH CHATWAL reimbursed the CI in the amount of $50,000 for the campaign contributions to Candidate A by the Group A1 Straw Donors and the Group A3 Straw Donors that had been

reimbursed by the CI through John Doe #2, as described above.

Specifically, CHATWAL reduced by $50,000 the amount of interest

the CI owed to CHATWAL on a $2.5 million loan that CHATWAL had

previously made to the CI.  On or about April 22, 2010, after

the CI began cooperating with the government, CHATWAL further

reimbursed the CI for contributions the Group A1 Straw Donors

and the Group A3 Straw Donors made to Candidate A, which

contributions the CI had caused to be reimbursed through John

Doe #2.  Again, CHATWAL reduced by $50,000 the amount of

interest that the CI owed on his loan from CHATWAL.

### iii. The Campaign Contributions To Candidate B

19.   In or about the fall of 2010, the defendant

SANT SINGH CHATWAL and the CI raised campaign contributions for

Candidate B in order to induce Candidate B, who was already a

federal elected official, to use his/her influence as a federal

elected official to intervene with a federal regulatory agency

on behalf of the CI's business, which had received an adverse

ruling from that federal regulatory agency.  CHATWAL told the CI

that the CI should raise campaign contributions from donors to

Candidate B (the "Group B Straw Donors").

20.   On or about September 16, 2010, in a

recorded conversation, the defendant SANT SINGH CHATWAL and the

CI discussed the need to reimburse the Group B Straw Donors in

order to obtain the contributions for Candidate B.  In pertinent part the CI and CHATWAL stated:

> CI:       When you give the people the money then
>           only they are going to make a check.
>
> CHATWAL:  There is no other way.  This is it. Then you-
>
> .          .          .
>
> CI:       Sir in the week- weekend I have to do it, you
>           know.  All check-form will have to be filled
>           out, check will have to be taken, money will
>           have to be given to people.
>
> CHATWAL:  Yes.

21.  Consistent with this September 16, 2010 conversation with the defendant SANT SINGH CHATWAL, on or about September 18, 2010, in Nassau County, New York, the CI gave approximately $20,000 in cash to John Doe #2 so John Doe #2 could reimburse the Group B Straw Donors for their campaign contributions to Candidate B.  John Doe #2 obtained campaign contributions and Donor Forms from the Group B Straw Donors. Reimbursing the Group B Straw Donors using the funds the CI provided, John Doe #2 collected from the Group B Straw Donors three checks and one credit card payment in the amount of $4,800 per Straw Donor, totaling $19,200, along with Donor Forms.  On or about September 19, 2010, in Nassau County, New York, John Doe #2 gave these campaign contributions and Donor Forms to the CI.

22.  On or about October 2, 2010, during a
meeting that the defendant SANT SINGH CHATWAL arranged and
attended, the CI gave the Group B Straw Donors' contributions
and Donor Forms to Candidate B.  As a result, CHATWAL caused
Candidate B to submit FEC Reports that falsely reported the
sources and amounts of contributions to Candidate B by the Group
B Straw Donors.

23.  On or about October 28, 2010, CHATWAL
underscored the importance of political campaign contributions,
stating in a recorded conversation with the CI about
Candidate B:

> CHATWAL:  Without that nobody will even talk to you.
> When they are in need of money [unintelligible]
> the money you give then they are always for you.
> That's the only way to buy them, get into the
> system. [unintelligible]. What, what else is
> there? That's the only thing.

### D. John Doe #1's Role In CHATWAL's Scheme

#### i.  The Campaign Contributions To Candidate C

24.  In or about April 2010, the defendant SANT
SINGH CHATWAL and the CHATWAL Associates recruited John Doe #1
to obtain campaign contributions for Candidate C from Straw
Donors (the "Group C Straw Donors"). As an inducement for the
Group C Straw Donors to make campaign contributions to
Candidate C, John Doe #1, CHATWAL and the CHATWAL Associates
agreed to reimburse the Group C Straw Donors for their

12

contributions. John Doe #1 obtained contributions from the Group
C Straw Donors and typically reimbursed the Group C Straw Donors
with cash for their contributions.

> ii.   CHATWAL's Reimbursement Of
> John Doe #1

25.   On or about June 13, 2011, from his office
in Queens, New York, John Doe #1 submitted an invoice (the "June
2011 Invoice") in the amount $104,745 to Northquay Properties,
LLC ("Northquay"), a company controlled by the defendant SANT
SINGH CHATWAL, which invoice was purportedly for work that John
Doe #1's company performed for Northquay.  John Doe #1 created
the June 2011 Invoice at the direction of one of the CHATWAL
Associates.  In fact, approximately $69,000 of the June 2011
Invoice was a disguised bill to CHATWAL for reimbursement of
contributions that John Doe #1 had raised from the Group C Straw
Donors and for which John Doe #1 had already reimbursed the
Group C Straw Donors.  The remainder of the June 2011 Invoice
was for work that John Doe #1's company had performed at Old
Brookville.  Before John Doe #1 received any payment for the
June 2011 Invoice, one of the CHATWAL Associates directed John
Doe #1 to issue a new invoice that incorporated an additional
bill for reimbursement of $25,000 in campaign contributions that
John Doe #1 had obtained, at the direction of the CHATWAL
Associates, from Straw Donors for a candidate for local office,

an individual whose identity is known to the United States
Attorney.  On or about July 26, 2011, from his office in Queens,
New York, John Doe #1 submitted a new invoice to Northquay (the
"July 2011 Invoice") in the amount of $129,745.  On or about
August 14, 2011, Northquay paid $129,745 to John Doe #1's
company for the July 2011 Invoice.

26.  As a result of this arrangement, the
defendant SANT SINGH CHATWAL caused Candidate C to submit FEC
Reports that falsely reported the sources and amounts of
contributions to Candidate C by the Group C Straw Donors.  As a
further consequence of these campaign contributions, CHATWAL
knowingly and willfully made, and caused to be made,
contributions of money to Candidate C aggregating $25,000 and
more in a calendar year, in the names of the Group C Straw
Donors.

IV.   Obstruction Of Justice

A.   The Grand Jury Investigation

27.  In or about and between January 2010 and the
present, a federal Grand Jury in the Eastern District of New
York had conducted an investigation (the "Grand Jury
Investigation") of the defendant SANT SINGH CHATWAL, and others,
for violations of the Election Act and tax offenses under Title
26 of the United States Code (collectively, the "Federal
Offenses"). In furtherance of the Grand Jury Investigation,

14

agents from the Federal Bureau of Investigation ("FBI") and the
Internal Revenue Service ("IRS") (collectively, the "Law
Enforcement Officers") conducted interviews of, and issued Grand
Jury subpoenas to, numerous individuals.

### B. CHATWAL's Tampering With John Doe #1

#### i. The June 30, 2012 Tampering

28. During a recorded conversation that took
place at Old Brookville on June 30, 2012, John Doe #1, while
acting at the direction of the Law Enforcement Officers, told
the defendant SANT SINGH CHATWAL that two Law Enforcement
Officers had left their business cards at John Doe #1's
residence and sought to interview John Doe #1. CHATWAL
instructed John Doe #1 about false answers John Doe #1 should
give to the Law Enforcement Officers' questions regarding
reimbursements for campaign contributions. Nonetheless, as an
initial matter, CHATWAL instructed John Doe #1 to refer Law
Enforcement Officers to a lawyer CHATWAL would provide, if
either John Doe #1 or his family members were approached by Law
Enforcement Officers. In any event, John Doe #1 told CHATWAL
that John Doe #1 was not going to tell the Law Enforcement
Officers that CHATWAL gave John Doe #1 money to reimburse Straw
Donors, and CHATWAL agreed:

CHATWAL:  .   .   .  Best thing.  The answer over there
          is.  You tell them yes. Never tell any lies.

JD#1:  No, I would not lie either.

CHATWAL:  No, No, No always the truth.  "Yes, I deal with
          Chatwal."

JD#1:  I did it with you

CHATWAL:  Yeah. "No, I deal with Chatwal."

JD#1:  Okay.

CHATWAL:  Me and [a CHATWAL Associate]. Nobody else.

JD#1:  So I'm going to tell him. I did it with you to
       your knowledge. But I'm not going to tell him you
       gave me the money, right?

CHATWAL:  Never, never.

### ii.   The July 2, 2012 Tampering

29.   During a July 2, 2012 recorded telephone

conversation, John Doe #1 asked the defendant SANT SINGH CHATWAL

for advice about how John Doe #1 should respond to Law

Enforcement Officers who wanted to interview John Doe #1.

CHATWAL told John Doe #1 not to tell the truth:

JD#1:  Okay, so I, umm, I don't know what to do. Should
       I tell them the truth the next time . . .

CHATWAL:  No, no, no, no, listen.  No. . . .

### iii.   The July 3, 2012 Tampering

30.   During a July 3, 2012 recorded conversation,

in Nassau County, New York, the defendant SANT SINGH CHATWAL

told John Doe #1 that CHATWAL would pay for John Doe #1's legal

16

fees in connection with the investigation conducted by the Law
Enforcement Officers. CHATWAL offered to conceal his payment of
John Doe #1's legal fees by making it part of a payment to John
Doe #1 for work John Doe #1's company had performed.  While
discussing the Law Enforcement Officers' request for copies of
campaign checks in John Doe #1's possession, CHATWAL told John
Doe #1 not to worry about Law Enforcement Officers' obtaining
these checks, because the only campaign checks that John Doe #1
had were John Doe #1 and his spouse's own campaign contribution
checks, and such checks would not tie John Doe #1 and his spouse
to any Straw Donors:

> JD#1:    You have copies of all the checks I gave you.  My
>          lawyer asked me "do you have copy all the
>          checks."  Do you have my checks for the campaign?
>
> CHATWAL: No, no, no. Let me explain. Very important.  As
>          far you're concerned, you have all the checks for
>          yourself and your wife.  Nobody else.
>          [unintelligible] all the checks.  Let me tell
>          you, it's very important, checks, when people
>          fill out the form, they sign the form. Okay? The
>          checks go straight to . . . You're not
>          responsible for anybody else's check.  If you
>          don't have the checks, they have nothing. It's
>          very simple. . . .

    31.  Also during their July 3, 2012 conversation,
the defendant SANT SINGH CHATWAL told John Doe #1, in sum and
substance, to falsely tell the Law Enforcement Officers that

17

CHATWAL never reimbursed John Doe #1 for the campaign contributions John Doe #1 and his wife had made.   In pertinent part, CHATWAL stated:

> CHATWAL:  The other thing they ask you, when you give your check or your wife's check, "Did Chatwal give you the money back?" "Never."
>
> JD#1:  I'm lying now. [Laughing.]

CHATWAL also coached John Doe #1 to falsely claim that John Doe #1 liked the candidates to whom he had given campaign contributions at CHATWAL's direction, even after John Doe #1 reminded CHATWAL that showing his "genuine" support for the candidates and denying the reimbursement itself would be "lying."   Further, during this July 3, 2012 conversation, CHATWAL and John Doe #1 discussed Straw Donors who were recruited and reimbursed with "cash":

> CHATWAL:  . . . [D]id you give them some money back or no?
>
> JD#1:  Of course. I give all the money you gave me. I gave it to them.
>
> CHATWAL:  No but, how did you give it to them?
>
> JD#1:  I gave them cash.
>
> CHATWAL:  Cash?
>
> JD#1:  Yes, cash, and I gave them, I think, couple of checks.
>
> CHATWAL:  OK, but cash has no proof.

COUNT ONE
(Conspiracy To Violate The Election Act)

32. The allegations contained in paragraphs 1 through 31 are realleged and incorporated as if fully set forth in this paragraph.

33. In or about and between March 2007 and August 2011, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SANT SINGH CHATWAL, together with others, did knowingly and willfully conspire to make, and cause to be made, contributions of money, aggregating $25,000 and more in a calendar year, in the names of others, to the Candidates, all of whom were candidates for federal office, contrary to Title 2, United States Code, Sections 441f and 437g(d)(1)(A)(i).

34. In furtherance of this conspiracy and to effect its objectives, within the Eastern District of New York and elsewhere, the defendant SANT SINGH CHATWAL, together with his co-conspirators, did commit, and did cause to commit, among others, the following:

OVERT ACTS

a. In or about September 2008, in New York, New York, CHATWAL, together with others, reimbursed the CI for campaign contributions from the Group A1 Straw Donors and the Group A3 Straw Donors that the CI had previously obtained by

19

reducing by $50,000 the amount of interest that the CI owed on a $2.5 million loan CHATWAL previously made to the CI.

b.   On or about October 2, 2010, in New York, New York, CHATWAL and the CI delivered to Candidate B campaign contributions from Straw Donors totaling approximately $19,200.

c.   In or about July 2011, from his office in Queens, New York, John Doe #1 submitted the July Invoice to Northquay, a company controlled by CHATWAL, in the amount of $129,745, which invoice included approximately $69,000 in reimbursement for campaign contributions that John Doe #1 had raised for Candidate C by reimbursing the Group C Straw Donors.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
### (Witness Tampering)

35.   The allegations contained in paragraphs 1 through 31 are realleged and incorporated as if fully set forth in this paragraph.

36.   In or about and between June 2012 and July 2012, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant SANT SINGH CHATWAL, together with others, did knowingly and corruptly persuade another person, to wit: John Doe #1, with intent to

20

hinder, delay or prevent the communication to one or more law enforcement officers of the United States: to wit, the Law Enforcement Officers, of information relating to the commission, or possible commission, of one or more federal offenses, to wit: the Federal Offenses.

(Title 18, United States Code, Sections 1512(b)(3) and 3551 et seq.)

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

JACK SMITH
CHIEF
U.S. DEPARTMENT OF JUSTICE
PUBLIC INTEGRITY SECTION

21