# MORVILLO ABRAMOWITZ GRAND IASON & ANELLO P. C.

ELKAN ABRAMOWITZ
RICHARD F. ALBERT
ROBERT J. ANELLO***
LAWRENCE S. BADER
BENJAMIN S. FISCHER
CATHERINE M. FOTI
PAUL R. GRAND
LAWRENCE IASON
STEPHEN M. JURIS
JUDITH L. MOGUL
JODI MISHER PEIKIN
ROBERT M. RADICK***
JONATHAN S. SACK**
EDWARD M. SPIRO
JEREMY H. TEMKIN
RICHARD D. WEINBERG

565 FIFTH AVENUE
NEW YORK, NEW YORK 10017
(212) 856-9600
FAX: (212) 856-9494

www.maglaw.com

WRITER'S CONTACT INFORMATION

(212) 880-9410
jsack@maglaw.com

COUNSEL
RACHEL Y. HEMANI
JASMINE JUTEAU
BARBARA MOSES*

SENIOR ATTORNEY
THOMAS M. KEANE

ROBERT G. MORVILLO
1938-2011
MICHAEL C. SILBERBERG
1940-2002
JOHN J. TIGUE, JR.
1939-2009

*ALSO ADMITTED IN CALIFORNIA AND
WASHINGTON, D.C.
**ALSO ADMITTED IN CONNECTICUT
***ALSO ADMITTED IN WASHINGTON, D.C.

October 28, 2014

**BY ECF AND FEDERAL EXPRESS**

The Honorable I. Leo Glasser
Senior United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Sant Singh Chatwal, 14 CR 143 (ILG)

Dear Judge Glasser:

      My firm represents the defendant, Sant Chatwal, in the above-referenced case. Sentencing is currently scheduled for November 19, 2014.

      In connection with sentencing, we have enclosed a copy of our sentencing memorandum submitted on behalf of Mr. Chatwal (the "Memorandum"). We have redacted from the publicly filed version of the Memorandum personal medical information concerning members of Mr. Chatwal's immediate family. Unredacted versions of the Memorandum have been provided to AUSA Martin Coffey and the Probation Department. We respectfully request that the unredacted Memorandum we have provided to Your Honor not be placed in the public record.

The Honorable I. Leo Glasser
October 28, 2014
Page 2

If Your Honor has any questions or concerns regarding our submission, we would be glad to address them.

Respectfully Submitted,

Jonathan S. Sack

Enclosure

cc:     Assistant U.S. Attorney Martin Coffey (By Email and Federal Express)
        Ms. Michelle Espinoza, U.S. Probation Department (By Email and Federal Express)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

───────────────────────────────

UNITED STATES OF AMERICA

v.

14 CR 143 (ILG)

SANT SINGH CHATWAL,

Defendant.

───────────────────────────────

**SENTENCING MEMORANDUM ON BEHALF OF
SANT SINGH CHATWAL**

*Morvillo Abramowitz Grand Iason
& Anello P.C.*
Jonathan S. Sack
Judith L. Mogul
Miriam L. Glaser
565 Fifth Avenue
New York, NY 10017
Phone: 212-856-9600
jsack@maglaw.com

*Attorneys for Defendant Sant Singh Chatwal*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... iv

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ....................................................................................................... 4

I.      Personal History ................................................................................................................. 4

      A.      Sant Chatwal's Family History and Values ........................................................ 4

      B.      Work at the Canteen .............................................................................................. 5

      C.      Sant's Education and Early Career ...................................................................... 6

      D.      Sant's Life and Service in Ethiopia ..................................................................... 7

      E.      Flight from Ethiopia ............................................................................................. 9

II.     The Chatwals' Family Challenges ................................................................................... 9

      A.      Vivek Chatwal ..................................................................................................... 10

      B.      Vikram Chatwal .................................................................................................. 12

      C.      Sant's Presence in the Home Is Critical ............................................................ 14

III.    Professional Life ............................................................................................................. 15

IV.    Acts of Kindness and Humanitarianism ....................................................................... 18

      A.      Support of Family ............................................................................................... 19

      B.      Generosity and Assistance to Employees .......................................................... 21

      C.      Generosity toward Others ................................................................................... 24

      D.      Support of Human Dignity and Self-Reliance .................................................. 26

      E.      Support of Educational, Religious and Humanitarian Organizations .................. 28

            1.      Education ................................................................................................. 28

            2.      Religious and Cultural Organizations ...................................................... 31

                  a.      Sikh Gurdwaras and Spiritual Organizations ............................... 32

                  b.      Cultural Institutions ...................................................................... 35

3. Humanitarian Initiatives ....................................................................... 37

    a. Support for Medical Programs Around the Globe ...................... 37

    b. Support for Disaster Relief ...................................................... 39

F. Civic Engagement and Advocacy .................................................................. 42

CALCULATING THE ADVISORY SENTENCING GUIDELINES ........................................ 45

I. The Court Should Not Apply the Offense Characteristic-Specific Enhancements in U.S.S.G. § 2C1.8(b) Because the Guideline is at Odds with the Governing Statute and Is Therefore Invalid ................................................................................................ 46

A. The Relevant Statute and Guideline ............................................................. 47

1. The Sentencing Commission Exceeded its Authority in Adopting U.S.S.G. § 2C1.8(b) ..................................................................................... 48

2. The Impact of Invalidating U.S.S.G. § 2C1.8(b) .................................... 53

B. Specific Guidelines Issues ............................................................................ 53

1. Specific, Identifiable Non-Monetary Federal Benefit ............................ 54

2. Obstruction of Justice ............................................................................ 55

C. Proposed Alternative Advisory Guidelines Calculation ................................. 56

A NON-CUSTODIAL SENTENCE IS JUST AND APPROPRIATE ........................................ 57

I. A Sentence Substantially Below the Advisory Guidelines is Appropriate and Sufficient to Achieve the Goals of Sentencing Set Forth in 18 U.S.C. § 3553(a) ................................ 57

A. The History and Characteristics of the Defendant ......................................... 58

1. Extraordinary Family Circumstances ...................................................... 59

2. Generosity and Community Service ........................................................ 61

B. The Nature and Circumstances of the Offense ............................................... 63

C. The Advisory Guidelines Calculated in the PSR Overstate the Seriousness of the Offense ........................................................................................................ 67

1. The Disproportionate Effect of the Fraud Loss Table on the Advisory Guidelines ............................................................................................. 68

    a. The Loss Table is Flawed ......................................................... 68

    b. The Loss Table Is an Unreliable Measure of Campaign Finance Offenses ................................................................................... 70

2.      The Cumulative Effect of Substantially Overlapping Offense
        Characteristic Enhancements ................................................. 72

D.      A Substantial Variance is Needed to Avoid Unwarranted Sentence Disparities .. 73

        1.      Courts Routinely Decline to Impose Guidelines Sentences on Campaign
                Finance Defendants .................................................. 73

        2.      The Type of Illegal Campaign Contributions at Issue Here Are Often
                Resolved Civilly .................................................... 76

E.      The Need for Deterrence and Protection of the Public from Future Crimes ........ 77

        1.      Specific Deterrence ................................................. 77

        2.      General deterrence ................................................. 78

II.     A Sentence of Probation, with a Substantial Community Service Requirement, is
        Sufficient to Achieve the Goals of Sentencing ................................ 80

A.      Courts Recognize that Probation is Punitive in Nature ....................... 81

B.      Friends of Island Academy .................................................. 82

C.      The Proposed Job-Training Program .......................................... 84

CONCLUSION .......................................................................... 87

# **TABLE OF AUTHORITIES**

**Cases**                                                                                  **Page(s)**

*Buckley v. Valeo*, 424 U.S. 1 (1976)………………………………………………………….63

*Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010) ..................................... 63, 78

*Davis v. Federal Election Comm'n*, 554 U.S. 724 (2008)..................................................... 63, 78

*Federal Election Comm'n v. Wisc. Right to Life*, 551 U.S. 449 (2007) ..................................... 78

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................................. 81

*Kimbrough v. United States*, 552 U.S. 85 (2007) ........................................................... 57

*Lee v. Bankers Trust Co.*, 166 F.3d 540 (2d Cir. 1999)...................................................... 48

*McCutcheon v. Federal Election Comm'n*, 134 S. Ct. 1434 (2014)..................................... 63, 78

*Nelson v. United States*, 555 U.S. 350 (2009) ............................................................. 57

*United States v. Acevedo-Vila*, 08-cr-36 (D.P.R. 2008)................................................... 74

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) .......................................... 58, 69

*United States v. Autery*, 555 F.3d 864 (9th Cir. 2009)...................................................... 82

*United States v. Booker*, 543 U.S. 220 (2005)…………………………………………….....59, 62, 72

*United States v. Brady*, 02 Cr. 1043 (JG), 2004 WL 86414,
   (E.D.N.Y. Jan. 20, 2004) ............................................................................................... 81

*United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995) ............................................. 67

*United States v. Butler*, 207 F.3d 839 (6th Cir. 2000) ................................................ 51

*United States v. Canova*, 412 F.3d 331 (2d Cir. 2005)................................................. 62

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008)........................................... 45, 57

*United States v. Chettiar*, 501 F.3d 854 (8th Cir. 2007)............................................. 82

*United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013) ............................................. 68

**Cases**                                                                  **Page(s)**

*United States v. Coughlin*, No. 06-20005, 2008 WL 313099
  (W.D. Ark. Feb. 1, 2008) ............................................................... 81

*United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005) ............................... 45

*United States v. Cuza*, 05-cr-00344-RGK (C.D. Cal. 2005) ...................... 74

*United States v. Danielczyk*, 11-cr-85 (E.D. Va. 2013) ........................... 66

*United States v. Diaz*, 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013) ............ 68

*United States v. DiCristina*, 726 F.3d 92 (2d Cir. 2013) ......................... 48

*United States v. D'Souza*, 14-cr-34(RMB) (S.D.N.Y. 2014) .................. 75-76

*United States v. Duhon*, 541 F.3d 391 (5th Cir. 2008) ............................ 82

*United States v. Ericson* 07-cr-00238 (E.D. Wis.) ................................ 74-75

*United States v. Farha*, 11-cr-115(JSM) (M.D. Fla. 2014) ...................... 70

*United States v. Feldman*, 08-cr-36 (D.P.R. 2008) ................................ 74

*United States v. Feldman*, 09-cr-75 (E.D. Pa. 2009) ............................. 74

*United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000) ........................ 51

*United States v. Fireman*, 96-cr-10187 (D. Mass. 1996) ......................... 74

*United States v. Florez*, 447 F.3d 145 (2d Cir. 2006) ............................ 73

*United States v. Gaind,* 829 F. Supp. 669 (S.D.N.Y. 1993) ..................... 80

*United States v. Greene*, 249 F. Supp. 2d 262 (S.D.N.Y. 2003) ............... 62

*United States v. Gupta,* 904 F. Supp. 2d 349 (S.D.N.Y. 2012) ............. 68-69

*United States v. Handy*, 570 F. Supp. 2d 437 (E.D.N.Y. 2010) ............... 52

*United States v. Howe*, 543 F.3d 128 (3d Cir. 2008) ............................. 62

*United States v. Huerta*, 371 F.3d 88 (2d Cir. 2004) ............................. 61

*United States v. Huntley*, 961 F. Supp. 2d 409 (E.D.N.Y. 2013) ............. 77

| Cases | Page(s) |
|---|---|

*United States v. Husein*, 478 F.3d 318 (6th Cir. 2007) .................................................. 59

*United States v. Infisio,* 08-cr-44 (E.D. Wis.)......................................................... 74-75

*United States v. Jackson*, 346 F.3d 22 (2d Cir. 2003) .............................................. 72-73

*United States v. Jinnah*, 06-cr-383 (C.D. Cal. 2009) ................................................... 75

*United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992) ............................................... 59

*United States v. Jones*, 531 F.3d 163 (2d Cir. 2008) ............................................. 45, 57

*United States v. Knights*, 534 U.S. 112 (2001) ....................................................... 81-82

*United States v. Kravchuck*, 335 F.3d 1147 (10th Cir. 2003) ....................................... 52

*United States v. Kumar*, 04-cr-846 (E.D.N.Y. 2006) ................................................... 56

*United States v. LaBonte*, 520 U.S. 751 (1999) .......................................2, 46, 48-49, 51-53

*United States v. Lane*, No. 03-cr-102 (D.D.C. 2003)..................................................... 76

*United States v. Lauersen*, 348 F.3d 329 (2d Cir. 2003) ........................................... 72-73

*United States v. Magliocchetti*, 10-cr-286 (E.D. Va. 2011)........................................... 66

*United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006).................................... 58

*United States v. Menyweather*, 431 F.3d 692 (9th Cir. 2005) ...................................... 59

*United States v. Mobley*, 12-cr-00150 (M.D. Fl. 2013) ................................................ 74

*United States v. Murphy*, 254 F.3d 511 (4th Cir. 2001) ..............................................52

*United States v. Ovid*, No. 09-CR-216, 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010)................. 69

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008)..................................... 69

*United States v. Peterson,* 11-cr-665 (RPP) (S.D.N.Y. 2012)...................................... 62

*United States v. Ramsey*, 237 F.3d 853 (7th Cir. 2011)..............................................52

*United States v. Richards*, 04-cr-846 (E.D.N.Y. 2006) ............................................... 56

**Cases**                                                     **Page(s)**

*United States v. Roberts*, 03-cr-71 (D.D.C. 2003)……………………………………………………75

*United States v. Schwartz*, 05-cr-00157-RMU (D.D.C. 2005) .................................................. 74

*United States v. Shuster*, 331 F.3d 294 (2d Cir. 2003) ............................................................. 62

*United States v. Spears*, 03-cr-96 (D.D.C. 2003)..................................................................... 75

*United States v. Stipe*, 03-cr-00128 (D.D.C. 2003) ................................................................. 75

*United States v. Thurston*, 544 F.3d 22 (1st Cir. 2008) ........................................................... 62

*United States v. Troha*, 07-cr-00050 (E.D. Wis.)…………………………………………………74-75

*United States v. Turkcan*, 08-cr-428(DJS) (E.D. Mo. 2009) ................................................... 69

*United States v. Warner*, 13-CR-731 (N.D. Ill. 2014) …………………………………………81

*United States v. Whittemore*, 12-cr-58 (D. Nev. 2014)............................................................. 66

*United States v. Vigil*, 998 F. Supp. 2d 1121 (D.N.M. 2014) ................................................... 80

**Federal Sentencing Guidelines**

U.S.S.G. § 2A2.1 ..…………………………………………………………………………..72
U.S.S.G. § 2A3.2 ...................................................................................................................... 72
U.S.S.G. § 2A3.4 ...................................................................................................................... 72
U.S.S.G. § 2B1.1...................................................................................................................67-72
U.S.S.G. § 2C1.8...............................................................................................................*passim*
U.S.S.G. § 2F1.1…………………………………………………………………………………70
U.S.S.G. § 2G1.3 ...................................................................................................................... 72
U.S.S.G. § 2G2.2 ...................................................................................................................... 72
U.S.S.G. § 2H2.1 ...................................................................................................................... 72
U.S.S.G. § 2H4.1 ...................................................................................................................... 72
U.S.S.G. § 2J1.3 ....................................................................................................................... 72
U.S.S.G. § 2J1.9 ....................................................................................................................... 72
U.S.S.G. § 2K1.4 ...................................................................................................................... 72
U.S.S.G. § 2K2.5 ...................................................................................................................... 72
U.S.S.G. § 2M3.3 ..................................................................................................................... 72
U.S.S.G. § 2M3.9 ..................................................................................................................... 72

**Federal Sentencing Guidelines**                               **Page(s)**

U.S.S.G. § 2M5.3 ................................................................ 72
U.S.S.G. § 2N1.1 ................................................................. 72
U.S.S.G. § 2Q1.1 ................................................................. 72
U.S.S.G. § 2Q1.4 ................................................................. 72
U.S.S.G. § 2T4.1 ................................................................. 72
U.S.S.G. § 2X5.1 ................................................................. 47
U.S.S.G. § 3B1.1 ............................................................ 46, 56
U.S.S.G. § 3C1.1 ......................................................... 46, 54-55
U.S.S.G. § 3D1.3 ................................................................. 56
U.S.S.G. § 3E1.1 ................................................................. 46
U.S.S.G. § 5B1.3 ................................................................. 86
U.S.S.G. § 5C1.1 ................................................................. 82
U.S.S.G. § 5D1.3 ................................................................. 86

**Statues and Legislative Material**

18 U.S.C. § 3553 ........................................................... *passim*

Bipartisan Campaign Reform Act of 2002 (McCain-Feingold Act),
    Pub. L. 107–155, 116 Stat. 81 ........................................ *passim*

*Current Issues in Campaign Finance Law Enforcement: Hearing Before*
    *the Subcomm. on Crime and Terrorism of the Sen. Comm.*
    *on the Judiciary*, 113th Cong. 3 (2013) ................................. 79

Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745 (2002) ............. 50

147 Cong. Rec. S3127 (daily ed. Mar. 29, 2001) ........................... 48

**Publications**

Craig A. Donsanto & Nancy L. Simmons, PUB. INTEGRITY
    SECTION, FEDERAL PROSECUTION OF ELECTION OFFENSES
    215-16 (7th ed. May 2007) ........................................ 47, 70-71

Kenneth P. Vogel, *Big Money* 16 (PublicAffairs ed. 2014) .................. 79

Frank Bowman, *Sacrificial Felon: Life Sentences For Marquee*
    *White-Collar Criminals Don't Make Sense*, *American Lawyer*, Jan. 2007 .......... 79

**Publications** **Page(s)**

Hon. Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should Be*
  *Scrapped*, 26 Fed. Sent'g Reptr. 1 (2013) ............................................................ 69

Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in*
 *in the Federal Courts* (The University of Chicago Press ed. October 1998) ........................... 69

American Bar Association,
  *A Report on Behalf of the American Bar Association Criminal Justice Section*
  *Task Force on the Reform of Federal Sentencing for Economic Crimes, Second*
  *Draft* (May 15, 2014) ..................................................................................... 69-70

Office of Probation and Pretrial Services, Administrative Office of the U.S. Courts,
  *Court & Community: An Information Series About U.S. Probation*
  *& Pretrial Services: Community Service* (2007)......................................................82

U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History*
  *Computation of the Federal Sentencing Guidelines* (May 2004) ..................................77

## PRELIMINARY STATEMENT

This memorandum is submitted on behalf of Sant Singh Chatwal, who is scheduled to be sentenced by Your Honor on November 19, 2014. He pleaded guilty in April 2014 to an information that charged him with conspiring to violate federal election law and witness tampering.

Sant Chatwal is nearly 70 years old and has led a life of hard work, great achievement and extraordinary service to others, as reflected in the over 260 letters provided to the Court. A just sentence under 18 U.S.C. § 3553(a), one that takes into account not only Sant Chatwal's offenses but also his family circumstances and lifelong generosity, should be substantially below the advisory guidelines calculated by the Probation Department, for three principal reasons.

First, at the same time as he has pursued success in business, Sant has devoted himself to the well-being of others. This dedication and service began when Sant was a boy in India, where he was encouraged to share his modest portion with the needy; took shape in young adulthood in Ethiopia, where he founded a school that provided an education to troubled and poor children; and continued to grow after he became a successful entrepreneur in the United States. As recounted in hundreds of letters, Sant has given enormous amounts of time and energy to help individuals near and far lead lives of dignity and self-reliance.

Second, Sant is the father of two adult sons with disabilities who depend on him to an exceptional degree. His older son has had an overwhelming dependency on drugs and alcohol. His younger son suffers from ███████████████████. As their treating physicians have advised the Court, Sant's love, devotion and active, informed participation in their care have been essential, and the withdrawal of that support, even for a brief time, would be devastating, leading possibly to irreparable setbacks for each of them.

Third, without in any way minimizing the offense conduct, we submit that the advisory guidelines range calculated by the Probation Department should not be given substantial weight in the Court's determination of a just sentence. As an initial matter, the sentencing range is largely driven by the guidelines provision applicable to the campaign finance offense (U.S.S.G. § 2C1.8), but that provision, adopted as a guidelines amendment by the Sentencing Commission in 2003, is fundamentally at odds with the law that authorized the guidelines' amendment, the McCain-Feingold Act of 2002, and is thus invalid under *United States v. LaBonte*, 520 U.S. 751 (1999). Consequently, the appropriate guidelines computation is substantially lower than the advisory range indicated in the Presentence Investigation Report ("PSR").

Beyond the issue of statutory authorization, the guidelines range overstates the nature and seriousness of Sant's wrongdoing because it turns, to a large extent, on application of the fraud loss table to the present campaign finance offense. Application of the fraud loss table distorts the guidelines insofar as the table drives sentences higher without a well-grounded relationship to the underlying conduct and, more specifically, treats a dollar of campaign contributions as the equivalent of a dollar of fraud loss, even though the two types of harms are very different. The distorting effect of the guidelines is exacerbated further in this case because of overlapping, cumulative guidelines adjustments that turn on essentially the same facts.

Finally, the guidelines are particularly unsuited to a case like this one in which the campaign contributions at issue were not driven by a desire for financial or other personal gain. This case stands in contrast to other criminal campaign finance cases in which the individuals who solicited straw donations were seeking to promote a lobbying career or projects in which they had a financial interest.

We urge the Court to weigh carefully Sant's age and lifetime of contribution to others, the impact imprisonment would have on his family and community and the additional considerations set forth below, in deciding the minimum sentence that is "sufficient, but not greater than necessary" to fulfill the requirements of 18 U.S.C. § 3553(a). We respectfully request that the Court impose a sentence of probation with substantial community service, so that Sant can make amends by continuing to serve others and take care of his sons.

Recognizing the substantial variance we are seeking from the advisory guideline range computed in the PSR, we have sought out a community service program which, without diminishing the punitive nature of probation, would permit Sant to use his experience in education and training, and contribute to a grossly underserved segment of the population. That program, which has already begun successfully, is providing unprecedented opportunities to young men and women released from Rikers Island to become productive members of society, as explained in detail by Ms. Christine Pahigian in a letter submitted with this memorandum. We mean no presumption by this suggestion to the Court, but respectfully urge that such a program, consistent with Sant's experience as teacher and leader, can aid the Court in fashioning a just sentence.

In sum, Sant comes before this Court humbled—filled with remorse and shame for what he has done, knowing that he broke the law and, as a consequence, disappointed the many people who depend on and look up to him. On his behalf we ask Your Honor to recognize that he is a good man, albeit one who erred, whose life has been distinguished by a devotion to this country—his adopted home—and a commitment to protecting and uplifting others. He makes no excuses for his conduct, but, as we explain below, we ask the Court to impose a sentence that recognizes the lifetime of good he has done, and will continue to do, if given the opportunity.

<u>**FACTUAL BACKGROUND**</u>

**I.      Personal History**

   **A.      Sant Chatwal's Family History and Values**

Sant Singh Chatwal was born into a middle-class family in Rahotra, a small town in the district of Campbellpore, then part of Greater India, shortly before the Partition of India.  He was the fourth of what would become a family of eight children.  His father was a merchant, and his mother stayed at home raising the children.

His early childhood was marred by sudden disruption and upheaval.  After India was granted independence from the British Empire in 1947, the Partition of India created the new nation of Pakistan, and left Sant's family on the Pakistani side of the border.  Along with millions of other families caught in the religious strife of the period, the Chatwals were forced to flee, abandoning their home and taking only what they could carry.  Sant was only a toddler—at the time, the youngest of the Chatwal family.

After spending six months in a refugee camp, the family was resettled in a three-bedroom home in Faridkot, a town in the Punjab region in the northwestern part of India.  Over the next several years the family grew to include Sant, his seven siblings, his parents and his grandmother, continuing to share the same three bedrooms.  The home did not have heat or running water; sometimes, during the summer months, members of the family slept on the roof or in a courtyard.

As Sant grew, he was immersed in the Sikh values of his parents and grandparents.  His father rose each morning at 4:00 a.m., bathed, prayed at the local temple and then returned home to have breakfast with the family before going to work.  Sant and his siblings learned Sikh prayers and meditation from an early age and were taught to pray before eating breakfast.  Their father modeled for his children the Sikh values of laboring without complaint and giving to

others, both in monetary terms and in personal service to those in need. Sant has lived by these religious principles his entire life.

Even though the Chatwal family had itself lost nearly everything in the turmoil of Partition, Sant's father, Makhan Singh Chatwal, taught his young children to give food to those less fortunate. Indeed, the children often gave food to the poor before they ate their own breakfasts. On some occasions, the family went together to a local railway station to take food to the blind and disabled people who begged in the streets. Sant was raised to see these acts of charity not as a personal deprivation but as a privilege and opportunity, and the value of improving himself by improving the lives of others was permanently ingrained in Sant and his siblings as part of their identity. As Sant's younger brother, Iqbal Chatwal, observes, Sant has the "exact same qualities" as their father—Sant "is always willing to help." (L 13.)[1]

## B.    Work at the Canteen

Sant got a humble start in the food and beverage industry working as a teenager in his father's small tea stall, or canteen, which was situated inside the local high school that Sant attended. Sant saw first-hand the demands of running a business, as the canteen, which sold basic food and had just a few tables, opened at approximately 5:30 or 6:00 a.m. and remained open until 10:00 p.m. Sant's father taught his son accounting (using beans to add up the figures) and insisted that Sant embrace the practice of *Dasvandh*, the Sikh custom of giving at least 10 percent of one's income to charity—a practice Sant continues to observe to this day.

---

[1] A Compendium of 266 letters to the Court written by friends, family, employees, members of the business community and others whose lives Sant has touched was submitted under separate cover on October 22, 2014 (hereafter, "Compendium"). References in the form "(L __.)" are to letters and page numbers in the Compendium. Additionally, photographs illustrating certain of the topics discussed in this memorandum are annexed hereto as Exhibit 3.

### C.    Sant's Education and Early Career

Education was a high priority for the Chatwal family, and Sant was dedicated to his studies.  After high school he attended Punjab University in the evenings while working at the canteen and as a tutor during the day.  For two years, he also taught English to middle-school students.  At the university he studied English, political science and history and received a Bachelor's Degree in education.

After completing his undergraduate degree, Sant began training as a pilot in the India Naval Aviation service.  After about one year, he decided to leave military service and accepted a job in Ethiopia working as a pilot for the country's commercial airline.  However, when he arrived in Ethiopia to take up the position, he learned that he would be required to cut his hair and remove his turban in order to take the job—actions that would violate fundamental tenets of his Sikh faith.[2]  Although he had no other immediate prospects, he felt compelled to turn down the job in order to stay true to his faith.  Sant relied heavily on the generosity and hospitality of the local Sikh community in Ethiopia during this time—a favor he has since returned many times over by helping fellow Sikhs assimilate to life in Canada and the United States.

Sant eventually found a position as a teacher in a local public school.  A longtime family friend who still lives in Ethiopia recalls that "Mr. Chatwal was a popular and well-respected teacher . . . and even though at that time a teacher's salary was very limited, he never hesitated to extend extra time and help to students."  (L 202.)

Sant was concerned about his parents and siblings, who were still in India, and worked hard to help support them.  (L 116.)  In addition to his new job as a teacher, Sant began to work

---

[2] The "articles of faith" worn by all devout Sikhs are *Kesh* (uncut long hair), a *Kangha* (small wooden comb), a *Kara* (steel or iron bracelet), a *Kacchera* (undergarment), and a *Kirpan* (short dagger, symbolizing a duty to defend oneself and others against persecution and oppression).  These articles of faith form the external identity of a Sikh, making a public statement of the individual's commitment to the Sikh values and way of life.

part-time at a Lebanese restaurant in order to send money back to his family.  When the owner of the restaurant became ill, he entrusted Sant with the business.  Sant ran the restaurant so successfully that the owner offered him a partnership.  Eventually Sant opened a second restaurant—this one featuring Indian cuisine—in Addis Ababa.

### D.  Sant's Life and Service in Ethiopia

In January 1971, Sant returned to India to meet Pardaman, the woman who would become his wife.  The marriage, arranged by their families according to Indian custom, was strong from the start.  In her letter to the Court, Pardaman Chatwal describes meeting Sant and his family:

> Even before he arrived, I knew that our marriage would be filled with blessings. Our families were so much alike.  I was the seventh child out of eight children in my family.  Sant was the fourth child out of eight in his.  Like my family, his family was deeply religious, devoted to God, and respectful of all people.  Every day while I was with them we all got up early to pray at a nearby temple.  Before we returned for our own breakfast, we followed my father-in-law's example and gave out breakfast to the poor people who gathered outside the temple waiting for us.  Sant and I went out together again in the evening to bring food to three blind people who waited for us near the rail station.  In exchange for food, they gave us their blessings, and only afterward did we eat ourselves.  When it was time for Sant and me to leave Faridkot, my father-in-law reminded Sant that giving to the poor is a mandate in our religion.  I think this mandate was already engraved in Sant's heart, though such words are always welcomed anyway.  (L 1.)

After the wedding, the Chatwals returned to Ethiopia.  Pardaman writes of her "surprise[] . . . to see maybe 100 people standing there waiting for the plane to land.  Sant was a very popular teacher, and his students and their families and other people he knew—from many different nationalities—had come to congratulate him and wish us well." (*Id.)*

The Chatwals started a family almost immediately, with their firstborn, Vikram, born to the new couple at the end of 1971 and their second son, Vivek, born in 1974.  Sant began to tutor adults as well as children, many of them the wives of ambassadors and other dignitaries who

wanted to learn English.  This additional work soon enabled Sant to pursue another ambition:

providing an education to children who, like him, had suffered dislocation and poverty.

In late 1972, with the limited money he had saved, Sant started the New Era Institute with

an Ethiopian partner, Belete Worku.  As Mr. Worku recounts,

> [a]t the heart of our venture was our agreement that we would offer education to both those who could afford it and those who could not.  If families were unable to pay the tuition, we offered them a waiver so their children could come to our school and study for free.  We were very proud to be able to provide this kind of assistance to perhaps 20 percent of our 800 students, about 600 of whom came during the day and 200 more who came for evening classes.  We also took in children who had been expelled from other schools around Addis Ababa, for we had high ideals, and in these children in which other administrators saw only trouble, we saw the potential for talent and creativity.  We knew we could stimulate them, and we hoped to guide and protect them too.  (L 353.)

Students at New Era thrived under Sant's guidance.  The school depended not just on

Sant's financial support, but on his presence and work with the students and their families.  As

Mr. Worku fondly remembers,

> Sant spent as much time as possible at the school, as an administrator and also teaching.  Not only did he enchant the students with his optimism and his vision, but all the parents love[d] him too.  He had a way of making everyone feel more capable, more likely to experience la joie de vivre in their lives, no matter how much of a contradiction it seemed to their present circumstances.  For him, the students, even the so-called troublemakers, wanted to do only their best work.  (*Id.)*

The New Era Institute, now run by the state, is still thriving today.  The current

Director, Hailu Tadesse, writes,

> all the stories I have ever heard of the early days of the school make it a point to include both [Mr. Chatwal's] skill as an educator and his absolute belief in the power of education to benefit all children of all nationalities, whether rich or poor.  That these stories have persisted all these years, through all the changes at the school, can only further validate that Mr. Chatwal is a man of great character and integrity.  (L 423; *see also* L 425, L 246.)

New Era was an early example of Sant's commitment to serve his community and to help

others become self-sufficient and successful.

8

### E.    Flight from Ethiopia

Political turmoil again uprooted the Chatwals when Emperor Haile Selassie was deposed in a Communist Party takeover in 1974.  In the aftermath of the coup d'etat, private enterprises in Ethiopia were nationalized—including Sant's two restaurants and the New Era Institute—and foreigners were expelled or jailed.  Like his parents before him, Sant found himself, virtually overnight, fleeing the country where he lived, with his wife, small children and two suitcases, leaving his life's work behind him.

Through various hardships, the Chatwals made their way to North America, staying first briefly in Nairobi until they obtained visas to Canada.  They initially settled in Montreal, where Sant knew other Indian émigrés.  Sensing Ethiopia's instability, Sant had managed to save some of the money he had earned from the two restaurants in Addis Ababa.  He used the money to buy a restaurant and a small hotel in Montreal.  Soon thereafter, drawn to the United States, particularly New York and its opportunities in the hospitality industry, he decided to look there for further business prospects.  He eventually moved his wife and two sons to New York City, where the four of them remain today.

## II.    The Chatwals' Family Challenges

Like many hard-working immigrant parents, Sant and Pardaman Chatwal have devoted themselves to the education and well-being of their children and hoped to watch them thrive, mature, leave home and become self-sufficient adults.  But the Chatwals have not been so fortunate.  Both of the Chatwals' sons suffer from ██████████████████████ that have narrowed their capacities and opportunities and, in different ways, have kept them dependent on their parents—in particular, on their father.

The Chatwals' younger son, Vivek, age 39, suffers from █████████████
████████████████████████████████████████████████████████████

████████████████████████ and provide him with as normal a family life as possible.  Their older son, Vikram, age 42, while able to pursue business interests when healthy, has suffered from severe alcohol and drug dependence for more than a decade.  Although Pardaman loves and cares for both her sons, she is not equipped to deal with their needs on her own.  As the PSR notes, Sant is "very involved in [his] older son's sobriety and the daily care of [his] younger son."  PSR ¶ 136.  His daily presence is essential for the family to cope with these challenges.

### A.  Vivek Chatwal

Vivek Chatwal is afflicted with ███████████████████████████████████ One of Vivek's treating physicians, Dr. Subhash Inamdar, a psychiatrist and Clinical Associate Professor at the New York University School of Medicine, explains that Vivek

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

Dr. Eric Hollander, a professor of psychiatry and behavioral sciences at the Albert Einstein College of Medicine, another of Vivek's doctors, agrees that █████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

██████████████████████ They have devoted enormous amounts of time and energy to

ensure that ██████████████████████████████████████████████████████████

████████████████████████████████████████████████

      Vivek cannot be left alone.  The Chatwals structure their lives around Vivek and his need

for their presence and supervision.  His mother stays in the apartment with him until he wakes up

in the late morning, after which she or another caregiver brings him, daily, to his father's office,

where Sant or one of his employees keeps a watchful eye on Vivek.  Sant's employees report

that, even in the sheltered office environment, ██████████████████████████████████

██████████████████████████████████████████████████

      Sant accompanies Vivek to doctor visits at least once per week and ████████████

███████████████████████████████.  Dr. Rocco Marotta, Chief of Services for the Transitional

Program at Silver Hill Hospital in New Canaan, Connecticut observed that the love and care the

Chatwals have shown their son is extraordinary and vital.  He writes,



      Dr. Inamdar reports that Vivek ███████████████████████████████.  (L 79.)

As Dr. Marotta puts it, if Sant is gone, "████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████" (L 69.)  Dr. Hollander expresses concern that ████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████" (L 73.) Dr. Inamdar writes that ████████

████████████████████████████████████████████████████████████████████

████████████████ (L 79.)

B. **Vikram Chatwal**

Vikram Chatwal has struggled with substance abuse and addiction for much of his adult life, which have required numerous interventions and inpatient treatment. ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ At times he has been able to function quite well, but only with substantial support overseen and managed by his father. Vikram's treating psychiatrist, Dr. Marotta, states that his ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████ (L 69.)

Despite the challenges of caring not only for Vivek but also a son who struggles with addiction, Sant has supported Vikram and has gone to great lengths to help him. A family friend recalls that Sant arranged an intervention for Vikram and successfully convinced him to go to a residential drug treatment facility in Minneapolis. Gautam Chopra, who went with Sant and Vikram on the flight to Minnesota, witnessed how, when Vikram began experiencing withdrawal symptoms, Sant had to physically restrain him in order to "make it through the flight securely." What Chopra recalls "most vividly" is Sant's "determination and commitment to insure Vikram would receive the best professional care and unconditional love and support from his family." (L 129.)

Unfortunately, this was just one of many battles for Vikram. During another hospitalization—this time for four months in Mumbai, in 2009—Queenie Singh, a family friend living in the area, explains that Sant "flew back and forth to be with [Vikram] constantly . . . and

with each visit he spent countless hours either at Vikram's side or in talks with his primary physician." This experience took its toll on Pardaman and Vivek, who accompany Sant when he travels overseas, and Sant had to "comfort and support his wife" while insisting that Vikram stay in treatment against his wishes. (L 93.)

Dr. Marotta, who cared for Vikram during a hospitalization in Connecticut, was struck by Sant's level of engagement, writing that Sant "█████████████████████████████ ████████████████████████████████████████████████████████████████████" Dr. Marotta was "████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████" (L 69.)

Another of Vikram's doctors, Dr. Hollander, also highlights the extent of Sant's commitment to Vikram's well-being: "██████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████" (L 73.)

Sant's role in his son's care and progress is indispensable even with the other help that Vikram receives. In his letter to the Court, Harold David DaSilva Singh, Vikram's assistant, recalls that he has "witnessed Mr. Chatwal's sleepless nights and seen him spending days to weeks in hospital[s]" across the country. (L 220.) Sober coach Jimmy Noonan, who himself has overcome addiction, helps ensure that Vikram does not relapse. Mr. Noonan has worked very closely with Sant, and writes that he "could not have been successful in this job without [Sant's] immense presence, love and professional guidance." Sant and Mr. Noonan speak almost every

day, and Mr. Noonan, based on considerable experience, worries that without Sant, Vikram's sobriety "will not endure." (L 210.)

Vikram's recovery has been marked by a number of relapses and in 2013 an arrest in Florida for unlawful possession of narcotics.[3]  Recently, Sant's dedicated efforts on Vikram's behalf have begun to take hold.  Vikram has been clean and sober for over a year.  Vikram describes what his father's commitment has meant to his recovery:

> I am now sober for ten months, in no small part because of my father's devotion to me.  He has arranged for me to have a 24/7 live-in 'sober coach' to stay in my home and accompany me virtually everywhere I go.  Even so, my father will often come and spend a night or two in my house, just to see with his own two eyes how well I'm doing.  When you consider that he spent time with me even when I was in the clinic in India for four months, this is not a surprise.  (L 5.)

Sant's intensive, hands-on efforts on Vikram's behalf are critical at this delicate stage in Vikram's recovery.  As Vikram states in his letter to the Court:

> I need my father in my life. . . .  The road to sobriety has been a long and difficult one.  Although I am both embarrassed and uncomfortable saying this, I am not certain that I am ready to go it alone at this time without the encouragement and guidance of my father.  His presence and strength are vital to my well-being.  He will never give up on me, even if I stumble again and give up on myself.  I rely on this knowledge.  It makes me stronger.  (*Id.*)

### C.     Sant's Presence in the Home Is Critical

Each of Vivek's and Vikram's treating physicians emphatically agree that "



" (L 69 (Dr. Marotta).)  "

" (L 79 (Dr. Inamdar).)  Dr. Hollander writes that

---

[3] After Vikram underwent further drug treatment, the charges against him were dismissed.

██████████████████████████████████████████████████████████████████████
█████████████████████████████ (L 73.)

Pardaman Chatwal is not able to give her sons what their father provides. As Dr.

Inamdar explains, although she is a loving and devoted mother, Pardaman has not been able to

██████████████████████████████████████████████ without Sant's active involvement.

She "████████████████████████████████████████████████████████

████████████████████████████████████████" (L 79.) Dr. Marotta observes

Sant's "████████████████████████████████████████████████████████

████████████████████████████████████████████████████" (L 69.)

And Dr. Hollander writes that he has "██████████████████████████████

████████████████████████████████████████████████████████████

███████████████████" (L 73.)

In short, Sant's day-to-day involvement with his sons is essential to keeping Vikram

healthy and sober and Vivek ████████████████████. His sons' conditions—especially

Vivek's—are not the type that financial resources, or the presence of other supportive family and

friends, can remedy. Sant's physical presence is critical to the health of the family that depends

on him heavily and that has remained intact only as the result of his extraordinary efforts.

### III. Professional Life

Against a backdrop of family hardship, Sant has built, lost and rebuilt an enormously

successful business in the hospitality industry—owning and operating hotels, a hotel

management company and a number of highly successful restaurants.

He opened his first New York restaurant in 1977, which became the Bombay Palace in

1979. At the time, the Bombay Palace was one of only a few Indian restaurants in New York

City. Its success allowed Sant to open Bombay Palace restaurants in other cities, including

15

Washington, Houston and Los Angeles, and eventually outside the United States in Kuala Lumpur and London.  In 1987, the Bombay Palace chain of restaurants took over Beefsteak Charlie's, a franchise chain of approximately 50 restaurants that were in need of modernization. During the 1980s he also acquired a number of hotels throughout the country.  Sant was a trailblazer—his nephew notes that he "was the first turbaned Sikh to make a name for himself in the US.  The pride of his success was felt throughout the community."  (L 21.)

Sant's business suffered in the late 1980s and early 1990s in a recession that severely affected the hospitality industry.  Many of his businesses, as well as Pardaman herself, who had personally guaranteed many of the businesses' loans, were forced to declare bankruptcy.  Sant staved off personal bankruptcy for as long as he could because he considered himself "a man who met his obligations to people, and would pay back what he owed."  However, three banks ultimately filed an involuntary Chapter 7 proceeding against him, forcing him into bankruptcy, from which he did not finally emerge until 2001.  (L 356.)

Rebounding from these financial setbacks, Sant became the president of Hampshire Hotels and Resorts LLC ("Hampshire"), a hotel and restaurant management company.  Over time, as the business thrived under Sant's leadership, Sant and his family were able to acquire interests in a number of the hotels and restaurants managed by Hampshire.

Sant is admired and respected by many in the business world, including his competitors, lenders and even the head of the union representing the majority of his employees.  What stands out is Sant's integrity in the highly combative worlds of real estate and finance and his reputation among people who are intimately familiar with Sant's way of doing business.  Fellow New York hotelier Sam Domb remarks that Sant "built [his] career from the ground up," and in his business

dealings Sant operates "in an atmosphere of mutual respect and trust."  He "is a man who honors his word above all."  (L 378; *see also* L 400, L 350.)

Joseph Vassallo, a managing director at Natixis North America and one of Sant's lenders, agrees:

> In our extensive professional dealings, Mr. Chatwal consistently conducted himself in the most honorable, transparent and fair-minded manner. . . .  Unfortunately we have seen many borrowers resort to unsavory behavior to thwart loan documents.  Mr. Chatwal, on the other hand, was a true gentleman, professional and a friend of the bank's. . . .  [W]hen we requested additional equity contributions on properties and modification of the loan agreements that benefited the bank's position, often to the detriment of Mr. Chatwal's, he willingly agreed even though he had no obligation to do so and every right to refuse.  (L 361.)

Peter Ward, the president of the New York Hotel Trades Council, the union to which most of Sant's hotel employees belong, has described the fairness with which Sant treats his employees.  Though on the other side of the table, Mr. Ward observes that "the various goals of the union—fair wages with regular pay raises, health insurance that includes dental, prescription, optical and drug coverage, larger pension contributions, etc.—align exactly with Mr. Chatwal's goals for his staff."  (L 352; *see also* L 361, L 400.)

Today, Sant's businesses consist of 12 hotels and 36 restaurants and bars.  The nearly 2,500 employees of Hampshire and its affiliated hotels and restaurants include about 600 maids, 550 servers, 600 kitchen employees and 100 maintenance staff, all of whom are supervised by over 400 managers.  Well over half of those employees have been with Hampshire for more than a decade, and many for two or three decades.  Dozens of those employees have written to the Court, giving example after example of Sant's loyalty, generosity and commitment to them and their families.

Even those employees who live overseas have been touched by Sant.  Sunil Thomas, a restaurant manager at the London Bombay Palace, explains:

On many occasions, when our employees have visited New York on personal visits, he has made it a point to invite them over to either his house or his hotel for a meal and has offered them to be accommodated in the hotel, all at his expense. Such good was his hospitality that every one of them would come away from the experience feeling like being a part of his family. (L 301.)

When it became clear that he would be pleading guilty to the charges for which he is now being sentenced, Sant was determined not to let his personal mistakes affect the lives of his employees or the continued success of the business. In April 2014, shortly before entering his guilty plea, Sant stepped down as President and CEO of Hampshire in favor of Eric Danziger, the former President and CEO of Wyndham Hotel Group, a large public hotel chain.

Mr. Danziger assumed his new role aware that Sant was intending to plead guilty to criminal charges, but he went ahead because of his confidence in Sant and the business Sant had built. Mr. Danziger writes,

between my initial conversations with Sant about the potential of joining Hampshire and finalizing those discussions, he fully and completely disclosed this issue. He wanted me to be aware of the circumstances and potential issues that this issue may cause here at the Company . . . [a]nd, to alert me that my life is likely to be more difficult were I to join, vis a vis answering the multitudes of questions which would arise about Hampshire. . . . [H]e felt it was important to be completely forthright and candid about the matter. (L 359.)

## IV.    Acts of Kindness and Humanitarianism

Sant's concern for the welfare of his family and of his thousands of employees is part and parcel of a lifetime devoted to Sikh precepts of charity and selfless service ("*Seva*"). His generosity and commitment to improving the lives of others began before he attained wealth and status. Over time, his efforts have radiated outward, from his family and employees, to educational institutions, to the Sikh and Indian community and, ultimately, to strangers in need at home and abroad.

Sant has given his time and energy, not simply financial support, to the people, organizations and causes he champions. He has mentored and supported people in their careers,

paid for medical treatment and education, built and funded schools, temples and kitchens, medical facilities and supported cultural institutions. He has also worked to improve relations between communities, supporting interfaith charitable and community building efforts and partnering with Colel Chabad in the wake of the terrorist bombing in Mumbai, India. Perhaps his proudest accomplishment is the role he was able to play behind the scenes in improving Indian-American relations, including, most notably, his contribution to the U.S./India Civil Nuclear Agreement of 2008.

A.     **Support of Family**

Sant is deeply committed to the Sikh values that his mother and father instilled in him and his siblings. As his father taught him, "charity begins at home." When he was a young man far from home in Ethiopia, he started sending money from his modest earnings back to his family in India. Although he himself was working several jobs, he was determined that his father should not have to bear the sole burden of providing for 10 family members, including young children and an elderly parent. Sant's sister Gurcharan Kaur remembers that when Sant first arrived in Ethiopia, "he used to share a room with four other boys . . . so that he c[ould] save some money and send that money to his family back home in India." (L 34.) He sent money from Ethiopia when he heard that Gurcharan needed a winter coat, and to help with the medical expenses of another sister, Inderjit Kaur, who suffered from depression. (L. 58.)

Sant continued providing much-needed funds and other support to his family in India when he moved to Canada. Sant's niece recounts that since coming to North America, Sant has "shared his success with his extended family, which numbers 100+ people." (L 54.) As she describes, "[h]e has created longstanding careers for several of my family members, including my father, other uncles, aunts, and cousins. He has helped us in difficult times—both financial and emotional." Sant has sponsored family members so that they could come to the United

States or Canada, paid for their weddings, helped them get started in jobs or businesses, provided capital when they approached him with business ideas, sponsored their schooling and, above all, gave them the means to become successful and self-sufficient businessmen and -women and providers for their family.

For example, niece Geeta Kaur credits Sant with restoring her father's "confidence and dignity" by sponsoring him to come to New York to retrain in the restaurant business after an accident left him permanently disabled.  (L 24.)  Sant's brother, Iqbal Chatwal, worked for Sant for years (*see* L 13); Sant's nephew, Kanvar Singh, is the general manager of one of Sant's flagship hotels (*see* L 15); Pardaman's uncle Inderjit Singh Gurjal has been Sant's business partner for decades (*see* L 11).  Sant's sister Darshan Kaur writes that the success of the extended Chatwal family "would not have even been a dream without the leadership, vision, and the love for one's family that Sant has shown towards everyone."  (L 30.)

When it comes to providing love and support, Sant's definition of family is expansive. Sant's brother-in-law, Har Bhajan Singh, comments that when Singh's "father was diagnosed with a serious kidney ailment . . . Sant went out of his way to get him treated for almost 10 years before he expired in his own house in New York."  (L 56.)  His sister-in-law's grandson's wife describes how Sant treated her like a daughter, and personally made travel arrangements for her honeymoon.  She observes, "[i]n the newspapers he seems like a shrewd businessman, in the community he is considered to be a soldier, fighting all wrongs and helping the less fortunate but at home he is just a father, a loving, caring and a very soft hearted father who will melt your heart with a gentle hug."  (L 36.)

Among the hundreds of letters from people whom Sant has touched, Sant's grand-niece, Meyha Chhatwal, whom Sant thinks of as a granddaughter, might explain Sant best:  "In the

small world I live in, I had always seen it as a big race to the finish, and Grandpa has always been the one to step back, lend a hand, and be joyful and positive about everything that comes to him." Sant is "one of the most positive, brave, understanding, generous, and fun person[s] I have ever met in my young life." (L 26.)

B. **Generosity and Assistance to Employees**

As Peter Ward, the President of the New York Hotel Trades Council, reports, Sant's workers say that "they are treated like family." (L 352.) Indeed, Sant has a special sense of responsibility to the 2,500 employees of Hampshire and its affiliated hotels and restaurants, and they, current as well as former employees, have enormous respect and affection for him in turn. Some of Sant's support has been professional, creating opportunities for growth and development, and some has been financial, whether paying for medical care, education or some other family expense. For example, Jagdeep Sethi, who started as an intern for Sant in 1984, writes that Sant told him to "work hard and grow with the Bombay Palace chain." Jagdeep became a cashier in 1985, was "rapidly rewarded for hard work to the position of manager," and, eventually, with Sant's assistance, purchased the Beverly Hills Bombay Palace. (L 277.) Additionally, as Kanvar Singh writes, "Hampshire Hotels gives bonuses to all employees including Union members every year. This is very uncommon as most hotels that have union employees do not give anything extra to them." (L 16.)

Sant has provided long-term job security by refusing to lay off workers during even the most difficult economic times for the hospitality industry. Faiza Khan, who started as a reservations agent in 1999 and rose to become a revenue manager, describes how "Mr. Chatwal ensured that all his employees remained hired [during the recession] and their families felt secure with the knowledge that a job is not lost." (L 290.) Christopher Mallon, an employee of Sant's for nearly two decades, recounts that "through difficult economic times . . . Mr. Chatwal's focus

has been to keep members of the staff employed.  While companies that Hampshire Hotels competes with have made the decision to lay off staff and cut benefits, Mr. Chatwal focused on ways to keep members of the team employed and save our benefits."  (L 256; *see also* L 262, L 269.)

Beyond rewarding loyalty and hard work with professional advancement and security, Sant steps in to help—often unasked—when his employees or their families are in crisis.  For example, Alan Lanigan began working for Sant in 1983, and more than three decades later, at 86 years of age, still works for Sant full time.  When Mr. Lanigan's family home in Georgia was hit by a tornado, Mr. Chatwal "contributed personal funds towards its re-building, so that [Mr. Lanigan's] ailing widowed sister could continue her life there."  Observing that "Mr. Chatwal has never turned away from personal difficult predicaments suffered by individuals in his companies," he concludes his letter by asking, "How do you measure a man, if not by his words, deeds and kindnesses to others?"  (L 208.)

Space does not permit describing all the instances of Sant's generosity to employees, so we include representative examples below:

- Rajandurai Nadar, who has worked as a curry chef in Sant's restaurants for decades, recalls turning to Sant when Mr. Nadar's wife was diagnosed with a brain tumor in the early 1980s.  "Without hesitation, Mr. Chatwal took charge of her care and found the best doctors in New York City to perform an operation on her.  He paid for everything out of his pocket."  Mr. Nadar's wife recovered.  Sant also helped Mr. Nadar pay for his children's educations.  Whenever Sant visits the restaurant, he "stops by the kitchen to ask about my welfare and that of my family."  (L 266.)

- When Days Hotel employee Sanjib Ray was in a terrible pedestrian accident on the way home from work, which resulted in the amputation of both his feet, Sant immediately called Mr. Ray's wife, and told her "he would stand by her come what may, and offered any support [needed], including financial."  Sant ensured that Mr. Ray would continue to receive his salary and that his job would be held for as long as it took for him to recover and return to work—which turned out to be eight months.  (L 246.)

- When former accounting employee Agha Khan's son was in the hospital, Sant called Khan to make sure his son was receiving the best possible treatment, and "informed the staff in the department not to stop my paychecks as long as I was out with my son." (L 252.)

- Daulat M. Jethwani, the Director of the Bombay Palace in Kuala Lumpur, notes that "[a]bout two years back, one of our staff Mr. Kasimuddin . . . was diagnosed with throat cancer and was hospitalized for about 6 months. Mr. Sant Singh Chatwal told me specifically to make sure Kasimuddin continued to get all his wages and asked me to keep checking with his family to make sure that they were completely taken care of." (L 260.)

- Sant has also paid for fertility treatments for his employees, when such treatments were not covered by insurance. One employee now has twelve-year-old twin daughters; another writes, "[Mr. Chatwal] not only agreed to pay for the IVF cycle but also gave me the necessary time off to go and visit the doctors and nurses." (L 339, L 227.)

- Shyam Mehrotra, the Hampshire Hotels Finance Controller, recalls, "In 2009, one of our front desk employees, Mr. Hugo Hernandez, had an unfortunate death in his family. . . . The company was not obliged to extend any financial support. But Mr. Chatwal went out of his way and donated $5000 to help the family pay for the funeral." (L 317.)

- Feroz Ahmed, a Bombay Palace employee for 35 years, comments, "there have been many acts of generosity, but his biggest one was to give his personal guarantee to the bank which financed the purchase of my first home, without which I would not have received the loan." (L 268.)

- Robert Mallia, a young architect and construction manager, was "[s]addled with college debt and with a looming work visa expiration" during the height of the recession from a job in which he performed "[c]ountless hours of grueling work." Arranging for his green card and paying thousands of dollars in fees, Sant provided Mr. Mallia with "the passport to true freedom . . . [and] the door to a better life." (L 204.)

Former employees recount that Sant remains a mentor and a guide to them as they pursue new business endeavors. Jagdeep Sethi, a former cashier at the Bombay Palace, remembers that Sant one day asked him whether he wanted to own the restaurant in which he worked. Sethi said that he did, and Sant sold it to him for "an extremely reasonable cost." Today, Sethi "look[s] up to [Sant] as a mentor and a father figure." (L 277; *see also* L 225, L 292.)

23

## C.   Generosity toward Others

Beyond family and employees, others who have crossed paths with Sant, even briefly or in a limited way, have experienced his spontaneous acts of kindness and generosity.  As family friend Queenie Singh observes, "Everyone's problems are his."  (L 93.)

For example, Sant owns and manages a number of apartment buildings.  As the letters from several of his tenants attest, Sant is not the typical landlord.  He has kept tenants in apartments at rents substantially below what he could charge, and has gone out of his way to make their lives comfortable.  Andrée Lockwood remembers that, when Sant became the manager of her Midtown apartment building 20 years ago, "he inherited a large group of us who had been there for many years, living in these old, neglected buildings.  At first we were all suspicious and hostile.  We'd been treated badly by previous owners and managers, and expected more of the same.  What we found was the opposite."  Ms. Lockwood goes on to explain that one of her neighbors, Bertha Halozan, was "an Austrian ex-opera singer and . . . artist" who had "survived the Nazis, a stroke and a heart attack."  She "sold her paintings of the Statute of Liberty on street-corners."  When her health began to fail, Sant "renovated her apartment so it was easier for her to navigate."  Sant also arranged for one of his employees to look in on Ms. Halozan, and bring her meals, several times every day.  In a letter to the Court, a Hampshire employee remembers that when Sant learned that Ms. Halozan had died and been buried at Potters Field, Sant arranged for her remains to be moved and for her to have a proper burial.  (L 487, L 238.)

Jerry Allmand and his wife Patricia have lived on the second floor of an apartment building on 55th Street between Broadway and Seventh Avenue since 1978.  Mr. Allmand "could not afford to live in New York if it were not for Mr. Chatwal."  He states, "My rent is $876 per month and I have not had a rent increase since 2000."  Mr. Allmand explains that he

and his wife "are not unique," and that "[t]he tenants in this building owe their residency in Manhattan in equal parts to social security and Mr. Chatwal."  Mr. Allmand describes Sant as having an "over abundance of generosity" and an "old world charm" not seen frequently in New York.  (L 494.)

Jean Lionel Ligonde has been a doorman for 26 years in the apartment building where Sant lives.  Mr. Ligonde describes Sant as respectful and notes that Sant has invited Mr. Ligonde and other doormen up into Sant's apartment—which Mr. Ligonde notes is "very rare."  After Mr. Ligonde's mother died, Sant, unasked, provided Mr. Ligonde with funds to travel to Haiti and to pay for the funeral.  Mr. Ligonde writes that he "is praying for [Mr. Chatwal] every day because he is an honest, helpful man, one who makes everyone, including me, feel valued and cared about."  (L 223.)

Jayan Shreshta, the son of a former household employee of the Chatwals, recalls, "When I arrived in New York on a student visa [from Nepal], Mr. Chatwal arranged a room for me, free of charge, at the Days Hotel . . . (I ended up staying there for almost two years) and arranged my part-time job at Bombay Palace."  (L 313.)  Photographer Mohammed Jaffer of SnapsIndia News Service, who has known Sant for more than 21 years, writes, "I cannot forget his surprising help during Christmas of 2003 when he read about my expensive cameras and equipment of $47,000 worth stolen from my apartment in Jersey City.  He called me to his office and presented a check of $50,000 to buy new cameras and equipment to restart my business again."  (L 482.)

Kewal Chopra, who taught with Sant in Ethiopia in 1969, states, "When I came to New York in 1980, he was of utmost help to me and my family.  He employed me immediately in one of his businesses, provided me with a rent-subsidized apartment in one of his hotels. . . .  In short, I could not have settled down in the USA without his help and support."  (L 116.)

Similarly, K.S. Chadha, of ANG Group of Industries in India, writes,

Personally, I am very grateful to him for helping to save my life.  I was suffering from mouth cancer. . . .  It was suggested I get the surgery done . . . by Dr. Jatin Shah, the world's foremost surgeon for this type of cancer. . . .  I called Sant Chatwal, who . . . immediately arranged my meeting with Dr. Shah. . . .  Upon reaching New York in July 2010, all arrangements were personally handled by Sant and Daman Chatwal, and I was successfully operated within four days after my arrival. . . .  Dr. Shah told me that, just before the surgery, he got a phone call from Sant Chatwal requesting that he delay the start of surgery for 10 minutes as Sant wanted to pray for me in his temple.  (L 111.)

Sant's generosity extends to those he has not even met.  Former Indian Consul General Prabhu Dayal writes that

[m]any times, Indians would reach out to the consulate when they experienced medical, financial, or legal difficulties while in the U.S.A.  Providing them with help was not always within the scope of my position as consul, and I frequently passed such urgent requests on to Sant. He stepped up to assist those in distress by personally arranging funding or medical or legal assistance in the person's language or helping to clear some obstacle in their path. This is community service on a global scale.  (L 435.)

## D.    Support of Human Dignity and Self-Reliance

As these many letters recount, Sant provides assistance in many forms to many people. On a deeper and more personal level, he seeks to give others their full measure of human dignity. His purpose, and ultimate satisfaction, is not just to give charity but also to help restore and maintain the self-worth of others.  He seeks to give people the tools to thrive and become self-reliant, productive members of the community.

For example, during a 2004 visit to Bangalore, India, Sant struck up a conversation with a hotel taxi driver.  Sant learned that the driver, named Shambhu, did not own his taxi but rented it from an individual who charged high rates.  Shambhu told Sant that he was saving money so that he could buy his own taxi.  Upon his return to his own hotel in New Delhi, Sant asked the hotel's financial officer to purchase a taxi for Shambhu and to send the bill to Sant.  Shambhu's business

has flourished since Sant's intervention:  he now owns two taxis and has drivers who work for him.  (L 44.)

Sant provided invaluable support to Pardaman's cousin Rajni Singh when her marriage collapsed after 10 days, leaving her alone and "completely shattered" in New York City.  She recalls,

> Mr. and Mrs. Chatwal personally came to pick me up from my estranged husband's house and took me to their home.  As you can imagine, I was in deep duress.  I had no clue where to go or what to do.  At that moment, Mr. Chatwal held my hand and said, "You are now staying in my house and you do not need to worry about anything."  I burst out in tears. Within a few days Mr. Chatwal invited me to his office and offered me a job in his hotel. . . .  [He] became a pillar of strength for me. He really helped me regain my confidence and self-esteem.  For that I thank him even till today.  (L 17.)

Sant helped Poonam Mishra, a 20-year-old widow living in India, start a new life after her husband's tragic and unexpected death left her as the sole provider for their two-year-old son.  She recalls, "Life just came to a halt. . . .  My parents took me back home since my In-laws refused to provide any support.  They took all my belongings & asked me to leave.  My faith in humanity was shattered."  Two years later, through a chance encounter with Pardaman's sister-in-law, Ms. Mishra was introduced to the Chatwal family, and soon Sant and Pardaman sponsored her to come to New York.  She observes, "Thanks to Mr. Chatwal I live in one of the greatest countries in the world where women are treated as equal citizens."  (L 489.)

Sant understands and believes in the dignity of work.  This is why he restored Harbhajan Singh Virk to his engineer's position in one of Sant's hotels after Harbhajan, at 69 years old, "was forced to retire" because he "couldn't work as fast."  Sant tracked him down (even though Mr. Virk had changed his cell phone number) and offered him a job "with better pay and less hours."  Mr. Virk writes, "He also said the next time some young manager wants to replace me to call him on his direct line.  I am very proud to work for such a kind person."  (L 274.)

In another instance that took place nearly 30 years ago, Sant insisted that Morris Thaw, who was suffering from terminal cancer, be allowed to continue to work as the kitchen designer of Sant's Zona Rosa restaurant in Manhattan despite his weakened state.  Mr. Thaw's daughter recalls that her father "proudly went to the [restaurant's] opening and passed away 6 months later."  She adds, "To this day, I am thankful to Sant's loyalty to my family for allowing my father to build the kitchen."  (L 138.)

In 2003, Sant was approached by a young man suffering from cerebral palsy who saw that his disability kept him from taking a job in finance for which he had trained.  "Scared and unsure of himself," Atul Bhatara approached Sant, who was a prominent member of the temple Bhatara attended but was otherwise a stranger, for help.  Sant and Bhatara spoke for three hours, and Sant told Bhatara that his "disability does not define who [he is] or what [he is] capable of accomplishing."  Over the next few months Sant called Bhatara frequently to check on his progress.  Soon, Bhatara—with Sant's encouragement and guidance—purchased a restaurant.  Bhatara writes, "[t]oday, I am in the restaurant business . . . and able to support and provide for myself."  (L 83.)

### E.     Support of Educational, Religious and Humanitarian Organizations

In addition to acts of kindness that help individuals in need, Sant has supported causes that help larger groups and entire communities.

#### 1.     Education

Education opened doors for Sant, and he has sought to provide the same opportunities to others.  Although he is now able to give substantial economic support to large educational initiatives and programs, he is still a teacher at heart, who cares even about the every-day details of school life—the curriculum, the professional development of the teachers and the nutritional needs of the students.  For this reason, his support extends beyond the generous checks he writes;

he visits schools all over the world, spending time with teachers and students and visiting students in their homes.

While still a young man in Ethiopia, Sant, together with Belete Worku, opened the New Era Institute, a progressive school that served a broad range of students, including the poor of Addis Ababa and those who had been expelled from other schools, as described above.  At the time, "[t]he school as well as its two founders . . . won laurels within the Ethiopian community and the Ministry of Education."  (L 97.)

A student who attended New Era in the 1970s, Ambachew H/Mariam, remembers that "everyone in the school . . . knew [Mr. Chatwal] very well," in part because he would want to learn about each student at the school.  Although this student's family could afford tuition, he remembers having "many friends whose families were not able to pay," whom Sant "allowed . . . to study without paying their tuition."  (L 425.)  The school continues its legacy of service to the poor of Ethiopia, providing a free education to 160 students each year.  From its original 800 students, it has doubled its enrollment and now employs over 80 teachers.

New Era was the first of many schools Sant has established or supported.  He has also been a major contributor to the organization that ran the high school in his hometown of Faridkot, India, the Sangat Sahib Bhai Pheru Sikh Educational Society, which, in an important change from when Sant studied there, now provides education to underserved populations with an emphasis on creating opportunities for girls and young women.  (L 420.)

As Dr. Gursevak Singh, the director of this Educational Society, explained, Sant has provided a range of support for many of the Society's initiatives.  In 1989 Sant sponsored a free school for 3,500 students, and he sponsored another school in 1995.  Additionally, "[w]ith his help, we were able to open a dental school for 400 students in 1992 here in Faridkot, a charitable

hospital in 2005, and a nursing school for 600 women students in 2005." Sant "visits and guides" the school, and "never forgets his roots in Faridkot." Perhaps most tellingly, "when Mr. Chatwal learned that commuting to school was not safe for" some of the nursing students, "he built a new dormitory." (L 420.)

Beyond his hometown of Faridkot, Sant has supported schools and education initiatives in cities throughout India as well as in London and Fresno, California. The programs are varied, but all have in common the mission of providing education to those who would not otherwise have access to it. For instance, Sant has supported

- the Shri Dashmesh Jyot School in Maharashtra, India. Sant has visited the school and its children with his own family, and helped the school purchase the land it needs to expand from the 600 boys and girls it currently serves to its goal of providing free or low cost education to 2,000 children. (L 418.)

- the Shri Guru Gobind Singh Ji Welfare Trust, which runs the Dashmesh school, and whose director credits Sant's contributions with making "a difference in the lives of thousands in a place where there is no industry and no agricultural land, and people live in indescribable poverty." (L 418.)

- the Ekal Vidyalaya Foundation—a charitable trust and non-profit organization that creates and assists small schools throughout India. The Chairman of the Foundation, notes that Sant's extensive fundraising efforts and personal donations have "helped the Ekal organization open 137 schools in India potentially reaching out to over 35,000 young children from poor and underprivileged families." (L 422.)

- the Guru Nanak Garib Niwaj School, a New Delhi school that provides children, most of whom live in dire poverty, with a free education, transportation, meals, medical screening, vitamins, clothes, and shoes. The school's Administrator, Paramjit Singh, explains that Sant's support helped the school's enrollment grow from 13 to 570, allowing it to become a "beacon of hope" against a backdrop of begging and child slavery. When Sant visits the school, he "inspire the teachers" and "always meets with the children," even visiting them in their houses in the slums. (L 27.)

- the Guru Nanak Sikh Academy in London, a school focused on educating "looked after children"—children in state care, or who have suffered abuse or neglect in their homes—and children with special educational needs. Sant supports the school financially and visits three times a year. In 1993, when his

own fortunes were facing a downturn along with the rest of the U.S. economy, Sant nevertheless provided the down payment to enable the school to purchase a building. Since then, the school has grown from 50 to 1,400 students, and serves children of all religions from nursery school through high school. (L 429.)

Sant also supports programs that help equip schools across India with the latest technology, such as the Digital Equalizer Initiative of the American India Foundation ("AIF"). The Foundation provides government schools (where poor students attend) with computer centers. The Vice Chair of AIF explained that through a single major gift Sant allowed the program to expand to Punjab, India. (L 440.) Beyond his personal donation, Sant has inspired many others, Indians and non-Indians alike, to make donations to the Digital Equalizer Initiative.

Sant is interested in children's development and well-being generally, not simply their academic success. Surinder Singh Sandhu, the Chairman of the Spring Dale Seniors School in Amritsar, India, tells of Sant's support for his school's athletic program, designed to help

budding teenagers from the villages by providing them access to equipment, facilities, and the right nutrition so that they might be able to represent the nation one day [in field hockey]. These boys were from less fortunate homes and did not have access to either the opportunity or the resources to play hockey. Sant, on seeing this, just asked how much it cost to run the academy on a monthly basis and my son told him the amount. Sant took out his checkbook and to everyone's disbelief wrote out a check for the entire year's expenses for the academy! . . . . There was no press there that day, and there was no mention of this anywhere. Only a handful of us knew what he had done for those kids. (L 101.)

## 2. Religious and Cultural Organizations

Sant is a deeply religious man who channels many of his philanthropic efforts through religious institutions. Although his greatest contributions to religious organizations have been to institutions connected to Sikhism, he has given freely of his time, energy and money to groups associated with other religions as well.

## a.     Sikh Gurdwaras and Spiritual Organizations

Sant has been an active member and supporter of multiple Sikh congregations since his arrival in North America in 1975.  Starting with a gurdwara (temple) in Richmond Hills, New York, Sant has helped the Sikh community establish a total of seven gurdwaras in the New York area:  Guru Gobind Singh Sikh Gurdwara (Plainview, NY); Sri Guru Singh Sabha Gurdwara (Glen Rock, NJ); Gurdwara Mata Sahib Kaur (Glen Cove, NY); Richmond Hills Gurdwara (Richmond Hills, NY); Gurdwara Baba Makhan Shah (Richmond Hills, NY); Guru Nanak Darbar Gurdwara (Hicksville, NY); and Guru Nanak Jahaj Gurdwara (Jersey City, NJ).

Sant gives his time and his heart to these communities as well.  In Hicksville, New York, he not only provided substantial funding during the founding of the community kitchen at Guru Nanak Darbar Temple, but today he and his family cook and serve free meals there most weekends, and sometimes during the week, often eating alongside the individuals they serve.

Ranbir Singh Bhalla, the former President of Sri Guru Singh Sabha Gurdwara in Glen Rock, New Jersey, describes how Sant "stood by [his] side for countless hours over the years and helped to prepare and serve food in our community kitchen. . . .  With joy he has cleaned up after events."  Mr. Bhalla also observes that Sant "has used his capacity for lyrical and expressive language to motivate the young among us to be proud of who they are, to be grateful to have the support of their community, to live up, always, to their responsibilities to their fellow man." (L 449.)

Leaders of these gurdwaras describe Sant's active participation and support as invaluable to their work in the Sikh community.  They write of his economic assistance, without which, Inderjeet Singh, President of Guru Gobind Singh Sikh Gurdwara, explains, his congregation in Plainview, New York could not have "established our programs of worship for hundreds of people from around Long Island, nor begun carrying out our tradition of welcoming and feeding

32

visitors, including homeless persons with nowhere else to go." When this gurdwara faced closure due to fire code violations, it turned to Sant to provide legal and technical expertise in order to keep it open, and he gladly obliged. (L 441.) To this day, Sant volunteers substantial time and effort whenever a local Sikh community seeks to build a new gurdwara.

Members of the Sikh community regularly turn to Sant with their problems. At temple, Sant "seeks out those who might be suffering and encourages them to tell him how he can help." (L 170.) The president of Guru Nanak Darbar Gurdwara in Hicksville, comments on the efforts Sant makes to help newcomers from India "find a foothold in America. Mr. Chatwal has helped many who would otherwise feel themselves far from home and at a loss. He has listened attentively to their concerns, offered financial help and advice, guidance in locating housing, assistance in finding employment." (L 455.) Harsimran Sabharwal, a fellow Sikh and long-time friend, comments, "[i]t is a very common saying in our community that if you need help, go ask Mr. Chatwal [because] he would never say no to anyone." (L 183.)

In keeping with his abiding interest in education and helping young people, Sant also mentors young members of the community. In 1980, Sant co-founded the Sri Hemkunt Foundation to impart Sikh spiritual, moral and religious teachings to children, youth and adults. In his letter, the Foundation's General Secretary echoes letters from other educators when he writes of Sant's impact on the children of Sri Hemkunt: "One of the first programs Mr. Chatwal organized was a study tour of 50 children, of different age groups, to visit India. His goal was to give these youths first-hand experience of the history and culture of Sikhism." Sant took these children to religious, historical, and educational institutions "throughout India—even making a trip to a holy temple high in the Himalayan Mountains," and the children "came home with much

to tell, with newfound pride and joy in their heritage, and with conviction to carry forward the most important Sikh values of truth, sharing with others, and service to humanity." (L 438.)

Sant's support extends beyond the Sikh community, to programs and organizations of many faiths. Rabbi Michael Miller writes,

> Sant is well known and loved by many Jewish groups who have honored him for his magnanimity in support of their organizations. . . . [H]e has been a generous donor to JCRC [Jewish Community Relations Council of NY], most especially in support of our extensive intergroup programs, building multi-ethnic/faith coalitions throughout New York City. . . . (L 445.)

Sant reached out to Colel Chabad, a Jewish organization that provides medical care and food to the needy, after the Mumbai attacks of 2008, in which a young couple living in and running the Mumbai Chabad House were murdered.[4] Sant "was distraught over this incident," and he and Rabbi Sholom Duchman, the director of Colel Chabad, "discussed doing something together, uniting the Indian community and Jewish community to benefit the State of Israel." Sant began supporting Chabad's work, "especially" its work "for Russian and Ethiopian immigrants in Israel," which has special meaning for Sant because of his own experience as an immigrant to Ethiopia and later the United States. Sant's support has continued after the immediate interest in the Mumbai attacks subsided. (L 433.) Richard Born, a long-time friend and fellow hotelier who is also involved in Colel Chabad, adds that Sant "has inspired many others in the Indian community to contribute as well. He has reached out to unite the Indian community and the Jewish community in brotherhood and solidarity." (L 383.)

Sant also actively supports the efforts of the Church of the Nazarene, "a mission hospital in Central India serving rural mothers and infants where the infant mortality rate is 5 times that

---

[4] On November 26, 2008, members of terrorist group Lashkar-e-Taiba carried out a coordinated series of attacks against civilian targets throughout South Mumbai.

of the U.S." John P. Bowen, the Executive Director of a non-profit corporation affiliated with the Church of the Nazarene, comments that "Mr. Chatwal has consistently shown a great deal of interest and respect for our church and its mission even though we are not part of his heritage or faith tradition." (L 396.) William Brothers, an architect who has worked with both Sant and the Church of the Nazarene, recalls how Sant found common cause with the church at the very beginning of Sant's career: "In 1982 . . . most tourists (and locals) were afraid of Times Square at night. There were 3 organizations dedicated to making the area a safe and more desirable place; The Red Berets, The Church of the Nazarene and Sant Chatwal." Sant's partnership with the church continues to this day, and includes sponsoring trips for church leadership to visit potential ministry sites in India. (L 347.)

Ann Hamilton of the Brooklyn Faith Seventh-day Adventist Church recounts how Sant was "one of the first people" to respond to an email seeking contributions to upgrade the audiovisual system at their place of worship. She observes, "Mr. Chatwal has never met me and he has never been to my church in Brooklyn, yet he showed that he cared about others by his kindness and generosity toward others' needs." (L 460.)

### b. Cultural Institutions

Since 2004, Sant has supported the work and mission of the Sikh Art and Film Foundation, a non-profit cultural organization dedicated to creating awareness of and pride in the diversity, culture and history of the Sikhs, as well as the contributions of Sikhs in American society. Sant is both a fundraiser and an ambassador of sorts for the Foundation, whose chairman, Amritpal Johar, reports that Sant "has been in the forefront of helping all faiths whether be it the Sikh, Hindu, Muslim, Jewish or Christian communities." (L 451.)

Sant's work to foster and promote social services and cultural advancement through religious institutions is not limited to Sikh organizations. Since 1994 he has been actively

involved with the work of the India Cultural Society of Wayne, NJ.  Although primarily a Hindu temple, the India Cultural Society also provides social services to the community.  Jayesh Patel, the Society's President, describes the broad range of Indian institutions and organizations Sant supports in addition to the Society:

> [Sant] is one of those who have helped many charitable south Asian organizations like Federation of Indian Association (FIA) of Tristate.  Nargis Dutt Memorial Foundation, Asia Society, Indian American Foundation, Lions club, Punjabi Society and many more sociocultural and educational organizations.  He also helped a less fortunate childrens in India where in small villages education and hygiene is rarely available to child.  He believes in the principals of Swami Vivekananda that if a Child cannot go to education, Education must go to the child.  Because of this quality, he held a very high regard by entire Indian community.  (L 461.)

Sant's commitment to interfaith activities and community service has inspired others as well.  One former employee, Harpreet Singh Wahan, took the lessons he had learned from Sant and, "[w]ith Mr. Chatwal's able guidance," created the Flushing Interfaith Council, which organizes Interfaith Walks to promote dialogue between people of different "faiths, races, origins, religions, and communities."  Mr. Wahan is "proud to reiterate that all such endeavors are the framework and design of [his] mentor."  Like so many others, Mr. Wahan describes Sant as unable to turn away someone in need, stating "whenever I have approached him for it, [he] has always provided funds for organizing langar (free community meals) during my interfaith events."  Moreover, "[w]ith [Mr. Chatwal's] advice, encouragement, and monetary donations, we are succeeding at weaving a diverse ethnic fabric, one neighborhood at a time."  (L 225.)

Gregory Kinsey, a banker and former trustee of the Asian Art Museums at the Smithsonian Institute in Washington, DC, comments that, "during the four years [of my term], Mr. Chatwal provided significant financial support for several of our international exhibitions of art and their related educational programs.  He also took the time to engage personally with some

of our programs at the Smithsonian and contributed quite meaningfully in promoting cross-cultural, cross-border understanding between India and the U.S."  (L 409.)

### 3. Humanitarian Initiatives

#### a. Support for Medical Programs Around the Globe

In approximately 2005, Sant was one of the founders of the Clinton Global Initiative ("CGI"), which, among other humanitarian endeavors, provides free or inexpensive AIDS medication and malaria treatment to impoverished areas of Africa.  Sant raised substantial funds for the organization and was a primary driver in its early success.  He traveled repeatedly to India to meet with drug manufacturers in order to lobby them to provide generic AIDS and malaria medications to CGI at a low cost.  Because of Sant's efforts, CGI was able to secure deeply discounted AIDS and malaria medications from those manufacturers.  Sant has served as a trustee of CGI for nearly a decade, and continues in that role today.

Sant is also a key sponsor of Gift of Life, a Rotary Club-affiliated charity that provides free heart surgeries for children in India with congenital heart defects.  In addition to his generous financial donations, Sant has served as an advisory resource for Gift of Life, enabling it to make contact with local communities.  Gift of Life's President, Ravishankar Bhooplapur, reflects that Sant "has been invaluable in connecting the charity to the most remote villages in India.  In each instance he has risen to the occasion and helped complete strangers overcome devastating events and maladies."  (L 448.)

Since 1993, Sant has actively participated in the work of Bochasanwasi Shri Akshar Purushottam Swaminarayan Sanstha ("BAPS"), a United Nations-affiliated Hindu organization in India that helps families and individuals through a network of 3,850 centers administering a range of humanitarian services, including health and wellness, education, environmental awareness, community empowerment and disaster relief.  Sant has "visited [their] temples on

special events, voluntarily donating personal time and financial resources to help us help those in need," and "[h]is selfless efforts conferred much needed power to this mission of reaching and rescuing thousands of people."  (L 452.)

Several years ago, Sant donated an expensive microscope to opthalmologist Baldev Brar, who uses it to perform surgical procedures for the poor during his annual humanitarian trips to India.  As a result of Sant's generous donation, "hundreds of patients who were blind with cataracts [had] the opportunity to see again.  Their quality of life significantly improved and we could not have done it without this act of charity."  (L 437.)

Dr. Samin Sharma, currently Director of Clinical and Interventional Cardiology and Professor of Medicine at Icahn School of Medicine at Mount Sinai Hospital in Manhattan, remembers Sant's crucial assistance when Dr. Sharma was building the Eternal Heart Care Hospital in Jaipur, India with the goal of providing vital free services to the needy.  He states:

> This [hospital] was an expensive endeavor, and when I mentioned to Mr. Chatwal, in the middle of construction, that I was in need of bank financing, he introduced me to Rana Kapoor, the Chairman of Yes Bank of India.  Not only did I get better financing terms . . . , [Mr. Chatwal] even offered to guarantee the loan. . . .  Mr. Chatwal is committed to providing medical service to the poor, and I'm proud to say that the Eternal Heart Care Center has been able to treat the many needy people that Mr. Chatwal has sent to us.  (L 185.)

Additionally, through Sant's active and generous support of the Dashmesh Hospital Medical Clinic, "[v]olunteer teams of Doctors, Specialists, and Paramedical Professionals offer their services to 6000 to 10000 Patients."  The Superintendent of the Board which oversees the clinic and its activities, explains that they "provide free Medical Treatment, including Lab Tests and Medicine" and also conduct "'Eye Camps,' where we treat people with serious Eye Diseases and Perform necessary ocular surgeries."  He adds that "[w]ithout [Sant's] generous donations,

Dashmesh Hospital would still be housed in our old decrepit building instead of our modern, spotless new quarters."  (L 459.)

When Bobby Kalotee and friends established the "Friends of Good Health to Help Humanity" organization, "Mr. Chatwal was again at the forefront and joined for this noble cause."  He adds that, "on our last trip to El Salvador[], more than fifty doctors and health care professionals joined in to provide free medicine and preventative care to thousands of poor and needy people. . . .  [I]t was Mr. Chatwal's kind financial support [that] assisted us to carry out our mission."  (L 454.)

**b.      Support for Disaster Relief**

Sant's problem-solving skills and energy are most evident in his response to crises. Unlike many who donate generously and move on to other priorities, Sant's involvement in the wake of disaster has been active and extensive, producing both immediate relief and a lasting impact.  For example, he helped found the American India Foundation ("AIF"), in the aftermath of the devastating January 26, 2001, earthquake in Gujarat, India.  Measuring 7.9 on the Richter scale, the earthquake was felt throughout northwest India and much of Pakistan.  An estimated 20,000 people were killed, 167,000 injured and 600,000 rendered homeless.  Complete towns were destroyed, and the regional economy was devastated.

In the face of this disaster, Sant summoned his organizational, fundraising and humanitarian skills.  At Sant's urging, former President Bill Clinton led a delegation to India of Indian-American business and civic leaders, including Sant.  The group toured the earthquake site and met with local leaders and the affected people.  Upon Sant's return to the United States, he worked with others to coordinate a fundraising gala that was sponsored by Hampshire.  One of Sant's co-organizers, Pradeep Kashyap, recalls that "Sant was very generous personally, not

only financially, but also with his valuable time. He worked hard to fundraise at the gala and successfully raised about $1.3 million." (L 440.)

Now, some 13 years later, with the help of Sant and others, AIF has grown from an earthquake relief charity to a vibrant and thriving organization dedicated to furthering social and economic change in India and building stronger ties between India and the United States. AIF has partnered with former President Clinton on a number of initiatives. As Mr. Kashyap puts it: "Sant played a significant role in getting AIF initiated and put us on the track of becoming today, the most important (Indian) Diaspora Collective Philanthropy not just in the US, but perhaps in the world. For this, we are indebted to Sant." (*Id.*)

Sant is committed to many other enterprises that provide health care and disaster recovery around the globe. He "offered his hotels . . . to help victims and volunteers of the 2004 South Asian tsunami." (L 448.) Vasilios Kokkosis, who owns a delicatessen near one of Sant's New York City hotels, writes, "last January when there was a devastating earthquake in Cephalonia [Greece] which reduced many schools, hospitals, and private residences to rubble, immediately Sant Chatwal approached me with his heart and checkbook open as usual." (L 382.)

Even early in Sant's career, before attaining wealth, he responded immediately to disaster. As described by P.S. Arora, a friend of Sant's for more than 30 years and a major general in the Indian army, "[M]y father's house and medical clinic were gutted in a 1984 Anti-Sikh Riots at Mathura (UP), and my family was rendered homeless and jobless. Mr. Sant Singh Chatwal not only came to our aid, but of the entire affected Sikh community at Mathura, for which the members of the community have been extremely grateful." (L 160.)

Here in New York, Sant mobilized the community after the terrorist attacks of September 11, 2001.  Jay Dean, the General Manager of the Best Western Hotel on 48th Street in Manhattan, recalls,

> [A]fter the September 11 attacks[,] Mr. Chatwal, without hesitation, extend[ed] hotel rooms to the NYFD Engine 54 Ladder Battalion 9 located around the corner at 48th and 8th Avenue. That particular company lost 15 members of the fire department during that horrific attack. He also extended rooms to the New York Police department during the same period. . . .  In 2009 I explained to Mr. Chatwal of the deplorable mattress conditions at the same fire house.  Before I could finish a request for new mattresses for the entire fire house he said YES without any indecision.  (L 238.)

Recognizing that Sikhs in the United States were being targeted for violence by individuals who mistakenly believed Sikhs were anti-American, Sant helped organize rallies and events that supported 9/11 victims and responders while at the same time raising public awareness of Sikhism and the Sikh community.  Sat Jivan Singh (S.J.) Khalsa, a Sikh attorney and active member of the community, explains that Sant is "especially mindful of his personal commitment to victims of disasters and tragic occurrences in New York and around the world." Despite increased attacks on Sikhs after September 11, Mr. Khalsa describes "holding prayer rallies in Central Park [with Sant], where we proudly wore our bana (traditional spiritual attire) as we gave out food and guided mourners in meditation."  (L 163.)

Again, after the November 2008 terrorist attacks in Mumbai, Sant played an important role in raising funds for the victims of that attack and for victims of terrorism more broadly.  In addition to Sant's efforts on behalf of Jewish victims, as described above, Srimoyi Bhattacharya writes of Sant's efforts in connection with her fundraising project called MAI MUMBAI ("I am Mumbai" in Hindi), which directed support to relief organizations.  She notes that "Mr. Chatwal convinced personalities like Naomi Campbell to help raise awareness through an auction show" which raised money "to buy[] ambulances."  (L 229.)

### F.    Civic Engagement and Advocacy

In addition to Sant's support of countless individuals and humanitarian efforts, he has viewed political engagement as a form of public service.  Nowhere is this more evident than in his efforts to improve U.S.-India relations—an ambition he set for himself as an immigrant who loves both countries.

Soon after arriving in the United States in the late 1970s, Sant met Stephen Solarz, then a second-term member of the U.S. House of Representatives.  Congressman Solarz, a dedicated advocate for various Asian causes, and Sant became instant friends—a friendship that would last until Congressman Solarz's death in 2010.  Over the years, Congressman Solarz introduced Sant to other prominent individuals who would help Sant pursue his goal of healing the relationship between India and the United States and then building a strong alliance between the two countries.

When they first met, Sant and Congressman Solarz knew that their task of bringing the two nations together would not be an easy one.  At the time, the United States had a much closer relationship with Pakistan than with India, which was perceived as aligned with forces opposing American interests.  The United States supported Pakistan during the 1971 Indo-Pakistani War.  As Nina Solarz, the Congressman's wife of over 40 years, recalls:

> When Steve was elected in the mid-1970s, the United States and India did not have a good relationship, largely due to the Cold War, I presume.  Steve became India's best friend in the Congress, since he was convinced that the United States and India could mutually benefit from closer ties, and he worked diligently to make that happen.  He and Sant discussed this issue many times in my presence and they worked together to make this vision a reality.  (L 475.)

Mrs. Solarz explains that Sant was proud to "help play a role in the emergence of closer ties between the country of his birth and the country he was coming to love as a new resident through his relationship with Steve."  Sant "worked tirelessly" to help arrange a meeting between

Congressman Solarz and Prime Minister Indira Gandhi in India.  Although "Steve reluctantly agreed to take only twenty minutes of Mrs. Gandhi's time, . . . [w]hen the meeting took place, it lasted two hours!"  Sant was "elate[d]" that "India and the United States were on the path to a much closer and more productive relationship."  (*Id.*)

It was Congressman Solarz who first introduced Sant to Bill and Hillary Clinton before the 1992 primaries.  Over the next decade, Sant and President Clinton would go on to form a relationship centered on the subject of U.S.-India relations.  In 2000, with Sant's encouragement, President Clinton made the first trip by a sitting U.S. president to India since President Carter in 1978.  (Since leaving office, former President Clinton has visited India two more times, including after the Gujarat earthquake in 2001, as described above.)  Sant did not seek or receive financial or other benefits from his relationship with the Clintons.  Indeed, when President Clinton invited Sant to serve on an advisory committee for Asian affairs, Sant turned down the honorary position because he felt it would divert his attention from his work, and from his true policy goal:  the advancement of U.S.-India relations.

The most concrete and substantial example of Sant's accomplishments in the area of U.S.-India relations is the contribution he was able to make toward the U.S.-India Civil Nuclear Agreement of 2008.  He played an active role in breaking down resistance in both countries to the Agreement, by which India and the United States set forth terms for a strategic nuclear partnership, including the development of civilian nuclear power in India and control of India's nuclear arms development.  The partnership, which consisted of a series of laws enacted in both the United States and India, permitted India to develop a source of inexpensive, widespread and safe electrical power—a critical need, in light of India's hundreds of millions of residents who

lived without reliable electricity at the time—and at the same time brought India's nuclear facilities under the supervision of the International Atomic Energy Agency.

Despite political opposition in both countries, between 2006 and 2009 both the United States and India enacted legislation designed to achieve the goals set forth in the Agreement. Sant worked tirelessly and effectively to arrange meetings between U.S. and Indian lawmakers, and met with officials from both nations to lobby on behalf of the Agreement and its enacting legislation. T.K.A. Nair, former Principal Secretary and Advisor to the Prime Minister of India, describes Sant's unstinting efforts to mobilize support for the initiative:

> For well over ten years I have known Mr. Chatwal but it was during the course of the protracted negotiations on the Indo-U.S. nuclear agreement that I came to know him closely. . . . His firm conviction that the agreement was in the best interests of both India and U.S. motivated him to mobilize all possible resources and explore all avenues open to pursue his objective. The passion with which he committed himself to the cause was remarkable indeed. (L 474.)

Subhash Chandra, an Indian media executive and long-time friend, recalls that Sant was "a catalyst in bringing about the nuclear power deal between India and the United States." Mr. Chandra was "present at a forum that Mr. Chatwal helped organize, which was sponsored by Senators Charles Schumer, Lamar Alexander, Joseph Biden, and John Cornyn. The forum was attended by eighteen (18) senators and fifty-nine (59) congressmen and several of India's most prominent business leaders." The pact between the United States and India "solidified the ties between our two countries," and "improve[ed] the lives of Indian people in both India and the United States." After its passage, Sant received "accolades . . . from both Houses of Congress for his unselfish efforts." (L 140.)

As Mrs. Solarz puts it, "Because he was not a public figure, Sant's role in history may be less well known, but those of us who were privileged to know what he did behind the scenes to foster closer U.S.-Indian ties are acutely aware that he helped to make a huge difference in the

lives of ordinary citizens by his actions." His efforts were also recognized by the Indian

government, which in 2010, awarded Sant the Padma Bhushan, India's third-highest civilian

honor. As businessman Rajan Jetley states,

> Simply put, he is a man who believes that he has a responsibility to make life better for people whenever and wherever he can. He saw that the Civil Nuclear Agreement would improve life for literally millions of Indians, and, because he had friends and acquaintances in both governments, he saw a clear opportunity to get involved, so he did. (L 484.)

## CALCULATING THE ADVISORY SENTENCING GUIDELINES

As the Second Circuit explained in *United States v. Jones*, 531 F.3d 163 (2d Cir. 2008),

a sentencing court must give fair consideration to the guidelines before imposing sentence,

although "in the end, it must make an 'individualized assessment' of the sentence warranted by

§ 3553(a) 'based on the facts presented.'" *Id.* at 170 (citations omitted); *see also United States v.*

*Cavera*, 550 F.3d 180, 188-89 (2d Cir. 2008) (*en banc*); *United States v. Crosby*, 397 F.3d 103,

113 (2d Cir. 2005). The guidelines are merely "advisory" and a sentencing court has "wide

latitude to decide the proper degree of punishment for an individual offender and a particular

crime." *Cavera*, 550 F.3d at 188.

The Probation Department has calculated an advisory guidelines level in this case of 25,

resulting in a range of 57 to 71 months. The PSR calculation begins with a base offense level of

8, and includes the application of three offense characteristic-based enhancements under

U.S.S.G. § 2C1.8(b): a 10-level enhancement for more than $120,000 in unlawful contributions,

*id.* § 2C1.8(b)(1); a two-level enhancement for engaging in 30 or more illegal transactions,

*id.* § 2C1.8(b)(4); and a two-level enhancement for committing the offense "for the purpose of

obtaining a specific, identifiable non-monetary Federal benefit," *id.* § 2C1.8(b)(3)(B). The

Probation Department's computation also includes a four-level enhancement for aggravating role

pursuant to U.S.S.G. § 3B1.1 and a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1. Lastly, the PSR recommends a three-level reduction for Sant's full and prompt acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1.[5]

The advisory guidelines as computed in the PSR are incorrect in three respects. First, the computation is premised on several offense enhancements under Section 2C1.8(b) that are fundamentally at odds with the law directing the adoption of the campaign finance guidelines and are thus improper under *United States v. LaBonte*, 520 U.S. 751 (1999), with the result that the advisory guidelines level should be 12, not 25. Second, if the Court applies the offense guidelines as written, the two-level enhancement premised on seeking "a specific, identifiable non-monetary Federal benefit" should be rejected as inapplicable to the facts of this case.[6] Third, an enhancement for obstruction of justice is not warranted because the same conduct that supports that proposed enhancement formed the basis of Count Two of the Information to which Sant has pled guilty.

I.      **The Court Should Not Apply the Offense Characteristic-Specific Enhancements in U.S.S.G. § 2C1.8(b) Because the Guideline is at Odds with the Governing Statute and Is Therefore Invalid**

The Probation Department's application of three separate offense characteristic-based enhancements in Section 2C1.8(b) has the effect of increasing the total offense level by 14 levels. Because the enhancements in subsection (b) are inconsistent with the law directing the

---

[5] The PSR states that Sant may be assessed a fine in the range of $10,000 to $100,000. PSR ¶ 129. In this regard we note that Sant has already paid a $1 million voluntary civil forfeiture in this case pursuant to the plea agreement.

[6] The government did not include an enhancement for seeking a non-monetary federal benefit in its guidelines estimate in the plea agreement. In its submission to the Probation Department, the government has adhered to the position it took in the plea agreement—correctly, in our view.

Sentencing Commission to adopt a campaign finance guideline, the Court should not impose offense characteristic-based enhancements under that subsection.

### A.    The Relevant Statute and Guideline

In 2002, Congress passed the Bipartisan Campaign Reform Act of 2002 ("BCRA"), commonly known as the McCain-Feingold Act.  Among its provisions, the law raised the statutory maximum sentences on certain campaign finance offenses from one to five years' imprisonment and, in Section 314(b)(1) of the law, directed the Sentencing Commission to adopt a guideline that reflected "the serious nature of such violations."[7]  Previously, the guidelines lacked a specific offense guideline for campaign finance violations, and district courts as well as the government looked to the catch-all provision of the guidelines, U.S.S.G. § 2X5.1.  This provision directed courts to craft sentences with reference to factors set forth in 18 U.S.C. § 3553 in the absence of guidelines analogous to the offense.  *See* Craig A. Donsanto & Nancy L. Simmons, Pub. Integrity Section, *Federal Prosecution of Election Offenses* 215-16 (7th ed. May 2007), available at http://www.justice.gov/criminal/pin/docs/electbook-rvs0807.pdf.

In directing the Sentencing Commission to adopt guidelines for campaign finance offenses, Congress instructed the Sentencing Commission to take into account a number of "considerations," one of which was the adoption of

> **a** sentencing **enhancement** for any person convicted of such violation if such violation involves—
>
> (A) a contribution, donation, or expenditure from a foreign source;
> (B) a large number of illegal transactions;
> (C) a large aggregate amount of illegal contributions, donations, or expenditures;
> (D) the receipt or disbursement of governmental funds; **and**
> (E) an intent to achieve a benefit from the Federal Government.

---

[7] Section 314 of BCRA is annexed hereto as Exhibit 2.

BCRA § 314(b)(2) (emphases added).  The law directed the Commission to "[p]rovide" a single "enhancement," not "multiple enhancements," and to base this enhancement on the presence of all five specified characteristics—(A), (B), (C), (D) **and** (E).[8]  BCRA § 314.

In the new guideline promulgated after the enactment of BCRA, the Sentencing Commission said that it was implementing Congress's directives as set forth in BCRA.  The Commission provided an analysis of each of the enhancements in Section 2C1.8(b), specifying the subsection of BCRA that the enhancement was intended to implement.  United States Sentencing Commission, Guidelines Manual, Supplement, at 60 (Jan. 2003) ("Guidelines Supplement") (quoting BCRA § 314(b)(2)(C)).  In fact, however, the new guideline differs substantially from the law passed by Congress.  Instead of a single "enhancement" applicable when five different conditions are satisfied, the Commission adopted multiple separate enhancements, including at least one for each of the five factors.  U.S.S.G. § 2C1.8(b)(1)-(4).

### 1.  The Sentencing Commission Exceeded its Authority in Adopting U.S.S.G. § 2C1.8(b)

Although the Sentencing Commission has broad discretion to implement the directives of Congress, that discretion is not unlimited.  In *United States v. LaBonte*, 520 U.S. 751 (1997), the Supreme Court held that the Commission's discretion does not permit it to enact a guideline that "is inconsistent with [the statutory provision's] plain language."  *Id*. at 753.  Here, by adopting a

---

[8] Because the statute is unambiguous inasmuch as it refers to a single enhancement and the factors are listed conjunctively rather than disjunctively, legislative history is not relevant to interpreting the law.  When interpreting a statute, "[i]t is axiomatic that the plain meaning of a statute controls its interpretation."  *Lee v. Bankers Trust Co.*, 166 F.3d 540, 544 (2d Cir. 1999); *see also United States v. DiCristina*, 726 F.3d 92, 102 (2d Cir. 2013) ("[W]e look to the legislative history of a statute only where the text is not 'absolutely clear.'" (citations omitted)).  In any event, for the sake of completeness, we note the sparse legislative history for the applicable provision.  BCRA did not have a Senate report, and the report from the House of Representatives, Committee on House Administration, does not provide analysis or guidance on the provision related to the sentencing guidelines.  The sole comment our research uncovered was a statement on the floor of the Senate by the sponsor of the amendment that includes the relevant provision.  Senator Fred Thompson described the provision using the word "enhancement" (singular) but listed the five factors (A) through (E) using the word "or," rather than "and" as those factors are listed in the statute.  *See* 147 Cong. Rec. S3127 (daily ed. Mar. 29, 2001) (statement of Sen. Thompson).

guideline inconsistent with the plain meaning of the statute, the Sentencing Commission exceeded its authority.

In *LaBonte*, the statute at issue instructed the Commission to adopt a guideline imposing "a sentence of imprisonment 'at or near the maximum term authorized.'" 520 U.S. at 757. The issue in that case concerned whether the phrase "maximum term" referred to the maximum term for the underlying offense, or the higher maximum term for the underlying offense plus statutory enhancements applicable to career offenders. *Id.* at 753-55. The Supreme Court determined that the statutory wording, "at or near the maximum term authorized," unambiguously instructed the Commission to include all relevant statutory enhancements in fashioning the guideline. *Id.* at 762. Because the Sentencing Commission did not follow Congress's directive, the Supreme Court invalidated the guideline, holding that the Commission is not free to create a guideline that ignores Congress's explicit instructions. *Id.* at 759-61. "If the [guideline] is at odds with [the] plain language [of the implementing statute]," the Court held, the guideline "must give way." *Id.* at 757.

In this case, the multiple, cumulative enhancements in Section 2C1.8(b) are "at odds" and "inconsistent" with the text of BCRA. Congress directed the Sentencing Commission to provide a single enhancement that would be sensitive to multiple factors, rather than many separate enhancements that would turn on individual factors in isolation and then increase the guidelines computation cumulatively without limitation. Although the Commission was given the discretion to give content to broadly-worded factors—for example, the Commission was to determine what constituted a "large number" of transactions or a "large aggregate amount" of donations, *see* BCRA § 314(b)(2)(B)-(C)—it did not have the discretion to discard Congress's instruction that all five of the factors be present for the enhancement to apply. Accordingly, the

multiple, cumulative enhancements adopted by the Commission "must give way" and should not be included in the guideline computation.

Had BCRA called for a separate enhancement for each of the five factors, it could have instructed the Sentencing Commission to "provide sentencing enhancement*s*" (plural) for persons convicted of violations involving any of the five aggravating circumstances. But Congress did not take that path. Instead, it directed the creation of "*a*" singular "sentencing enhancement" for a person convicted of a violation involving all five factors, using the conjunctive "and" rather than the disjunctive "or" to demonstrate that all five factors had to be satisfied before an enhancement could be imposed. BCRA § 314(b)(2). Such an enhancement would not be applicable to Sant, because, at a minimum, the instant offense did not involve foreign contributors or the disbursement of federal funds.

Similarly, Congress could have given the Sentencing Commission broad discretion to adopt a guideline it felt appropriate based on a set of considerations. In fact, when the same Congress that passed BCRA directed the Commission to change the guidelines for financial crimes pursuant to the Sarbanes-Oxley Act, Pub. L. No. 107-204, 116 Stat. 745 (2002), Congress expressly instructed the Commission to adopt guidelines that took into account several "considerations," thus giving the Commission a substantial amount of discretion to weigh and implement these considerations as it thought appropriate. *Id.* § 1104(a)(2); *see also* Guidelines Supplement at 53-56. Unlike the discretion given to the Sentencing Commission in Sarbanes-Oxley, Subsection 314(b)(2) of BCRA specified the enhancement, and the elements of the enhancement, that Congress directed the Commission to provide.

The prescriptive nature of Section 314(b)(2) is reinforced by a comparison of subsection (b)(2) with the other subsections of Section 314(b). The other subsections give the Commission

broad discretion.  *See, e.g.*, BCRA § 314(b)(4) (the Commission instructed to "account for aggravating or mitigating circumstances that might justify exceptions").  But in Section 314(b)(2), Congress gave the Commission specific instructions on the sentencing enhancement to be adopted, making that subsection qualitatively different from the remainder of Section 314(b).

The present case is readily distinguishable from *United States v. Ferrarini*, 219 F.3d 145 (2d Cir. 2000), which upheld a guideline that "[went] further than" a Congressional directive but was not "at odds" with the authorizing statute.  *Id.* at 160 n.11 (distinguishing *LaBonte*).  The statute in *Ferrarini* called for an enhancement when the offense jeopardized the safety and soundness of federally insured financial institutions, whereas the subsequently enacted guidelines provision called for an enhancement for all financial institutions, whether or not federally insured.  *Id.* at 159.  The Second Circuit upheld the guideline because in broadening the definition of financial institution, it went "further" than but was not inconsistent with Congress's instruction.  *Id.* at 160 n.11.

In this case, by comparison, the enhancements in Section 2C1.8(b) do not simply do what Congress said and then go further.  The Sentencing Commission disregarded Congress's directive to impose a single enhancement when multiple factors are all present, instead imposing multiple enhancements, cumulatively, when single factors are present.  The guideline is thus at odds with the statute and "must give way."  *See LaBonte*, 520 U.S. at 757.

Although we are unaware of a decision addressing the specific guidelines provision at issue here, our conclusion that the guideline is invalid is consistent with holdings of other courts that have considered the validity of guidelines amendments in relation to statutory directives.  In *United States v. Butler*, 207 F.3d 839 (6th Cir. 2000), the Sixth Circuit considered whether a

guideline imposing an enhancement upon a defendant of any age who used a person under the age of 18 to commit an offense, was consistent with a statute directing the Sentencing Commission to adopt an enhancement for defendants 21 years or older who used a person under 18 to commit the offense. The Sixth Circuit determined on multiple grounds that the guideline should not have been applied against the defendant, who was under 21, and vacated and remanded the sentence. A two-judge majority[9] held that the guideline constituted a "direct overruling of an explicit Congressional declaration" and was thus invalid under *LaBonte*. *Id.* at 851-52 (6th Cir. 2000) (Jones, J., concurring).[10]

Similarly, in *United States v. Handy*, 570 F. Supp. 2d 437 (E.D.N.Y. 2010), Judge Weinstein held that an enhancement for possession of a stolen firearm was invalid. *Id.* at 480. Judge Weinstein held that the enhancement, which applied whether or not the defendant knew the firearm was stolen, conflicted with the Safe Streets Act of 1968, which criminalized traffic in stolen firearms but required the offender to know or have reason to know the firearm was stolen. *See id.* at 474 (citing 28 U.S.C. § 994(a)). Citing the Sentencing Commissions' enabling legislation, Judge Weinstein observed that the guidelines must be "consistent with all pertinent provisions of any Federal Statute," and accordingly invalidated the guideline as inconsistent with the Safe Streets Act of 1968. As the court explained, the Commission "lack[s] carte blanche to

---

[9] The Sixth Circuit decision contains two opinions. All three judges on the panel held that the guideline should not be imposed on the defendant. In a separate concurring opinion, two judges invalidated the guideline under *LaBonte* because of its conflict with the statutory directive, as discussed further in *United States v. Ramsey*, 237 F.3d 853 (7th Cir. 2011).

[10] Other courts have reached a different conclusion from that of the Sixth Circuit, holding that the Sentencing Commission was authorized to adopt an amendment that covered defendants younger than 21 years of age on the ground that the amendment simply went "further" than what Congress intended. *See United States v. Murphy*, 254 F.3d 511 (4th Cir. 2001); *Ramsey*, 237 F.3d at 856-58; *United States v. Kravchuck*, 335 F.3d 1147, 1158-59 (10th Cir. 2003). Regardless of the outcome, each court applied the test set forth in *LaBonte*, namely, whether the Sentencing Commission's actions "conflict[ed]" or were "at odds" with the statutory authorization.

ignore a congressional policy or fundamental law." *Id.* at 471 (citing *LaBonte*, 520 U.S. at 762 n.6).

In sum, because Section 2C1.8 is "at odds" with the plain meaning of the controlling statute, the enhancement is invalid and should not be used to compute the guidelines range on Count One of the information in this case. Alternatively, to the extent the Court determines that enhancements may be imposed under Section 2C1.8(b), we submit that the Commission's failure to adhere strictly to BCRA is one of several reasons that the advisory guidelines range calculated by the Probation Department overstates the seriousness of the offense, as we explain in greater detail below.

### 2. The Impact of Invalidating U.S.S.G. § 2C1.8(b)

If the Court accepts our analysis under *LaBonte*, the specific enhancements in Section 2C1.8(b) that exceed Congress's directive should be invalidated, but not the entire guideline provision. The remaining portions of the guideline, including the base offense level of 8, can still fairly be applied. An offense level of 8, though an imperfect approximation of what the Commission might have done had it followed the statutory instruction, is a reasonable alternative approach in the face of guideline enhancements that are "at odds" with the statute.

### B. Specific Guidelines Issues

If the Court decides that Section 2C1.8(b) is valid, we nevertheless urge that two of the enhancements proposed by the Probation Department not be imposed. First, the contributions to Candidate B do not warrant an enhancement under subsection (b)(3)(B)—and notably the government does not seek this enhancement—because Sant did not have the requisite purpose of

seeking a specific, identifiable non-monetary federal benefit.[11]   Second, an enhancement for
obstruction of justice under U.S.S.G. § 3C1.1 should not be imposed because such an
enhancement would constitute double counting of the obstruction conduct to which Sant has pled
guilty in Count 2.

### 1.    Specific, Identifiable Non-Monetary Federal Benefit

The Probation Department's recommendation of a two-level enhancement under Section
2C1.8(b)(3)(B) is mistaken and should be rejected for two reasons: (1) to the extent Sant was
involved with the contributions to Candidate B, he did not act "for the purpose of" obtaining a
specific, identifiable non-monetary federal benefit; and (2) the "benefit" at issue (that is,
assistance from a member of Congress in resolving a problem with a federal agency) is not the
type of concrete benefit to which the guidelines provision is directed.

First, the sequence of events shows that Sant did not have the "purpose" of using
contributions by the informant to secure a benefit.  Unlike the contributions to Candidates A and
C, Sant did not initiate the contributions for Candidate B.  Rather, the contributions were
proposed by, and later made by, the informant acting at the instruction of the government.
Although Sant acknowledges knowing that the contributions would be unlawfully reimbursed,
Sant had already agreed to introduce the informant to Candidate B, and had contacted Candidate
B on behalf of the informant, before the informant raised the subject of campaign contributions,
as noted in the PSR.  *See* Addendum to the Presentence Report, October 21, 2014 ("Addendum")

---

[11] The PSR discusses contributions to three separate candidates for political office—Candidates A, B and C.  The basis for the Probation Department's recommendation of this particular enhancement is that an informant made contributions to Candidate B in order to secure a "non-monetary" benefit, namely, Candidate B's intercession with the Department of Health and Human Services on behalf of the informant's company.  PSR ¶ 35.  The PSR does not suggest that the contributions to either Candidate A or Candidate C were made for the purpose of obtaining any sort of benefit.

at 2. Sant did not have the purpose of using the contributions to elicit Candidate B's involvement.

Further, the facts here do not involve the securing of a "specific, identifiable Federal benefit," as reflected in the government's computation of the guidelines. Application Note 2 to U.S.S.G. § 2C1.8 states that the enhancement is not intended to apply to "offenses . . . in which the defendant's only motivation for commission of the offense is generally to achieve increased visibility with, or heightened access to, public officials." Rather, the enhancement "is intended to apply to defendants who commit the offense to obtain a specific, identifiable non-monetary Federal benefit, such as a presidential pardon or information proprietary to the government." In other words, the benefit sought must have concrete, albeit non-monetary, value in and of itself. U.S.S.G. § 2C1.8 comment. (n. 2).

The guidelines commentary makes clear that the benefit to which the informant sought, even if linked to unlawful contributions, was not the type of concrete benefit to which the enhancement applies. Here, the "benefit" sought by the informant was assistance in the form of an inquiry from Candidate B to HHS—an inchoate benefit not comparable to the tangible benefits provided by way of example in the Application Note. Those benefits—a presidential pardon or proprietary government information—have intrinsic value, as opposed to an inquiry from a Congressman, which is only an intermediate step toward some ultimate goal. Assistance from a Congressman does not amount to the concrete benefit to which the Commission intended the enhancement to apply.

### 2.     Obstruction of Justice

The Probation Department has also computed a two-level upward adjustment on the basis of Sant's obstruction of justice, pursuant to U.S.S.G. § 3C1.1. Because Sant has pleaded guilty to witness tampering charged in Count Two of the information, an enhancement for obstruction

of justice is not warranted because that conduct is already reflected in the offense conduct for which he is being sentenced. As this Court has previously held, imposition of an obstruction of justice adjustment in these circumstances would constitute double counting of the obstruction-related charge. Transcript of Sentencing at 65, *United States v. Kumar*, 04-cr-846 (E.D.N.Y. Nov. 2, 2006), ECF No. 295 (rejecting upward adjustment for obstruction of the government's investigation into underlying securities fraud on the ground that the adjustment was "superfluous and may even be regarded as double counting"); *see also* Transcript of Sentencing at 16, *United States v. Richards*, 04-cr-846 (E.D.N.Y. Nov. 14, 2006), ECF No. 297 (same, and noting that imposition of such an enhancement would have "no useful purpose and [no] legitimate purpose").

### C. Proposed Alternative Advisory Guidelines Calculation

The Probation Department's recommended guidelines level of 25 is incorrect for the reasons discussed above. If the Court agrees that the enhancements in Section 2C1.8(b) are invalid and should not be imposed, and similarly accepts our argument that an enhancement for obstruction of justice is not warranted, then the correct guidelines calculation for Count One is 12 (consisting of a base level of eight plus a four-level enhancement for aggravating role pursuant to U.S.S.G. § 3B1.1). With an offense level of 12 for Count One, Sant's offense level for Count Two of 14 becomes the governing offense level. *See* U.S.S.G. § 3D1.3(a) (directing the Court to "apply the offense guideline that produces the highest offense level"). Crediting Sant with acceptance of responsibility, as reflected in Paragraph 37 of the PSR, results in a two-level reduction and a total offense level of 12, and an advisory guidelines range of 10 to 16 months.

If the Court does not invalidate the enhancements in Section 2C1.8(b), Sant's offense level should nevertheless be reduced from 25 to 21 because neither the two-level enhancement

for committing the offense "for the purpose of obtaining a specific, identifiable non-monetary Federal benefit" nor the two-level enhancement for obstruction of justice is warranted. A sentence at that offense level would yield an advisory guidelines range of 37 to 46 months.

A sentence in either the 10 to 16 month range or the 37 to 46 month range would be excessive for several reasons discussed below. We urge the Court to impose a non-incarceratory sentence under the factors set forth in 18 U.S.C. § 3553(a).

## A NON-CUSTODIAL SENTENCE IS JUST AND APPROPRIATE

**I.     A Sentence Substantially Below the Advisory Guidelines is Appropriate and Sufficient to Achieve the Goals of Sentencing Set Forth in 18 U.S.C. § 3553(a)**

Although the Court must "give fair consideration to the Sentencing Guidelines before imposing sentence, in the end, it must make an 'individualized assessment' of the sentence warranted by § 3553(a) 'based on the facts presented.'" *United States v. Jones*, 531 F.3d 163, 170 (2d Cir. 2008) (citations omitted); *see also United States v. Cavera*, 550 F.3d 180, 188-89 (2d Cir. 2008) (*en banc*). In this process, "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). Indeed, the Court "may vary [from the Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quotations and citations omitted).

In determining a just sentence, a district court is to take into consideration:

- "the nature and circumstances of the offense and the history and characteristics of the defendant";

-  "the kinds of sentences available";

- the guidelines and any pertinent policy statements of the Sentencing Commission; and

- "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

18 U.S.C. § 3553(a) (the "Section 3553(a) factors").[12]

After weighing these factors, Section 3553(a) directs the Court to impose the *minimum* sentence necessary to "reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense," while taking into account the need for deterrence and to protect the public, as well as any educational or medical needs of the defendant. If the Court determines that multiple sentences could "equally serve the statutory purpose of § 3553," the Court must, "consistent with the parsimony clause," impose the lowest possible sentence. *United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006).

The Section 3553(a) factors in this case call for a substantial variance from the advisory guidelines range and support the imposition of a non-custodial sentence, as set forth below.

## A.    The History and Characteristics of the Defendant

Sant's long, full life, unblemished until the offenses for which he is being sentenced— and distinguished by exceptional generosity, accomplishment and assistance to others—should weigh heavily in the Court's consideration of a just sentence. As Judge Rakoff observed in *United States v. Adelson*, "surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of sentencing, when his very future hangs in the balance." 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006). On a more personal level, Sant's vulnerable adult sons are heavily dependent on him. Without Sant ███████████████████████████ merit substantial consideration by the Court.

---

[12] Section 3553(a)(7) of Title 18 relates to "the need to provide restitution to any victims of the offense" and is inapplicable here.

### 1. Extraordinary Family Circumstances

The Chatwals' sons each ███████████████████. The doctors for both sons have explained that Vikram and Vivek each need Sant to be physically present, and that his absence, even for a short time, would cause Vikram to struggle anew with sobriety, and Vivek ██ ███████████████. The Probation Department echoes this assessment, noting in the PSR that Sant "is very involved in the older son's sobriety, and in the daily care of the younger son," and that the impact of Sant's incarceration on his sons is a mitigating factor the Court may consider at sentencing. PSR ¶ 136.

Prior to *Booker*,[13] Sant's critical role in his sons' well-being would have warranted a downward departure for extraordinary family circumstances. Courts in this Circuit have granted substantial departures when, as here, a defendant's dependent children would suffer significant harm as a result of the defendant's incarceration. *See United States v. Johnson*, 964 F.2d 124, 128 (2d Cir. 1992) (affirming 10-level downward departure for parent responsible for four young children). In post-*Booker* law, the extraordinary dependence Sant's children have on his support and physical presence can also serve as a basis for a substantial downward variance. *See United States v. Husein*, 478 F.3d 318, 329 (6th Cir. 2007) (affirming a 99.91% downward variance in light of extraordinary family circumstances); *see also United States v. Menyweather*, 431 F.3d 692, 700 (9th Cir. 2005) (family circumstances to be considered as part of the Section 3553(a) analysis).

Vivek's ███████████████ depends on his father's close personal attention. Sant accompanies Vivek to regular doctor's visits and ████████████████████. He brings Vivek to work with him and on business trips when he travels. ████████████████████

---

[13] *United States v. Booker*, 543 U.S. 220 (2005).



. Dr. Marotta observes that, should Sant be absent, "███████████████████████████████████████████████████ ███████████████" (L 69.)  Similarly, Dr. Hollander expresses concern that a prison sentence for Sant "███████████████████████████████████████████████ ██████████████████" (L 73.)  Dr. Inamdar ████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████" (L 79.)

Similarly, Sant's presence—and at times his physical intervention—have been critical to his other son Vikram's recovery from drug and alcohol addiction.  Vikram has been sober now for more than a year, a result of his own and his father's commitment to his recovery.  Although Vikram has made substantial progress—this is the longest period for which he has been sober since his problem with substance abuse emerged—without his father's presence, Vikram's doctors and even Vikram recognize that relapse is a distinct possibility.  Acknowledging his vulnerability, Vikram writes that "I am not certain that I am ready to go it alone at this time without the encouragement and guidance of my father.  His presence and strength are vital to my well-being.  He will never give up on me, even if I stumble again and give up on myself. . . .  I rely, more than I can ever express, on his physical presence in my life."  (L 5.)

The Chatwals' financial resources and supportive community cannot take Sant's place.  His sons' physical needs would be provided for, and they would receive assistance with handling their day-to-day affairs.  But Vivek and Vikram need their father.  As the Second Circuit has

explained, "the absence or presence of adults who can step in during the defendant's incarceration to assist with caring and providing for the [affected family members] . . . is a central part of the extraordinary family circumstances inquiry." *United States v. Huerta*, 371 F.3d 88, 95 (2d Cir. 2004). In this case, no other adult can step into Sant's role as the central caretaker for his sons.

The sons' doctors and Pardaman herself recognize that she would not be able to shoulder the responsibility for Vivek and Vikram in Sant's absence. Pardaman, who is 69 years of age, has acknowledged that she cannot ████████████████████████████ without Sant's involvement. (L 1.) The boys' doctors agree that Pardaman cannot take on this responsibility. ███████████████████████████████████████████ (L 73, L 79.) Because Sant is the only one who can provide Vivek ██████████████████████████████████ ████████████████████████ and who can give Vikram the loving but firm guidance that has kept him sober for more than a year, this case presents the type of extraordinary family circumstances warranting a non-incarceratory sentence.

### 2.   Generosity and Community Service

Sant's long history of generosity and community service also militates strongly in favor of a sentence that permits substantial community service in lieu of incarceration.

Sant's open-hearted giving has affected people and communities locally and across the globe, both individually and on a large scale. His extraordinary generosity is not simply philanthropy. It comes from a religious value of giving and service learned and embraced since childhood, maintained throughout his life, before and after achieving financial success. Although his success enables him to give generously of his money, he also devotes time and energy to numerous causes. He regularly works as cook, dishwasher and server in communal kitchens at local Sikh gurdwaras. He mentors fellow congregants and the children of his

employees and readily comes to the assistance of friends and strangers alike. He takes a personal interest in the success of the schools he funds, visiting them regularly and spending time with students and teachers. Sant also understands that making the right connections is an important ingredient of success, and he is known in the Sikh community and beyond as the man to whom people can turn for a job, advice, encouragement, medical care or some other introduction. In addition to his efforts to enrich the lives of individuals, he has worked to improve Indian-American relations for the benefit of both countries and their citizens.

The Second Circuit and other courts, both before and after *Booker*, have recognized that a defendant's good works and charity can and should be recognized through substantial departures or variances. For example, in *United States v. Peterson*, a district court imposed a sentence of probation, finding significant that the defendant had "engaged in a number of civic activities not as a figurehead, but as a participant, a person who gave of himself, not just of his wallet, and engaged in community activities to help his community." 11 Cr. 665 (RPP) (S.D.N.Y. 2012).[14]

Measured against any standard, Sant's service and dedication to the community have been extraordinary. We urge the Court to weigh carefully the positive contributions to society he has made, and will continue to make, in assessing a fair, just and reasonable sentence.

---

[14] *See also United States v. Howe*, 543 F.3d 128, 137-38 (3d Cir. 2008) (affirming sentence of probation with three months home confinement for wire fraud when advisory guidelines range was 18-24 months because defendant made an isolated mistake in the context of his entire life, including devotion to family, community and church); *United States v. Thurston*, 544 F.3d 22, 26 (1st Cir. 2008) (affirming three-month sentence for Medicare fraud conspiracy of more than $5 million based on, among other things, defendant's charitable work, community service, generosity with his time and support and assistance of others); *United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (affirming downward departure based on defendant's volunteer service with Marine Corps and as volunteer firefighter, as well as three recent acts of good samaritanism); *United States v. Shuster*, 331 F.3d 294, 296 (2d Cir. 2003) (upholding departure based on, among other factors, the defendant's charitable works); *United States v. Greene*, 249 F. Supp. 2d 262, 264-65 (S.D.N.Y. 2003) (in tax fraud case, court found the defendant was entitled to a seven-level downward departure because he had donated his time, not merely money, by adopting six "hard to place" orphaned children).

### B.        The Nature and Circumstances of the Offense

Section 3553(a) calls on us to address the nature and circumstances of the offense.  We note at the outset that nothing in this discussion is meant to minimize or excuse Sant's conduct.

Sant's conduct should be viewed in the context of the Supreme Court's recent decisions curtailing the reach of campaign finance regulation.  As the Supreme Court has now made clear, the only constitutional basis for regulating campaign contributions, with the attendant constraint on First Amendment rights, is to prevent actual or apparent *quid pro quo* corruption. *McCutcheon v. Federal Election Comm'n*, 134 S. Ct. 1434, 1450 (2014); *Davis v. Federal Election Comm'n*, 554 U.S. 724, 741 (2008).  Thus far, limits on individual contributions to specific candidates (and candidate-affiliated PACs) have survived on the ground that they are a reasonable impingement on First Amendment rights when balanced against the strong public interest in limiting corruption or its appearance.  In contrast, contributions geared toward increasing political access and goodwill are not prohibited.  As put bluntly by the Supreme Court:  "[i]ngratiation and access . . . are not corruption." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 360 (2010).

Although proof of corrupt intent is not required for finding a violation of the campaign finance laws,[15] the donor's intent is a salient consideration in crafting an appropriate sentence. When, as in Sant's case, the donor has not sought an improper *quid pro quo*, or personal benefit, the harm caused by the violation does not implicate the core policy goals of the campaign finance laws.  Such conduct should be punished less severely than conduct undertaken with the intent to secure personal gain or an improper benefit.

---

[15] In *Buckley v. Valeo*, 424 U.S. 1, 29-30 (1976), the Supreme Court rejected an overbreadth challenge to campaign contribution limits because they targeted donors who were not seeking improper influence, noting that it is too "difficult to isolate suspect contributions" based on a donor's subjective intent.

Unlike many who become involved in political fundraising for selfish reasons, Sant did so out of a desire to enhance the position of Indians and Indian-Americans, for whom Sant has long been a public voice. His goal was to raise the profile of India and its citizens in the American political realm, and to improve the relationship between the country of his birth and the country where he chose to raise a family and build a business.

The majority of the contributions Sant illegally reimbursed were for Hillary Clinton (identified as Candidate A in the Information[16]) or her political action committee, HILL PAC. By the time he engaged in these illegal fundraising efforts, starting with a June 2007 fundraiser for Mrs. Clinton's campaign for the Democratic nomination for President, Sant had known Mrs. Clinton and her husband for about 15 years and counted them among his friends and supporters of his goal of improving U.S.-Indian relations. President Clinton had proved to be a strong ally in Sant's public charitable causes, not only traveling with Sant to India in 2001 after the Gujarat earthquake, but also working with Sant to bring AIDS and malaria medication to underserved areas of Africa. Sant recognizes that he made a grievous error by violating the law and reimbursing contributions for Mrs. Clinton's campaign and PAC, and he fully accepts responsibility for doing so. But he did so not to advance a venal or personal interest, and not for any improper *quid pro quo,* but to help a politician with whom he had a genuine, longstanding relationship, and in whose policies and goals he believed.

Likewise, when Sant raised contributions for Candidate C, he did so motivated by his belief in the candidate's policies and based on their longstanding relationship forged working together on U.S.-India affairs.

---

[16] We refer to Mrs. Clinton by her name because the relevant facts—*i.e.*, her candidacy for president in 2008—make her readily identifiable, as reflected in media reports following Sant's guilty plea. The remaining individuals to whom the government has assigned pseudonyms, and whose identities are not otherwise clear from the facts of this case, are referred to by their pseudonyms.

Sant's outreach to Candidate B was also motivated by friendship—in this instance, friendship with the informant—whom Sant had known for many years and who came to Sant for help. The informant told Sant that a government agency was treating the informant's company unfairly. Although we do not agree with the Probation Department's reading of ambiguous draft transcripts as to Sant's involvement in the informant's fundraising activity for Candidate B, the Probation Department and the government have acknowledged that Sant called Candidate B before the informant raised the idea of making straw donations. *See* Addendum at 2. Sant did not provide the funds for the reimbursements (which came from the government) or arrange the straw donations (which was done by the informant). Sant's motivation was to help a friend in need. He should have rejected the idea of reimbursing the contributions, but again, his interest was selfless, and he neither sought nor expected to benefit personally from his interaction with Candidate B.

Finally, Sant fully acknowledges that, as charged, he tried to prevent John Doe #1 from speaking with the government, and in so doing, committed the additional crime of witness tampering. Although Sant broke the law in wrongly seeking to "hinder, delay or prevent" John Doe #1 from communicating information to the government, we do not agree with the Probation Department's characterization of his unlawful conversations with John Doe #1 as reflecting an intention to have John Doe #1 lie, rather than as a desire to deter John Doe #1 from speaking to the government at all. The Court need not resolve this disagreement, because even under the Probation Department's view of Sant's objectives, no actual obstruction of the government's investigation occurred, inasmuch as it was John Doe #1, working as an informant, who reached out to Sant at the government's direction, following which Sant engaged in the conduct at issue. Sant is embarrassed and ashamed that he made any effort to interfere with the government's

investigation. He acted from fear—for himself but most of all for his family. He recognizes that he did nothing but harm to his family by compounding his original offense with witness tampering.

Without minimizing the seriousness of Sant's conduct, we submit that the fact that his campaign finance violation and witness tampering conduct fall at the less harmful end of the spectrum for each offense should weigh in the Court's consideration of an appropriate sentence. The facts of this case contrast sharply with other recent campaign finance prosecutions in which the defendants engaged in aggravated conduct not present here and who were sentenced to imprisonment.

For example, in *United States v. Magliocchetti*, 10-cr-286 (E.D. Va. 2011), the defendant was the founder and president of a lobbying firm, who reimbursed upwards of $350,000 in campaign donations made for the purpose of advancing his business position. Magliocchetti pleaded guilty on the eve of trial. He faced a guidelines range of 46 to 57 months in prison, and received a sentence of 27 months. (Magliocchetti's son Mark, who participated in the offense conduct, cooperated with the government and was sentenced to 14 days' imprisonment.)

In *United States v. Danielczyk*, 11-cr-85 (E.D. Va. 2013), the defendant pleaded guilty on the day his trial was to begin to reimbursing $186,600 in campaign donations, which the government argued he made in the hope of obtaining appointment as an ambassador. Danielczyk also actively obstructed the government's investigation, falsifying documents and hiding a computer that contained records sought be the government. Danielczyk's guideline range was 63 to 78 months, and he was sentenced to 28 months' imprisonment and a fine of $50,000.

Similarly, the defendant in *United States v. Whittemore*, 12-cr-58 (D. Nev. 2014), a lawyer and lobbyist who was also seeking approval for a real estate development project, was

convicted, after trial, of reimbursing approximately $150,000 in campaign contributions. Whittemore, whose offense conduct also involved repeatedly lying to the government in the course of its investigation, received a sentence of 24 months despite an advisory guidelines range of 41 to 51 months.

Sant's conduct, which was not for personal benefit and for which he accepted responsibility before indictment, is different and warrants an even greater downward variance from the advisory guidelines.

### C. The Advisory Guidelines Calculated in the PSR Overstate the Seriousness of the Offense

A sentence in the advisory guidelines range calculated in the PSR of 57 to 71 months—at or near the five-year statutory maximum—overstates the nature and seriousness of the offense conduct and counsels in favor of a substantial departure or variance from the advisory guidelines level calculated by the Probation Department. *See United States v. Broderson*, 67 F.3d 452, 457-59 (2d Cir. 1995) (upholding substantial departure from advisory guidelines range where range overstated seriousness of offense).

Two factors above all give rise to the undue severity of the advisory guidelines as applied to Sant, each of which independently supports imposition of a non-guidelines sentence. First, Section 2C1.8(b)(1) incorporates the fraud loss table found in U.S.S.G. § 2B1.1, which has been rightly criticized by courts and commentators as overly harsh and without empirical basis. Second, the cumulative, "piling on" effect of the multiple enhancements recommended in the PSR, some of which, of necessity, apply to the same conduct, exacerbates the excessive nature of the guidelines.

1. **The Disproportionate Effect of the Fraud Loss Table on the Advisory Guidelines**

    a. **The Loss Table is Flawed**

Application of the fraud loss table in Section 2B1.1, which adds 10 levels to Sant's advisory guidelines range, has come under increasing criticism for being too severe and placing too much weight on a single factor contrary to the letter and spirit of Section 3553(a).

Ample precedent supports this Court's authority to vary from the advisory guidelines range to mitigate this harsh effect, particularly because, as Judge Stephan Underhill recently noted in his concurrence in *United States v. Corsey*, "the loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." 723 F.3d 366, 379 (2d Cir. 2013). Rather, the loss table has been upwardly adjusted at least three times in response to congressional direction. *Id.* at 380. These adjustments "effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds" without the Commission having engaged in the empirical study of nation-wide sentencing practices that it ordinarily conducts before promulgating a sentencing guideline. *Id.*

By dissociating the loss table from historical sentencing trends, the dollar amount of the offense has taken on excessive weight for sentences based on the table. As Judge Gleeson has written, "[a] district court's authority to vary from the applicable Guidelines range due to a policy disagreement is at its greatest when," as here, "the offense Guideline at issue is not the product of the Commission's empirical analysis and technical expertise." *United States v. Diaz*, 2013 WL 322243, at *3 (E.D.N.Y. Jan. 28, 2013). Judge Rakoff summed up the exaggerated impact of the loss table in his recent sentencing decision in *United States v. Gupta*:

> [T]he . . . Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss . . . occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the . . . Commission effectively ignored the statutory requirement that

federal sentencing take many factors into account, and by contrast effectively
guaranteed that many such sentences would be irrational on their face.

904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (citation omitted). Based on similar concerns, many

courts have imposed sentences well below the advisory guidelines range. *See, e.g.*, *United States*

*v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006) ("[W]here, as here, the calculations under

the guidelines have so run amok that they are patently absurd on their face, a Court is forced to

place greater reliance on the more general considerations set forth in section 3553(a)."); *United*

*States v. Ovid*, No. 09-cr-216(JG), 2010 WL 3940724 (E.D.N.Y. Oct. 1, 2010); Transcript of

Sentencing at 144, *United States v. Turkcan*, 08-cr-428(DJS) (E.D. Mo. June 11, 2009), ECF No.

63; *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008).

The Sentencing Commission itself has recognized that the loss table needs to be

reconsidered, recently embarking on a "comprehensive multi-year study of Sec. 2B1.1 . . . and

related guidelines. . . ." 78 Fed. Reg. 51820-51821 (August 21, 2013). In the meantime,

commentators and policy-makers have already come to the conclusion that the harsh impact of

the fraud loss table often requires mitigation through substantial downward departures or

variances. *See* Kate Stith & José A. Cabranes, *Fear of Judging: Sentencing Guidelines in the*

*Federal Courts* (University of Chicago Press 1998); Frank Bowman, *Sacrificial Felon: Life*

*Sentences For Marquee White-Collar Criminals Don't Make Sense*, *American Lawyer*, Jan.

2007, at 63 (noting that the "rules governing high-end federal white-collar sentences are now

completely untethered from both criminal law theory and simple common sense"); Hon. Jed S.

Rakoff, *Why the Federal Sentencing Guidelines Should Be Scrapped*, 26 Fed. Sent'g Reptr. 1

(2013); *see also* American Bar Association, *A Report on Behalf of the American Bar Association*

*Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes,*

*Second Draft* (May 15, 2014), available at

http://www.americanbar.org/content/dam/aba/uncategorized/criminal_justice/economic_crimes.

authcheckdam.pdf (last visited October 27, 2014).[17]

In short, when the loss table is a primary driver of a guidelines range, that range is very

likely to be unduly harsh.  The instant case is a clear example of that harshness, as the high end

of Sant's advisory guidelines range is more than tripled by the 10-level enhancement

recommended by the Probation Department pursuant to Section 2C1.8(b)(1).

> **b.      The Loss Table Is an Unreliable Measure of Campaign
> Finance Offenses**

Reliance on the fraud loss table in a campaign finance case further exacerbates the harsh

result discussed above because a loss-driven approach does not fairly measure the severity of an

offense that does not involve financial loss.

Even the Department of Justice has recognized that the fraud loss table is ill-suited for

campaign finance cases.  When the Federal Sentencing Guidelines were enacted in 1987, the

Public Integrity Section of the Department of Justice instructed prosecutors not to use the fraud

loss table contained in U.S.S.G. § 2F1.1 (now § 2B1.1) in campaign finance cases.  As the

Department of Justice recognized, "FECA's criminal provision was a classic example of a

regulatory offense that the guidelines were not [at the time] designed to address."  Craig A.

Donsanto & Nancy L. Simmons, Pub. Integrity Section, *Federal Prosecution of Election

Offenses* 215-16 (7th ed. May 2007).  A campaign finance-related offense was "significantly

_____

[17] *See also* Brief of Amici Curiae, *United States v. Farha*, 11-cr-115(JSM)(MAP), at 5 (M.D. Fla. May 12, 2014) (analyzing national sentencing statistics).  The amici curiae in *Farha*, a group of law professors who research sentencing issues, conducted an empirical analysis of sentences based on the loss table and departures from the table.  They determined that when courts depart from the advisory guidelines range they often do so in quite a substantial manner—in fact, the median departure is more than 50% of the recommended sentence.  *Id.* at 13-14.

different from a fraud offense designed to gain an advantage from another through deceit." *Id.* The Justice Department's position then is no less compelling today.

When it promulgated Section 2C1.8, the Sentencing Commission explained that it had incorporated the Section 2B1.1 loss table into the guideline in an effort to "assure[ ] proportionality with penalties for fraud offenses," Guidelines Supplement at 60, but the Commission offered no explanation for punishing campaign finance offenses similarly to fraud offenses. Congress itself treats the two types of offenses very differently—the statutory maximum for most fraud crimes is 20 years, while the maximum sentence for campaign finance offenses is five years. BCRA, which created the five-year maximum, called for an enhancement that took the aggregate dollar value of contributions into account—but only as one of several interrelated factors, as explained above, and without any suggestion that Congress was equating the dollar amount of contributions with fraud loss.

Indeed, the systemic harm caused by campaign finance violations is not equivalent to the financial loss or gain involved in a fraud, when the harm or ill-gotten gain is readily quantifiable. Whatever the flaws of linking so closely the penalty in a fraud case to the amount of the loss, at least the table measures the loss. The same cannot be said for campaign finance violations, when the non-monetary harm—a lack of transparency and the potential for corrupting influence—is diffuse and does not correlate to the amounts involved. The effect of linking the loss table to the campaign finance guideline is to cause campaign finance sentences involving relatively modest amounts of illegal contributions to approach or exceed levels imposed upon heinous crimes, including those resulting in harm to children, damage to people and property and danger to our

national security.[18]  For this reason, the loss table is not a useful tool for measuring the extent of the harm caused by a campaign finance violation.

> ### 2.      The Cumulative Effect of Substantially Overlapping Offense Characteristic Enhancements

Compounding the impact of the fraud loss table, the guidelines are increased by multiple enhancements that rest on substantially the same underlying facts.  The cumulative, overlapping enhancements in Section 2C1.8(b) provide an independent basis for a departure or variance from the guidelines.

In *United States v. Lauersen*, 348 F.3d 329 (2d Cir. 2003), the Second Circuit recognized that when, as here, "the cumulation of . . . substantially overlapping enhancements, when imposed upon a defendant whose adjusted offense level translates to a high sentencing range, presents a circumstance that is present 'to a degree' not adequately considered by the Commission," a sentencing judge may make a downward departure, *id.* at 344 (citation omitted), or, following *Booker*, cure the overlap by declining to apply the guidelines as calculated.  *See also United States v. Jackson*, 346 F.3d 22 (2d Cir. 2003) (instance when multiple enhancements

---

[18] *Compare* U.S.S.G. § 2C1.8 (offense level of 25) *with* § 2A2.1 (base offense level 27 for attempted murder or assault with intent to commit murder); § 2A3.2 (offense level of 18 for criminal sexual abuse of a minor under the age of sixteen years); § 2A3.4 (offense level of 24 for aggravated sexual assault of a minor under 12 years of age); § 2B1.1 (offense level of 25 for fraud loss of $2,500,000); § 2G1.3 (base offense level of 24 for sex trafficking of children); § 2G2.2 (base level 22 for possessing material involving the sexual exploitation of a minor); § 2H4.1 (base level of 26 for slave trade involving permanent injury or use of a dangerous weapon); § 2K1.4 (offense level 24 for arson creating substantial risk of death or serious bodily injury); § 2M3.3 (base offense level of 24 for unauthorized disclosure of classified information to a foreign government by a government employee); § 2M3.9 (base offense level of 25 for disclosure of information identifying a covert agent); § 2M5.3 (base offense level of 26 providing material support to terrorists); § 2N1.1 (base offense level of 25 for tampering with consumer products involving risk of death or bodily injury); § 2Q1.1 (base offense level of 24 for knowing endangerment of the environment resulting from mishandling toxic substances); § 2Q1.4 (base offense level of 26 for tampering with a public water system); *and* § 2T4.1 (offense level of 26 for tax loss of $7,000,000); *see also* § 2K2.5 (base offense level of 6 for discharge of a firearm in a school zone).

In contrast, other offenses that cause principally a systemic harm are typically assigned guidelines levels far lower than in this case.  *See* § 2J1.3 (base offense level of 14 for subornation of perjury or bribery of witness); § 2H2.1 (base offense level of 18 for obstructing an election or registration by use of force); § 2J1.9 (offense level of 10 for paying a witness to refuse to testify).

"are all little more than different ways of characterizing closely related aspects of [the] scheme" was "illustrat[ive of] the type of case that is eligible for a *Lauersen* departure").

Cumulative, overlapping enhancements heavily affect the guidelines computation in this case. Because of the limits on individual contributions imposed by the FEC, the same conduct resulting in the 10-level enhancement for illegally reimbursed contributions of $188,000 results in imposition of the two-level enhancement for more than 30 illegal contributions under Section 2C1.8(b)(4). The upward role adjustment also arises from essentially the same facts. A downward departure or variance is warranted to mitigate the unfair effect of cumulative enhancements when application of the guidelines would result in double counting of the same underlying facts. *Lauersen*, 348 F.3d at 344.

### D. A Substantial Variance is Needed to Avoid Unwarranted Sentence Disparities

In recognition of the harshness of the campaign finance guideline, courts have routinely imposed sentences that vary substantially from the guidelines and, often, impose probation rather than incarceration. Section 3553(a) counsels that the Court consider the penalties imposed on other campaign finance offenders for similar conduct in arriving at a fair sentence. *See United States v. Florez*, 447 F.3d 145, 158 (2d Cir. 2006). The Court should also consider that many such offenders are not prosecuted at all, with violations being addressed through civil enforcement proceedings. A noncustodial sentence would be appropriate in this case to avoid unwarranted disparities between Sant and individuals who commit similar offense conduct, as we explain below.

#### 1. Courts Routinely Decline to Impose Guidelines Sentences on Campaign Finance Defendants

Dozens of defendants have been sentenced pursuant to Section 2C1.8 since the passage of BCRA in 2002. The vast majority of those defendants have received probationary sentences.

Even when a defendant has received a sentence involving incarceration, the sentence almost always involved a downward variance from the guidelines.  We are aware of no instance in which, after pleading guilty, a first-time campaign finance offender received a sentence at or even near the 57 to 71 month advisory sentencing range recommended here by the Probation Department.

Many defendants who committed offenses involving dollar amounts at or close to the low six-figure range have been sentenced to terms of probation:

- In *United States v. Mobley*, 12-cr-00150 (M.D. Fl. 2013), the defendant, a Florida real estate mogul, pleaded guilty to reimbursing $94,500 in conduit contributions to a congressman.  He was sentenced to two years' probation.

- In *United States v. Acevedo-Vila*, 08-cr-00036 (D.P.R. 2008), the defendant was sentenced to probation and a fine in connection with a scheme to reimburse approximately $100,000 of conduit contributions aimed at gaining influence over a gubernatorial candidate.

- In *United States v. Feldman*, 09-cr-75 (E.D. Pa. 2009) and 08-cr-36 (D.P.R. 2008) the defendant, a prominent Philadelphia political consultant and fundraiser, was fined $6,000 for his role in a scheme to reimburse approximately $100,000 of contributions to the governor of Puerto Rico.  No probation was imposed.

- In *United States v. Schwartz*, 05-cr-00157-RMU (D.D.C. 2005), and *United States v. Cuza*, 05-cr-00344-RGK (C.D. Cal. 2005), Alan Schwartz, a former consultant to Mattel, Inc., and Fermin Cuza, another Mattel executive, made $102,214 in conduit contributions to 31 separate federal campaign committees, as well as to various candidates for state and federal office in California.  Schwartz pleaded guilty to causing the submission of false statements to the FEC, and he was sentenced to one year of probation, a $1,000 fine, and 100 hours of community service.  Cuza was sentenced to two years of probation and a $500 fine.

- In *United States v. Fireman*, No. 1:96-cr-10187 (D. Mass. 1996), the defendant, his corporation and his assistant illegally contributed more than $120,000 to, *inter alia*, two presidential election campaigns.  The assistant was sentenced to four months home detention, and the defendant was sentenced to one year probation, with the first six months to be spent in home confinement, and a $1 million fine.

- In *United States v. Troha*, 07-cr-00050 (E.D. Wis.), *United States v. Erickson*, 07-cr-00238 (E.D. Wis.) and *United States v. Infisio*, 08-cr-00044 (E.D. Wis.), the defendants conspired to make over $250,000 in illegal contributions, much of it via conduits.  Three different judges respectively sentenced Troha to six months'

probation and no fine and Erickson and Infisio to 18 months' probation and fines of $5,000.

Notably, even offense conduct of an aggravated nature not present here—involving corrupt professional gain or perjury or coercive obstructive conduct—has resulted in sentences substantially below the guidelines range:

- In *United States v. Stipe*, 03-cr-00128 (D.D.C. 2003), the defendant, who committed perjury and obstruction in connection with the government's investigation of his approximately $250,000 in conduit contributions, was sentenced to five years' probation, six months' home confinement, 1,000 hours of community service and a fine.

  Stipe's co-defendants were also given probationary sentences. *See United States v. Spears*, 03-cr-96 (D.D.C. 2003) (six months home detention, three years' probation and 200 hours of community service); *United States v. Roberts*, 03-cr-71 (D.D.C. 2003) (two years of supervised release and 200 hours of community service); *United States v. Lane*, No. 03-cr-102 (D.D.C. 2003) (three years' probation, two months of home confinement and a $5,000 fine).

- In *United States v. Jinnah*, 06-cr-00383 (C.D. Cal. 2009), the defendant gave a total of $53,000 to several campaigns. He intimidated his employees into serving as conduits and then fled the country after he was indicted. Despite these aggravating factors, he received a non-incarceratory sentence of 36 months' probation.[19]

The sentence imposed in *United States v. D'Souza*, 14-cr-34(RMB) (S.D.N.Y. 2014), is the most recent example of a court granting a variance and imposing a non-prison sentence for campaign finance violations—even when faced with multiple aggravating circumstances. D'Souza was responsible for $20,000 in conduit contributions. The indictment charged that D'Souza told a straw donor to lie about his contributions, instructing the donor to say, if asked, that he knew the candidate and supported her candidacy. The government also charged that D'Souza's motivation for the contributions was, in part, to induce the candidate to introduce D'Souza to wealthy individuals who could fund a film project that D'Souza was pursuing. The

---

[19] *See also* the discussion of other campaign finance cases above at pages 66 and 67.

district court also determined that D'Souza had not taken responsibility for his offense and had demonstrated disrespect for the criminal justice system, but nevertheless imposed a sentence of probation with special conditions involving community service and an eight-month period of community confinement, a substantial variance from the advisory guidelines range of 10 to 16 months.

This comparison to other cases demonstrates that a sentence within or near the guideline range would cause the very disparity that Section 3553(a) seeks to avoid, and further that a sentence of probation would be consistent with the sentences of similarly situated defendants. The campaign finance violations that have resulted in sentences of imprisonment generally involved defendants who, unlike Sant, made illegal contributions for personal or professional gain, engaged in other aggravating conduct not present here, or did not accept responsibility until the eve of trial (or at all).

### 2. The Type of Illegal Campaign Contributions at Issue Here Are Often Resolved Civilly

Many conduit contribution cases are not prosecuted criminally but are pursued by the FEC in an exercise of its regulatory powers, resulting in a civil resolution and financial penalties. The fact that some offenders similarly situated to Sant have been permitted to resolve campaign finance-related allegations without pleading guilty to felony charges also militates strongly in favor of a non-guidelines, non-incarceratory sentence.

Such cases include the following:

- Federal Home Loan Mortgage Corporation ("Freddie Mac") (Matter Under Review ("MUR") No. 5390 (2006)): Freddie Mac and a number of executives contributed $150,000 of corporate funds to the Republican Governors Association and used corporate resources to host fundraising events, which raised approximately $1.7 million for various federal candidates. Freddie Mac paid a fine, and no executive was prosecuted.

- Apex Healthcare, Inc. and James Chao (MUR No. 5405 (2006)): Apex and its President and sole shareholder, James Chao, used corporate funds to reimburse $75,500 in contributions made to federal candidates. Apex paid a fine and, despite the FEC's finding that Mr. Chao knowingly and willfully violated FECA, he was not prosecuted.

- Centex Construction (MUR No. 5357 (2003)): Centex made corporate and conduit campaign contributions over a five-year period, using its discretionary bonus program to compensate and reward employees for political contributions. The company reimbursed employees for $56,125 in campaign contributions. Centex and those of its officers and employees who participated in the scheme paid a fine, and none of the individuals were prosecuted.

### E. The Need for Deterrence and Protection of the Public from Future Crimes

Congress has instructed that in fashioning an appropriate sentence, the Court take into account the need for deterrence, and for protection of the public from the defendant's future crimes. Under this prong of Section 3553(a), courts assess whether a sentence will provide sufficient specific deterrence of the defendant from future crimes, and general deterrence of the public from committing similar offenses. *See United States v. Huntley*, 961 F. Supp. 2d 409, 414 (E.D.N.Y. 2013). A sentence of probation in this case would address both concerns.

### 1. Specific Deterrence

Specific deterrence has little application to Sant. He is nearly 70 years old, a first time offender, a college graduate who has been employed throughout his adult life and has been married for over four decades. He has been on pretrial supervision since April 2014 with no violations of any kind. PSR ¶ 4. Given these characteristics, common-sense and experience tell us that Sant's likelihood of recidivism is extremely low.[20]

---

[20] The lack of need for specific deterrence is confirmed by two in-depth analyses of recidivism that the Sentencing Commission conducted as part of its 15-year study of the guidelines in 2004. For first time male offenders over age 50, the recidivism rate is 6.2%. U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28 (available at http://www.lb5.uscourts.gov/ArchivedURLs/Files/08-10643%281%29.pdf) (last visited October 27, 2014). Although the Commission has not published data specifically identifying recidivism rates for individuals of Sant's age, one can safely assume it would be even lower.

## 2. General deterrence

Under the circumstances of this case, a custodial sentence is not necessary to achieve the goal of deterring others from violating the campaign finance laws.

As a threshold matter, dramatic changes in the law of campaign finance since Sant committed his offenses reduce the likelihood that such offenses will be committed in the future, and thus reduce the need for general deterrence of the type of conduct to which Sant pled guilty. Within just a few years of the passage of BCRA in 2002, its provisions began to be eroded by a series of Supreme Court decisions striking down aspects of the campaign finance regime in recognition of the First Amendment rights of political expression inherent in campaign donations.

In 2007, the Court exempted from most BCRA restrictions organizations that do not expressly urge support or defeat of a candidate. *See Federal Election Comm'n v. Wisc. Right to Life*, 551 U.S. 449, 457 (2007). The next year, the Court held limits on candidates' personal expenditures to be unconstitutional. *See Davis v. Federal Election Comm'n*, 554 U.S. 724 (2008). Two years later, *Citizens United v. Federal Election Comm'n*, 558 U.S. 310 (2010), marked a sea change in campaign finance regulation, striking down all limits on donations to independent-expenditure committees (or "Super PACS"), which can now lawfully spend unlimited amounts of money in support of issues and candidates. The landscape changed further with the Court's decision earlier this year in *McCutcheon v. Federal Election Comm'n*, 134 S. Ct. 1434, 1462 (2014), which held unconstitutional aggregate limits on the overall amounts an individual can contribute to various candidates during an election cycle.

In short, over the past seven years the Court has effectively opened up so many avenues for lawful political contributions that, even though the limits on donations to candidates remain in force, would-be large-scale contributors have little reason to resort to illegal conduit

78

contributions of the type for which Sant is being sentenced.  As one recent commentator noted, while an individual could donate up to $5,000 to candidates and $30,800 to national party committees, this was "nothing compared with the unlimited checks pouring into the Super PACs and other outside groups empowered by . . . the Court's decisions."  Kenneth P. Vogel, *Big Money* 16 (PublicAffairs ed. 2014).

Indeed, the DOJ itself has recognized that campaign finance offenses such as Sant's are likely to decrease in frequency as a result of these changes.  Mythili Raman, then a senior DOJ official, testified before Congress in 2013, stating that she "anticipate[s] seeing fewer cases of conduit contributions directly to campaign committees or parties, because individuals or corporations who wish to influence elections or officials will no longer need to attempt to do so through conduit contribution schemes that can be criminally prosecuted.  Instead they are likely to simply make unlimited contributions to Super PACs or 501(c)s." *Current Issues in Campaign Finance Law Enforcement: Hearing Before the Subcomm. on Crime and Terrorism of the Sen. Comm. on the Judiciary*, 113th Cong. 3 (2013) (statement of Mythili Raman, Acting Assistant Attorney General), available at http://www.justice.gov/iso/opa/ola/witness/04-09-13-crm-raman-testimony-re-current-issues-in-campaign-finance-law-enforceme.201361129.pdf  (last visited October 27, 2014).  The campaign finance crime in this case has in effect become almost obsolete given the many lawful ways for individuals to contribute large sums to candidates, and the need for general deterrence is thus substantially diminished.

Further, individuals who would commit a campaign finance violation are particularly sensitive to the reputational harm caused by a criminal conviction, and are therefore more likely to be deterred by the prospect of criminal prosecution in itself, whether or not a sentence of imprisonment is imposed.  In such cases, a criminal conviction effectively destroys the very

reputation the straw donations were intended to burnish.  *See, e.g.*, *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) ("Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time, and the substantial loss of assets and income resulting from [the crime] have decreased for the foreseeable future his ability to commit further crimes . . . and constitute a source of both individual and general deterrence."); *United States v. Vigil*, 998 F. Supp. 2d 1121, 1137 (D.N.M. 2014) (granting departure on grounds of, *inter alia*, damage to defendant's reputation and her professional relationships, her history of good works, and her advanced age).

We respectfully suggest that, in weighing the deterrent effect of a non-incarceratory sentence, the Court should assume that the public knows the relevant facts available to the Court. The facts in this case include the compelling mitigating factors of Sant's sons' ███████████ and Sant's history of exceptional generosity, kindness and community service.  The message sent by a non-incarceratory sentence for a person like Sant, nearly 70 years of age, who has devoted his life to service and caring for both his immediate family and his extended family of relatives, employees, friends and acquaintances, is not that he has "gotten away" with criminal conduct, but rather that the Court has appropriately considered his lifetime of good deeds and the severe impact of incarceration in fashioning a fair and just sentence.

## II.     A Sentence of Probation, with a Substantial Community Service Requirement, is Sufficient to Achieve the Goals of Sentencing

For all of the reasons stated above, a sentence of probation would be sufficient to reflect the seriousness of the offense, promote respect for the law, deter similar offenses and provide just punishment for the offense, whereas a guidelines-based sentence would constitute excessive punishment.

### A. Courts Recognize that Probation is Punitive in Nature

As detailed above, courts impose sentences of probation on the premise that probation is very much punitive in nature and, in appropriate cases, is a sufficient punishment to satisfy Section 3553's requirement that the sentence reflect the seriousness of the offense and provide just punishment. Transcript of Sentencing at 52-53, *United States v. Warner*, 13-cr-731 (N.D. Ill. Jan. 14, 2014), ECF No. 33 (sentencing defendant convicted of tax evasion to probation because "society will be best served by allowing him to continue his good works"); *United States v. Brady*, 02 Cr. 1043 (JG), 2004 WL 86414, at *8-9 (E.D.N.Y. Jan. 20, 2004) (imposing sentence of probation with community service and observing that "probation is also a punitive measure, and 'may be used as an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing, including promoting respect for the law, providing just punishment for the offense, achieving general deterrence, and protecting the public from further crimes by the defendant'" (quoting U.S.S.G. Ch. 5, pt. B, introductory cmt. (2004))); *United States v. Coughlin*, No. 06-20005, 2008 WL 313099, at *5-6 (W.D. Ark. Feb. 1, 2008) (discussing the "severely punitive quality of probation, [which is] capable of deterring corporate executives like [defendant], who cherish their freedom of movement and right of privacy, from engaging in conduct similar to [defendant's]").

Courts have held that imposition of a non-incarceratory sentence can sufficiently recognize the grave seriousness of white-collar crimes, and that a sentence of probation involves real and substantial punitive restrictions. *See Gall v. United States*, 552 U.S. 38, 49 n.4 (2007) (emphasizing that "[p]robation is not granted out of a spirit of leniency" (quoting Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957))); *see also United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very

81

nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled.").

Likewise, the Administrative Office of the United States Courts has observed that community service is "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair—a 'win-win' proposition for everyone involved." *Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service*, Office of Probation and Pretrial Services, Administrative Office of the U.S. Courts (2007), available at http://www.miep.uscourts.gov/PDFFIles/court_community_all.pdf (last visited October 27, 2014).

A sentence of probation would permit Sant to remain a part of the family life to which he is critical and the community of which he is an integral member, but would nonetheless constitute a substantial loss of liberty for Sant himself and make clear to him and others that breaking the law has substantial consequences.[21]

### B. Friends of Island Academy

In support of our request for a community service placement, we are proposing for the Court's consideration a program that would benefit from Sant's substantial experience educating and training young people, often from disadvantaged backgrounds. This program would require

---

[21] Under the current calculation of Sant's guidelines level he is not eligible for a probationary sentence, because his guidelines level falls in Zone D of the sentencing table. *See* U.S.S.G. § 5C1.1(f). However, because this Court is not bound by the guidelines, it is permitted either to depart downwardly to a guideline level of 11 or lower (Zones A or B), or grant Sant a variance from this particular provision of the guidelines. *See United States v. Duhon*, 541 F.3d 391, 398 (5th Cir. 2008) (affirming probationary sentence for offender in Zone D); *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009) (same); *see also United States v. Chettiar*, 501 F.3d 854, 859 (8th Cir. 2007) (observing that imposition of a sentence involving home detention upon defendant in Zone D effectively constituted "having moved the Zone B overlay upward" pursuant to a variance).

Sant to perform valuable community service and make use of Sant's particular skills, experience and position in the hospitality industry.

Friends of Island Academy ("Friends"), based in Harlem, is a nonprofit organization founded in 1990 which provides transitional and reentry support services for young people 16 to 21 years of age following their release from juvenile or criminal justice custody at Rikers Island. As this Court may be aware, treatment of juvenile detainees at Rikers Island has recently been the subject of an in-depth investigation by the United States Attorney's Office for the Southern District of New York, and has received substantial press coverage. That investigation revealed that young people detained at Rikers Island have been subjected to extreme forms of physical abuse, and have been the victims of civil rights violations by both guards and fellow inmates.

The problems that young detainees at Rikers Island face, both during and after their detention, are broader and deeper than the physical and psychological injuries that have been reported. Most of the detainees come from troubled backgrounds. While at Rikers Island they receive at best minimal job training and education. Once released, they face homelessness, joblessness and lack of reliable access to food, clothing and education. They are highly vulnerable to rearrest.

The mission of Friends is to help this group of vulnerable young people find meaningful work and become productive, self-supporting members of the community. The population it serves has either never held a regular job or has had trouble retaining work. Friends operates on the principle that providing these young people with the opportunity to work in a supportive environment that can accommodate their unique needs and challenges will give them a chance at becoming productive members of society. At a given time, Friends works with approximately 200 adolescents and young adults in the community. Friends receives public and private funding

and has contracts with the New York City Department of Youth and Community Development and Department of Probation.  Finding appropriate placements for its clients is very difficult yet critical to the program's success.

### C.    The Proposed Job-Training Program

Christine Pahigian, the Executive Director of Friends, has worked with Sant to create a job-training program that will allow some of the young men and women served by Friends to work in hotels and restaurants managed by Hampshire.  The participants receive four weeks of paid training, after which they are placed at one of the Hampshire-managed hotels or restaurants as a regular employee.  *See* Letter of Christine Pahigian, October 8, 2014, attached as Exhibit 1.[22]

The training and employment program, now active for about six months, currently has 21 participants,[23] and the results have been very impressive.  The participants are receiving experience in all aspects of the hotel and restaurant industry, including guest services, security, reservations, revenue management, sales and marketing, engineering, housekeeping, restaurant service and cooking.  After participants complete a paid training period, they are hired as full-time staff and their hourly wages go up substantially, with the potential for additional raises. Most participants will quickly earn more than they have earned in their lives and are learning job skills that can be used outside the hospitality industry.  After 60 days of full-time employment, participants will also be eligible for health care benefits.  With Sant's active support, the program

---

[22] Ms. Pahigian will be in the courtroom for Sant's sentencing.  We respectfully request that she be allowed to address the Court briefly regarding the Friends program.

[23] The number of participants has grown from the 12 mentioned in Ms. Pahigian's letter, as additional trainees have been hired.

with Friends will give opportunities for self-sufficiency and steady employment not otherwise available to these young people.

Ms. Pahigian writes that "[Sant's] active engagement and participation with our staff as well as the operations staff of his company has resulted in real job training and real job opportunities for our youth members. . . . The less tangible but more significant value of this opportunity and partnership with Mr. Chatwal is evidenced during the incidents when something is *not* going well." Ms. Pahigian describes Sant's interaction with the program as follows:

> On a number of occasions, with Mr. Chatwal's participation, youth have been given second, third and fourth chances until they have managed to get on track.
>
> We have found in him a genuine partner to build skills and support for the long-term employability of our youth members. The trajectory of setbacks is expected with our youth members. To have a career-track employer who works through it with them and with us is what makes the difference in effective outcomes – and makes this a very worthwhile community service placement for Mr. Chatwal and an extraordinary resource for our youth members.

Sant has been heavily involved in the development and implementation of this program and has spent time with each participant. His personal involvement has already made a significant difference to the young people in the program. During a conversation with a Friends trainee, Sant told the young man about his own rise from working in his father's canteen to running restaurants, and encouraged him to pursue his dreams. He then introduced the participant to Milon Khan, who rose from busboy to become general manager of two Serafina Restaurants under Sant's tutelage, who has since served as another role model for the participant.

When another participant in the program, who was given a job in a Hampshire hotel, developed a problem with tardiness, rather than terminate the young man's employment Sant met with him, listened to his concerns, and instructed his supervisor to be patient so that they could address the problems that were causing his tardiness. The young man is now thriving as an

employee of Hampshire.  Similarly, when another program participant took a phone from a guest's room, Sant ensured that the participant was given a second chance, and that he was provided with additional training and mentoring rather than being fired.  The participant has since become a successful and productive member of the program.

In light of the enormous contribution Sant can make in the lives of other people, we respectfully ask for a sentence of probation, a condition of which would be substantial community service requiring Sant to spend at least 10 to 20 hours per week assisting the Friends program.[24]  He would work directly with participants in the program, helping them to develop life as well as business skills, teaching vocational classes and working with students on developing their own business ideas.  Most importantly, Sant would serve as a mentor to the participants in matters of life, education, vocation and culture.  As Ms. Pahigian puts it, "[i]f sentenced to community service at Friends, Sant Chatwal would have a direct and relevant impact on our youth members and our agency's overall ability to provide meaningful tools to youth to clear pathways to their long-term positive youth development."  Letter of Christine Pahigian.

This sentence would bring Sant's life full circle, returning him to the role of educator of disadvantaged children, but now able to share with those children his own failings and hard-earned wisdom.

---

[24] Ordinarily, sentenced defendants are prohibited from associating with other known felons.  Although such an associational bar is a recommended condition of probation or supervised release, it is not mandatory.  *See* U.S.S.G. §§ 5B1.3(c)(9), 5D1.3(c)(9).  The Court has the discretion to permit Sant to associate with persons convicted of a felony for the limited purpose of this program.

## **CONCLUSION**

For the reasons set forth above, we urge that a sentence substantially below the guidelines range recommended by the Probation Department be imposed, and that the sentence be one of probation with a condition of substantial community service.

Dated:      New York, New York
October 28, 2014

_____/s/_____

Jonathan S. Sack
Judith L. Mogul
Miriam L. Glaser
Morvillo Abramowitz Grand
  Iason & Anello P.C.
565 Fifth Avenue
New York, NY 10017
Phone: 212-856-9600
jsack@maglaw.com

*Attorneys for Defendant Sant Singh Chatwal*