DAS:PT:MEC
F.#2010R01744
BRIEF.CHATWAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,                    14 CR 143(ILG)

        - against -

SANT SINGH CHATWAL,

            Defendant.

- - - - - - - - - - - - - - - - - X

GOVERNMENT'S
SENTENCING MEMORANDUM

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

JACK SMITH
U.S. Department of Justice
Public Integrity Section
1400 New York Avenue NW
Washington, D.C. 20005

Martin E. Coffey
Assistant U.S. Attorney

Kevin Driscoll
Trial Attorney

TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................ 1

BACKGROUND  ..................................................... 3

ARGUMENT  ....................................................... 8

POINT ONE - THE DEFENDANT'S CHALLENGES TO THE GUIDELINES
            CALCULATIONS IN THE PSR LACK MERIT AND
            SHOULD BE DENIED ................................... 8

I.    CHATWAL's Objections To His Guidelines
      Calculations ......................................... 8

      A.    The Sentencing Commission Did Not Exceed
            Congress' Directive In Promulgating The
            Enhancements Under Section 2C1.8(b) ................. 8

      B.    The Enhancement For Obstruction Of Justice
            Under Guideline Section 3C1.1 Is Warranted ......... 18

POINT TWO - CHATWAL SHOULD NOT BE GIVEN A
            NON-CUSTODIAL SENTENCE ............................ 20

      A.    History and Characteristics of the Defendant ........ 20

            1.    Extraordinary Family Circumstances........... 20

            2.    CHATWAL's Generosity and Good Works.......... 22

      B.    Nature and Circumstances of the Offense ............. 25

            1.    Recent Supreme Court Decisions Are
                  Inapplicable to this Case.................... 25

            2.    CHATWAL's Lack of Corrupt or Selfish
                  Intent (Even If True) Is Irrelevant......... 26

            3.    The Cases CHATWAL Cites Do Not Support
                  His Claim That His Conduct Is Somehow
                  Less Culpable............................... 27

      C.    The Guidelines Calculation Does Not Overstate
            the Seriousness of the Offense ...................... 31

1.   The Use of the Loss Table Is a Sound
     Exercise of the Commission's Discretion...... 31

D.   Substantial Variance Is Not Needed To Avoid
     Unwarranted Sentence Disparities ....................34

     1.   Civil Resolution Is Wholly Inappropriate
          For The Type of Illegal Campaign
          Contributions at Issue Here................. 35

E.   Deterrence and Punishment Are Important
     Factors to Consider Here ...........................36

CONCLUSION   ...................................................39

TABLE OF AUTHORITIES

Page

CASES

Burns v. United States,
  501 U.S. 129 (1991) .........................................17

McConnell v. Federal Election Commission,
  540 U.S. 93 (2003) .........................................14

United States v. Booker,
  543 U.S. 220 (2005) ........................................21

United States v. Canova,
  412 F3d 331 (2d Cir 2005) ..................................22

United States v. Carrasco,
  313 F.3d 750 (2d Cir. 2002) ................................21

United States v. Faria,
  161 F.3d 761 (2d Cir. 1998) ................................22

United States v. Fiore,
  381 F.3d 89 (2d Cir. 2004) .................................19

United States v. Fishman,
  631 F. Supp. 2d 399 (S.D.N.Y. 2009) ...................24, 25

United States v. Greene,
  249 F. Supp. 2d 262 (S.D.N.Y. 2003) ........................23

United States v. International Union United Automobile Workers,
  352 U.S. 567 (1957) ........................................15

United States v. Johnson,
  964 F.2d 124 (2d Cir. 1992) ...........................21, 31

United States v. LaBonte,
  520 U.S. 751 (1997) ...................................15, 16

United States v. Maggi,
  44 F.3d 478 (7th Cir 1995) .................................19

United States v. Munoz-Cerna,
  47 F.3d 207 (7th Cir. 1995) ................................17

United States v. Smith,
  331 F.3d 292 (2d Cir. 2003) ................................ 21

                          STATUTES

18 U.S.C. § 1512(b)(3) ...................................... 18

18 U.S.C. § 3553(a) .................................... passim

18 U.S.C. § 371 ............................................ 18

2 U.S.C. §§ 431 ............................................. 1

2 U.S.C. §§ 437g(a) ........................................ 35

2 U.S.C. §§ 437g(a)(5)(B) .................................. 35

2 U.S.C. §§ 441f ........................................... 18

28 U.S.C. § 944(h) ......................................... 15

28 U.S.C. § 994 ............................................ 17

                           RULES

Section 2C1.8 .............................................. 33

Section 2C1.8(b)(3)(B) ..................................... 17

U.S.S.G § 3C1.1 ............................................ 19

U.S.S.G. 5H1.6 ......................................... 20, 21

USSG § 2C1.8(b) ........................................ 13, 17

                      OTHER AUTHORITIES

14 CR 143(ILG) ............................................. 1

JDG:PT:MEC
F.#2010R01744
BRIEF.CHATWAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,                    14 CR 143(ILG)

    - against -

SANT SINGH CHATWAL,

       Defendant.

- - - - - - - - - - - - - - - - X

## PRELIMINARY STATEMENT

The United States of America, in accord with 18 U.S.C. §
3553(a) respectfully submits this Sentencing Memorandum with
respect to the sentencing of SANT SINGH CHATWAL.  On April 17,
2014, CHATWAL pleaded guilty to conspiracy to violate the
Federal Election Campaign Act of 1971, as amended, (the
"Election Act"), in violation of 2 U.S.C. §§ 431 et seq. (Count
One), and to witness tampering, in violation of 18 U.S.C. §
1512(b)(3)(Count Two).  Sentencing is currently scheduled for
December 18, 2014.

In his sentencing memorandum, CHATWAL objects to the
Sentencing Guidelines calculations in his Presentence Report
("PSR") and further argues for a downward departure and the
imposition of a non-custodial sentence.  First, CHATWAL contends

that the enhancements under Section 2C1.8(b) were misapplied and, as written into the Guidelines, were not authorized by the enabling statute.  He further objects that the two-level upward adjustment under Section 3C1.1, for obstructing justice, should not have been applied.  Second, under 18 U.S.C. § 3553(a), he claims that his history of generosity, charitable works and family circumstances merit a departure from the Guidelines.  In particular, CHATWAL asserts that the severe medical disabilities of his two children compel a non-custodial sentence so he can support and care for them.

Except for CHATWAL's objection to PSR ¶ 44, which is the two-level enhancement under Guidelines Section 2C1.8(b)(3)(B), for unlawful campaign contributions for the purpose of obtaining specific, identifiable non-monetary federal benefit, the Court should deny CHATWAL's motion in all respects. See ¶ 19-22 and PSR Addendum.

## BACKGROUND

CHATWAL made more than $180,000 in illegal campaign contributions to three different federal candidates.  When he realized the authorities were investigating his conduct, CHATWAL tried to cover it up by inducing a key witness to lie to the government on his behalf (unaware that the witness was cooperating with the government).  Despite CHATWAL's efforts to draw the court's attention away from them, these remain the irreducible, incontestable facts of this case.  And what they reveal is a man who knowingly sought to undermine two key pillars of our system of government:  first, our free, fair, and transparent electoral system (by making the illegal campaign contributions), and second, our criminal justice system (by coaching a witness to lie on his behalf).  These are not mere regulatory offenses, as CHATWAL suggests, and they ought not to be treated as such, even despite the defendant's apparently extensive history of generosity and good works.

Given CHATWAL's background and his conduct, his pleas for leniency only underscore the seriousness of his offense conduct, and serve to perpetuate the corrosive perception that there is one set of rules for the rich and powerful, and another for everyone else.  The evidence in this case reveals a man who believes either that the rules do not apply to him or that they can be subverted in pursuit of his own ends.  It bears noting

that the offenses at issue here are often, if not exclusively,

committed by individuals like CHATWAL: people of substantial

means, accomplishment, and education, highly respected within

their communities, and with spotless criminal records.  As one

Judge put it:

> [T]he fact is it almost always is going to be a person
> [committing  campaign  finance  crimes]  who  has
> absolutely no criminal history, who is probably highly
> respected. . . .  And that person . . . is likely to
> have no criminal history whatsoever.  Moreover, he's
> likely . . .  a person who is respected in the
> business community, a person who has a family behind
> them.  Because with success and with respect come all
> the things that make for good families and good
> relationships. . . . But the backdrop of all this is
> the offense which is committed here.  These offenses
> go to the very heart of our electoral process. . . .
> If we cannot have faith in our election process, then
> we can't have faith in the strength of our democracy.
> . . . That's why these offenses are viewed as so
> serious and why even a man of no criminal background,
> respected in the community, intelligent, strong peer
> group, strong business support, is no less responsible
> when he has done something that goes to the heart of
> our democratic process, when there's criminal
> undermining of the electoral process.

United States v. Whittemore, (12-cr-58) (D. Nev. 2014)

(Transcript of Sept. 20, 2013 Sentencing Hrg. at 160-65) (This

excerpt is attached as Exhibit 1.  The government is prepared to

make the full transcript available to the Court).  The very

nature of this offense—making excessive campaign contributions

in violation of the legal limits—usually dictates the nature and

characteristics of the offender: wealthy, well-educated,

influential, and respected.  But it is precisely because of the

nature of this offense and of the defendants most likely to commit it that the government takes cases like these so seriously—and it is also why the kind of probationary sentence CHATWAL seeks would send precisely the wrong message, undermining the general deterrence that a custodial sentence would convey.

The seriousness of these offenses is made plain by the defendant's own words.  With respect to the illegal campaign contributions, CHATWAL was explicit in his discussions about why it was important to give as much money as possible, even if it meant violating the campaign finance laws. It was important because, according to CHATWAL, that was the only way to "buy" politicians:  "Without [money]," he said, "nobody will even talk to you.  When they are in need of money [unintelligible] the money you give then they are always for you. That's the only way to buy them, get into the system . . . That's the only thing." PSR ¶ 21. This frank statement of CHATWAL's motives for making campaign contributions gives the lie to his attempt to distinguish himself from those "who become involved in political fundraising for selfish reasons."  Br. at 64.

Chatwal was similarly explicit when it came to encouraging a witness to lie on his behalf.  As with his disingenuous description of his reasons for making the illegal contributions themselves, CHATWAL's after-the-fact characterization of his

witness-tampering as merely seeking to deter a witness from speaking with the government does not comport with the facts—as revealed by CHATWAL's own contemporaneous statements. Again and again, he did more than merely "tr[y] to prevent John Doe #1 from speaking with the government." Br. at 65. He affirmatively told the witness to lie. PSR ¶ 26. On June 30, 2011, for example, when the witness asked CHATWAL a specific question about what he should or should not say to the government—"But I'm not going to tell him you gave me the money right?"—Chatwal gave a response—"Never, never"—that cannot be construed as anything other than an instruction to lie. Similarly, on July 2, 2011, when the witness asked CHATWAL whether he should "tell [the government] the truth next time," CHATWAL responded, "No, no, no, no, listen. No. . . ." PSR ¶ 28. CHATWAL's instructions to the witness, when placed alongside other statements he made—regarding the witness's use of cash to reimburse the contributions ("cash has no proof," CHATWAL noted) and noting the fact that, so long as the witness did not have in his possession any checks from straw donors, "they have nothing"—make clear that his statements were part of a systematic attempt to hinder the investigation into his conduct. PSR ¶ 29, 31. The Court should therefore reject CHATWAL's attempts to minimize the nature and seriousness of his conduct.

With these facts as background, the government turns now to the specific claims made by CHATWAL in his sentencing memorandum.

ARGUMENT

POINT ONE

THE DEFENDANT'S CHALLENGES TO THE GUIDELINES
CALCULATIONS IN THE PSR LACK
MERIT AND SHOULD BE DENIED

The government differs with the Guidelines calculations in

the PSR, as amended, only with respect to its incorporation of

the two-level enhancement for identifiable, non-monetary federal

benefit under Guideline Section 2C1.8(b)(3).  The plea agreement

did not apply this two-level enhancement.  The government will,

therefore, adhere to its Guidelines calculations in the plea

agreement and does not seek the imposition of this enhancement.

The PSR is correct in all other respects, and CHATWAL's various

challenges to the Guidelines calculations lack merit.  As a

result, the government contends that Court should impose a

sentence within the Guidelines range of 46 to 57 months

imprisonment set forth in the plea agreement.

The government addresses CHALTWAL's claim as follows.

I.   CHATWAL's Objections To His Guidelines
     Calculations

     A.   The Sentencing Commission Did Not Exceed
          Congress' Directive In Promulgating The
          Enhancements Under Section 2C1.8(b)

In an effort to avoid the clear application of the

guidelines to his offense conduct, CHATWAL urges this Court to

adopt a crabbed and ultimately unsupportable reading of Section

314 of the Bipartisan Campaign Reform Act of 2002. See
Bipartisan Campaign Reform Act of 2002, Pub. L. No. 107-155, 116
Stat. 81 ("BCRA"). CHATWAL contends that Congress mandated that
the Sentencing Commission create a single enhancement and not
the separate, alternative enhancements set forth in Section
2C1.8(b). In so doing, he invites the Court to focus narrowly
(and selectively) on two words- "enhancement" and "and"- to the
exclusion of the rest of the statutory text and the clear intent
of the statute, both of which vitiate his argument. The Court
should reject CHATWAL's transparent attempt to rewrite the
statute-and decimate the applicable Guideline- to suit his
narrow purposes of evading the clear consequences of his
actions.

As an initial matter, the government notes that because the
plea agreement did not incorporate the two level enhancement for
identifiable, non-monetary federal benefit under Section
2C1.8(b)(3)(B), it agrees with CHATWAL that the Court should not
impose that enhancement. Nevertheless, the government disputes
CHATWAL's contention that the remaining two enhancements—Section
2C1.8(b)(1), a 10-level enhancement for more than $120,000 in
unlawful contributions, and Section 2C1.8(b)(4), a 2-level
enhancement for engaging in 30 or more transactions—are

inapplicable because they are fundamentally at odds with the law directing the adoption of the Guidelines under the BCRA.

CHATWAL misconstrues the statute. CHATWAL contends that Congress mandated that the Sentencing Commission create a single enhancement. He is in error. Here, Section 2C1.8(b) is not at odds with or inconsistent with the BCRA. The statute called for increased penalties under the Election Act and the Sentencing Commission adhered to that instruction. The statute characterized the enhancements as "considerations", not "mandates" or "directives." The statute did not expressly mandate or direct that the "considerations" be incorporated in the Guidelines as a single enhancement, and indeed Congress expressly contemplated the Sentencing Commission might promulgate multiple enhancements. Congress did not explicitly instruct that all five of the factors in the enacting statute be present for the enhancement to apply. In fact, it is clear that Congress intended to provide for increased penalties under the BCRA. It makes no sense, therefore, to interpret this enabling legislation- as CHATWAL proposes- as calling for the promulgation of a Guideline that would apply only to a factual scenario that rarely, if ever, occurs in the real world. Indeed, CHATWAL's strained reading suggests Congress passed enabling legislation seeking enhanced penalties exclusively for

a factual situation involving all of the following:
contributions, donations, or expenditures from foreign sources
of funds; the receipt or disbursement of governmental funds; and
an intent to achieve a benefit from the federal government.  How
could this remotely possible scenario comport with Congress'
stated intent that campaign financing violations are serious in
nature and call for "aggressive and appropriate law enforcement
action to prevent such violations"?  It is clear that Congress'
objective was to enhance the penalties under the Guidelines for
the more commonplace and serious violations of the campaign
finance laws and not the obscure.  In enacting the BCRA,
Congress was engaged in adopting a pragmatic approach to dealing
with the burgeoning influence of money in politics and was not
an academic exercise in crafting legislation to respond to a
factual scenario that likely would never occur.

     CHATWAL incorrectly relies on language within Section 314
of the BCRA that directs the Sentencing Commission to "[p]rovide
a sentencing enhancement," as though the use of the singular is
dispositive.  CHATWAL overlooks the fact that the language in
which the enhancements are discussed occurs in the context of
"considerations" that Congress directed the Sentencing
Commission to take into account when formulating the new
Guidelines.  The plain language of the statute indicates that it

was not Congress' intent that the Sentencing Commission create a single sentencing enhancement nor did it mandate that these "considerations" be merged into a single enhancement.   Rather, Congress merely delegated to the Sentencing Commission the authority to promulgate a Guideline "taking into account" the suggested "considerations."  The statutory language makes plain that Congress did not intend to create a scheme where the "considerations" would be incorporated into an all-or-nothing Guideline provision that would require each of the "considerations" to be present in order for the guideline to apply.

This conclusion is made plain by the fact that the statute uses both "guideline", in the singular, and "guidelines" in the plural, interchangeably. Indeed, the specific language from the clause in question is prefaced with the following language: "The Commission shall provide **guidelines** under subsection (a) taking into account the following considerations . . . ." Id. (emphasis added).  It would be strange indeed for Congress to contemplate the possibility of the Sentencing Commission formulating multiple guidelines, but nevertheless insist that there be only one set of enhancements that must be established conjunctively.  To read the statute in that way would flatly contradict Congress' clear mandate that the Sentencing

13

Commission promulgate "Guidelines [that] reflect the serious nature of such violations and the need for aggressive and appropriate law enforcement action to prevent such violations." Id. The need for "aggressive and appropriate law enforcement action" is further evidenced in BCRA by virtue of the fact that Congress included Sections 312 and 315 in this statute increasing the maximum statutory penalties. It would be manifestly inconsistent for BCRA on the one hand to increase the criminal penalties under the statute and at the same time to reduce the impact of the Sentencing Guidelines by adopting an all-or-nothing provision as to the enhancements under Section 2C1.8(b).

There does not appear to be any authority that directly supports CHATWAL's strained interpretation of this statute and the accompanying Guidelines.  Notably, CHATWAL's interpretation conflicts with the Historical Notes to this Guideline, which support the argument that the Sentencing Commission carefully weighed the new enhancements and viewed them as "alternative" and not as one enhancement.  USSG § 2C1.8(b) App. C, Amendment 648.

If, as CHATWAL argues, the enhancements were to be applied collectively, or not at all, the enhancements would be rendered a virtual nullity.  For example, by requiring that the Section

2C1.8(b) enhancements be applied only as a single enhancement,
the enhancements would then only be implemented in situations
where the offense conduct simultaneously involved: a
contribution, donation or expenditure from a foreign source; a
large number of illegal transactions; a large aggregate amount
of illegal contributions, donations or expenditures; the receipt
or disbursement of governmental funds; and an intent to benefit
from the federal government.  This interpretation would require
a nearly impossible synchronism of factors that would render
ineffective the stated Congressional intent that law enforcement
action be "aggressive." CHATWAL's interpretation of these
Guidelines enhancements would severely restrict their
application to situations where only governmental funds and
foreign money were used in a large number of illegal
transactions along with an intent to achieve a benefit from the
federal government.  This would turn Congress' clear intent that
there be "aggressive and appropriate law enforcement action"
regarding campaign-finance offenses on its head.

     The overriding objective of the campaign financing laws is
to regulate the influence of money on politics, not just
"foreign" money or "governmental funds."  McConnell v. Federal
Election Commission, 540 U.S. 93, 115 (2003) ("BCRA is the most
recent federal enactment designed 'to purge national politics of

what was conceived to be the pernicious influence of "big money"
campaign contributions.'") (quoting United States v.
International Union United Automobile Workers, 352 U.S. 567,
572(1957)).  For all practical purposes, CHATWAL's
interpretation of the enhancements of Guideline section 2C1.8(b)
would remove from consideration under the Guidelines any
enhancements for illegal transactions involving non-foreign or
non-governmental money.  In other words, there could be no
enhancements where the source of the unlawfully contributed
funds came from within the United States, the very funds that
the campaign-finance laws are designed to regulate.

        CHATWAL's reliance on United States v. LaBonte, 520 U.S.
751, 757-758 (1997) is misplaced and, if anything, LaBonte
supports the government's position.  In LaBonte, the Supreme
Court held that the Sentencing Commission's discretion does not
permit the Commission to enact a guideline that is inconsistent
with the plain language of the enacting statute.  Id. at 753.
At issue in LaBonte was the Commission's interpretation of the
phrase "maximum term authorized" in the Guidelines commentary
for the Career Offender Guidelines.  The Commission had been
directed by Congress, in 28 U.S.C. § 944(h), to assure that the
Guidelines specify a prison sentence at or near the maximum term
authorized for certain categories of offenders.  Id.  In its

commentary on the Career Offender Guidelines, the Commission reasoned that the term "maximum term authorized" excluded all applicable statutory sentencing enhancements.  The Court in LaBonte rejected this interpretation as flatly inconsistent with the authorizing statute.  Importantly, the Court emphasized that, if the Commission's interpretation of the term was countenanced, they would have the effect of "largely eviscerat[ing] the penalty enhancements Congress enacted in statutes such as § 841."  LaBonte, 520 U.S. at 760.  The Court went further: "We are unwilling to read § 994(h) as essentially rendering meaningless entire provisions of other statutes to which it expressly refers."  Id.

Thus, the Supreme Court in LaBonte rejected an approach very similar to the one CHATWAL advances here.  Like the respondents in LaBonte, CHATWAL is proposing an interpretation that would "render[ ] meaningless" entire provisions of BCRA, to say nothing of the violence it would do to the broader congressional intent to "[e]nsure that the sentencing guidelines and policy statements reflect the serious nature of [campaign finance] violations and the need for aggressive and appropriate law enforcement action to prevent such violations."  BCRA Section 314(b)(1).

The Sentencing Commission acted reasonably in promulgating enhancements in Guideline Section 2C1.8(b).[1] The Sentencing Commission adhered to the clear and unmistakable congressional intent in creating this Guideline, namely to increase the penalties for violations of the Election Act.

In sum, with the exception of Guideline Section 2C1.8(b)(3)(B), the Court should apply the enhancements set forth in the PSR.

---

[1]     Congress chose not to modify or otherwise disapprove of the enhancements to this Guideline within 180 days as provided for under 28 U.S.C. § 994. Indeed, the Guidelines have been revised multiple times since the promulgation of this particular Guideline, and Congress has not seen fit to correct the error CHATWAL contends the Commission has made.  United States v. Munoz-Cerna, 47 F.3d 207, 212 (7th Cir. 1995) ("The Congress had the opportunity to accept, reject, or modify the guideline provision. Although charged with knowledge of its earlier handiwork, it decided to allow the Commission's handiwork to take effect. A presumption of validity must be given to what Congress and the Sentencing Commission drafted.") Nor is this a case where Congress's silence should not be credited because "it is contrary to all other textual and contextual evidence of congressional intent."  Burns v. United States, 501 U.S. 129, 136 (1991).  Indeed, as noted above, it is CHATWAL's interpretation, not the government's, that flies in the face of congressional intent.

## B. The Enhancement For Obstruction Of Justice Under Guideline Section 3C1.1 Is Warranted

CHATWAL objects to the two level upward adjustment, pursuant to Guideline Section 3C1.1, for obstruction of justice. PSR and Addendum ¶ 37 and 48. CHATWAL claims that this adjustment is "double counting" because he pleaded guilty to Count Two of the Information, which charged witness tampering in violation of 18 U.S.C. § 1512(b)(3). He contends that obstruction of justice is already reflected in Count Two.

CHATWAL's "double counting" argument is without merit. The two level adjustment under Guideline Section 3C1.1 was correctly applied to the Guidelines calculation under Count One, conspiracy to commit campaign financing offenses in violation of 18 U.S.C. § 371 and 2 U.S.C. §§ 441f and 437 (d)(1)(A)(i). The fact that CHATWAL pleaded guilty to witness tampering along with his plea to conspiracy to violate the campaign financing laws does not shield him from the two level adjustment under Guideline Section 3C1.1.

As set forth in PSR ¶ 56-65, the two counts in CHATWAL's information were grouped together under Guideline Section 3D1.2(c). Pursuant to Application Note 8 to Guideline Section 3C1.1,

> If the defendant is convicted both of an
> obstruction offense . . . and an underlying offense
> (the offense with respect to which the obstructive
> conduct occurred), the count for the obstruction
> offense will be grouped with the count for the
> underlying offense . . . . The offense level for that
> group of closely related counts will be the offense
> level for the underlying offense increased by the 2-
> level adjustment specified in this section or the
> offense level for the obstruction offense, whichever
> is greater.

U.S.S.G § 3C1.1, comment. (n.8).

This formula ensures that there will not be double counting. Here, the PSR correctly grouped the two offenses in the information under Guideline Section 3D1.2(c) and then properly applied the offense level for the conspiracy to violate the campaign financing laws as the most serious offense. The two- level upward adjustment was applied to the offense level for the conspiracy count. Had the witness tampering count called for an offense level higher than the conspiracy count, Application Note 8 provides that the two level upward adjustment would not have been applied to the witness tampering count. See United States v. Fiore, 381 F.3d 89, 95-96 (2d Cir. 2004); United States v. Maggi, 44 F.3d 478, 482-483 (7th Cir 1995). Because the conspiracy count calls for a higher offense level, the obstruction enhancement is correctly applied here.

<u>POINT TWO</u>

<u>CHATWAL SHOULD NOT BE GIVEN A NON-CUSTODIAL SENTENCE</u>

CHATWAL estimates his Guidelines range at either 10 to 16 months or 37 to 46 months. Based upon the factors set forth in 18 U.S.C. § 3553(a), CHATWAL seeks a departure from these Guidelines and a non-custodial sentence. A departure from the Guidelines range is not warranted. CHATWAL should be sentenced within the Guidelines range of 46 to 57 months imprisonment as set forth in his plea agreement.

A. <u>History and Characteristics of the Defendant</u>

CHATWAL argues that under Section 3553(a)(1) his history and characteristics are grounds for a downward departure and a non-custodial sentence. He points to his extraordinary family circumstances, generosity, and charitable works.

1. <u>Extraordinary Family Circumstances</u>

Section 5H1.6 of the Sentencing Guidelines provides that "family ties and responsibilities are not ordinarily relevant in determining whether a departure is warranted." U.S.S.G. 5H1.6. The Second Circuit has held that the effect of incarceration on a defendant's parental responsibilities, family ties, and responsibilities are not ordinarily relevant in reaching a determination to depart downward. Parental responsibilities should be weighed only where they are extraordinary and

21

incarceration would wreak extraordinary destruction on dependents. United States v. Smith, 331 F.3d 292, 294 (2d Cir. 2003); United States v. Carrasco, 313 F.3d 750, 756 (2d Cir. 2002); United States v. Johnson, 964 F.2d 124, 126-130 (2d Cir. 1992). [2] CHATWAL has not demonstrated such extraordinary family circumstances here.

In the 2003 amendments to the Commentary to Guideline Section 5H1.6, the Sentencing Commission tightened the restrictions for a departure for family circumstances. Under the amendments, the Court must find that "incarceration "will cause a substantial, direct and specific loss of essential caretaking, or essential financial support, to the defendant's family." In addition, the court must find that the "loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant and that the caretaking or financial support is "irreplaceable" to the defendant's family. USSG § 5H1.6, comment, n.1 (Emphasis added.)

In most cases, incarceration causes pain and hardship for family members. See United States v. Smith, 331 F.3d 292, 293-294 (2d Cir. 2003). (holding that the evidence was insufficient to justify a departure based upon the defendant's close

---

[2]     These cases were decided in the pre-Booker context. United States v. Booker, 543 U.S. 220 (2005).

relationship with his two-year-old child and his spouse's need to postpone her education); United States v. Faria, 161 F.3d 761, 763 (2d Cir. 1998) (overturning a downward departure for a recently divorced father of three children under the age of 18 years old who lived with their mother because the defendant's family was not uniquely dependent on the defendant's support).

CHATWAL's situation will be no different.  His incarceration will not cause a loss of essential caretaking. The defendant's spouse and the defendant's extended family are available to step in as temporary substitutes.  Although his incarceration poses a hardship, it would not be extraordinary so as to merit a downward departure.

2.   CHATWAL's Generosity and Good Works

CHATWAL's generosity and good works are not a basis for departure.  While the government acknowledges CHATWAL's philanthropy and good works, it is clear that under Section 5H1.11 of the Guidelines, such factors are not ordinarily relevant in determining whether a departure is warranted.  And while it is within the Court's discretion to downward depart for extraordinary public service and good works, this Court should not exercise that discretion here.  See United States v. Canova, 412 F3d 331, 358, 359 (2d Cir 2005).

Unlike many defendants, CHATWAL's wealth enabled him to make substantial charitable contributions and, because of his life of privilege, he had the time and the opportunity to perform good works.  However, as one sentencing Court has pointed out, it can sometimes be more impressive when a salaried employee, who is of modest means, performs good works.  See United States v. Greene, 249 F. Supp. 2d 262, 264-265 (S.D.N.Y. 2003) (departing downward where a salaried defendant in a white collar prosecution spent the time to perform good works.)

CHATWAL's generosity and good works are best understood, for sentencing purposes, when viewed in light of the crimes to which he has pleaded guilty.  While demonstrating commendable generosity and performing good works, CHATWAL, at the same time, cynically violated the campaign financing laws and then showed contempt for the law by trying to conceal his wrongdoing through witness tampering.  While achieving enormous professional success, CHATWAL became intoxicated with power and in securing influence over those with power.  CHATWAL once explained his reasoning behind campaign contributions to public officials as follows:

> Without that nobody will even talk to you. When they
> are in need of money [unintelligible] the money you
> give then they are always for you. That's the only way
> to buy them, get into the system. [unintelligible]
> What, what else is there? That's the only thing.

PSR ¶ 21. (October 28, 2010 recorded conversation).

The following observations by the sentencing court in

United States v. Fishman, 631 F. Supp. 2d 399, 400 (S.D.N.Y.

2009), who likewise sought leniency because of his generosity

and good works, are equally applicable here. Like Fishman,

CHATWAL's argument

> echoes . . . similar pleas for mercy frequently urged
> . . . in courtrooms across the country. . . .
> [His] argument falls into a pattern advanced by a
> subset of the white collar criminal. This category
> encompasses a select class: distinguished, reputable,
> highly esteemed model citizens . . . The list of their
> achievements and virtues is long and impressive. At
> home, they are good family men and women, caring
> spouses, loving parents, loyal and reliable to
> friends. At work, they are looked up to as
> outstanding professionals and business partners. To
> their community's charities and public causes they are
> generous patrons and sponsors. As worshippers they
> are devout, often rising as leaders of the
> congregation.
>
> Yet, for all their outward rectitude, these
> otherwise good people suffer a fatal flaw: they
> sometimes lead a double life. Somewhere at the core,
> in a distorted dimension of the soul, the public image
> they present is as false as the lies they tell to
> sustain the appearance of an exemplary life. And
> somehow, for reasons that always defy reason, they
> fall into crime, doing wrongful deeds that seem
> aberrational, selfish and greedy acts that, when
> caught, they claim are entirely out of character with
> their otherwise law-abiding lives.

Id.  (Emphasis added.)  CHATWAL's argument seeking leniency for
his generosity and good works goes only so far.  His otherwise
charitable work omits what is equally important here, namely the
nature and circumstances of his offenses, which weigh heavily
against a downward departure.

      B.   Nature and Circumstances of the Offense

     CHATWAL's argument regarding the nature and circumstances
of the offense begins by "not[ing] at the outset that nothing in
this discussion is meant to minimize or excuse Sant's conduct"
(Br. 63), before undertaking a series of arguments that appear
designed to do just that.

          1.   Recent Supreme Court Decisions Are
              Inapplicable to this Case

     First, CHATWAL attempts to place his guilty plea in the
context of "the Supreme Court's recent decisions curtailing the
reach of campaign finance regulation," Br. 63, but those
decisions have no relevance here.  CHATWAL is correct that the
Court has struck down certain campaign finance laws on First
Amendment grounds, but even he concedes that the laws he has
pleaded guilty to violating "have survived on the ground that
they are a reasonable impingement on First Amendment rights when
balanced against the strong public interest in limiting
corruption or its appearance."  Br. 63.  This concession—if one
could call an acknowledgment of the continuing vitality of a law

one has pleaded guilty to violating a "concession"—is the end of the matter.   Interesting though the Supreme Court's recent jurisprudence on the First Amendment may be, it has absolutely no bearing on the appropriate sentence in this case.

Tellingly, CHATWAL's "concession" regarding the state of the law governing illegal conduit contributions contains one notable omission that is especially relevant here:   Courts have repeatedly held that one of the best ways to serve what CHATWAL acknowledges as "the strong public interest in limiting corruption or its appearance" is to promote transparency through open, honest, and accurate reporting regarding the sources of contributions to candidates and their committees. It is that public interest in transparency—and the concomitant confidence in the fairness of the electoral process—that CHATWAL's conduct was designed to undermine, and did undermine.

> ### 2.   CHATWAL's Lack of Corrupt or Selfish Intent (Even If True) Is Irrelevant

CHATWAL's assertions regarding his claimed lack of corrupt or selfish intent are similarly beside the point. As with his canvass of recent Supreme Court law, CHATWAL's discussion of his purported lack of corrupt intent carries with it yet another "concession," namely that "proof of corrupt intent is not required for finding a violation of the campaign finance laws," Br. 63.   This correct statement of the law regarding the conduit

contributions, by its own terms, renders CHATWAL's extended discussion of his asserted benign motivations about as relevant as his discussion of the Supreme Court's recent campaign finance decisions—that is to say, not relevant at all.   CHATWAL's claim that he lacked selfish intent when making the illegal contributions is contradicted by his own words.   One who is acting unselfishly and without corrupt intent does not say, as CHATWAL did, "That's the only way to buy them, get into the system. . . . What, what else is there? That's the only thing." PSR ¶ 21.

> 3.   The Cases CHATWAL Cites Do Not Support
>       His Claim That His Conduct Is Somehow
>       Less Culpable

Having outlined the ways in which his conduct here— including his witness tampering—was purportedly not motivated by selfish or even improper reasons, CHATWAL once more reminds us that he is not "minimizing the seriousness of [his] conduct," Br. 66. He then proceeds to distinguish his case from that of the defendants in three other campaign-finance cases, all of whom received jail time.   CHATWAL's attempt to distinguish these cases, however, is unavailing and ultimately self-defeating.[3]

---

[3] Each of these cases was prosecuted by the Public Integrity Section, which is co-counsel with the U.S. Attorney's Office for the Eastern District of New York.   As such, counsel is quite familiar with the facts of all three cases, and will be prepared to address the Court regarding how they should inform the sentence in this case.

Ultimately, the government submits that CHATWAL's attempts to distinguish these cases are unavailing, and indeed undercut his contention that he ought to receive a non-custodial sentence. While CHATWAL is correct that each of these cases involved a substantial downward variance, to highlight that aspect of these cases is "burying the lede": each of these defendants was sentenced to substantial jail time—Paul Magliocchetti to 27 months, William Danielczyk to 28 months, and Harvey Whittemore to 24 months—despite the fact that all of them claimed, as CHATWAL does here, that their conduct (and their spotless criminal records and prior good acts) warranted only a probationary sentence.

CHATWAL is correct that the illegal contribution scheme at issue in United States v. Magliocchetti, (10-cr-286) (E.D. Va. 2011, involved both more money and a more transparently self-interested motive than the crimes to which CHATWAL has pleaded guilty. Bad though Magliocchetti's conduct was, however, there was no allegation that he tampered with witnesses, as CHATWAL has pleaded guilty to doing. That circumstance alone, the government submits, makes CHATWAL's case readily distinguishable from the facts in Magliocchetti and not in a manner favorable to CHATWAL.

Furthermore, while CHATWAL is correct that Paul Magliocchetti's son, Mark, also pleaded guilty, cooperated with

the government, and received a custodial sentence—CHATWAL fails
to note that this sentence was imposed despite the fact that
Mark Magliocchetti had pleaded guilty to only misdemeanor
violations of the campaign finance laws.  In other words, Mark
Magliocchetti received a far more serious sentence than CHATWAL
is seeking despite offenses of conviction that are, by
definition, far less serious—and despite the fact that he
cooperated against his own father.

   CHATWAL's reliance on United States v. Danielczyk, (11-cr-
85) (E.D. Va. 2013) is similarly misplaced.  First, the
government notes that the total amount of illegal conduit
contributions that Danielczyk made is almost identical to those
made by CHATWAL.  Furthermore, Danielczyk's conduit
contributions were made to a single campaign, at a single
campaign event, whereas CHATWAL's were made to at least three
different campaigns over a prolonged period of time.

   Finally, while the defendant in United States v.
Whittemore, (12-cr-58) (D. Nev. 2014), was charged with one
count of making false statements to the FBI in the course of its
investigation of his conduct, the jury ultimately hung on that
count, and the trial court—over the government's objection—
declined to impose the obstruction of justice enhancement.
Here, by contrast, CHATWAL has pleaded guilty to witness
tampering.  Moreover, even if it were true, as CHATWAL contends,

that CHATWAL's tampering did not actively impede the investigation, that is so only by virtue of the fact that the witness CHATWAL tampered with was (unbeknownst to CHATWAL) cooperating with the government.  CHATWAL ought not receive a benefit because he was lucky enough to tamper with a witness who would not do his bidding.

If there is a common thread uniting each of these three cases, it is not that the sentencing court varied from the recommended Guidelines range, but rather that in each one the courts rejected vigorous claims by the defendants that a probationary sentence would be appropriate.  The district court in Whittemore, for example, stated: "I do not view this as a probation case.  It is simply too aggravated under the circumstances.  It is too severe in the nature of the conduct. It would be an insult, in the Court's view, to the purpose of complete and accurate disclosure of contributions to campaigns and our federal elections."  Whittemore Sentencing Transcript at 170 (Excerpt attached as Exhibit 1).

The same court, in rejecting the defendant's contention (similar to the one advanced by CHATWAL in this case) that a civil resolution would be more appropriate, was emphatic: "What is the government to do?  Are they to say these criminal offenses that strike at the heart of our electoral process and arguably affect our democracy itself, that we should turn this

over to the Federal Election Commission and have it handled civilly?  It just doesn't work that way."  Id. at 175.

In sum, these three cases are instructive, but not in a way that aids CHATWAL's argument; for they all squarely reject his contention that non-custodial sentences are appropriate in cases like CHATWAL's that involve serious campaign finance offenses.

        C.    The Guidelines Calculation Does Not
              Overstate the Seriousness of the Offense

CHATWAL next contends that the guidelines calculation overstates the seriousness of the offense because, first, the loss table is flawed and, second, the enhancements in this case impermissibly rely on "substantially the same underlying facts." Br. 72.  Neither claim withstands scrutiny.

        1.    The Use of the Loss Table Is a Sound
              Exercise of the Commission's Discretion

In Section 314 of the BCRA Congress directed the Commission to promulgate a guideline that reflected "the serious nature" of campaign-finance violations and "the need for aggressive and appropriate law enforcement to prevent such violations."  The cross-reference to the fraud-loss table in Section 2B1.1 was specifically incorporated in response to this directive, and, as such, it constitutes a sounds exercise of the Commission's discretion.  CHATWAL cannot cite a single controlling precedent— and the government is aware of none—that supports his argument

that the Court should simply disregard the loss table in this case.

CHATWAL quotes a sentence from an internal Department of Justice publication regarding how the Department used to prosecute election crimes before the passage of BCRA, and then attempts to bootstrap the out-of-context statement into an argument against the application of the loss table to this case. CHATWAL is surely correct that the Department once had a very different approach to the prosecution and sentencing of campaign financing crimes.  In citing the Department's former position on these matters, however, CHATWAL neglects to mention one significant development that has substantially altered the Department's approach to these cases:  Congress passed a law (BCRA) significantly enhancing the penalties for these types of offenses, and instructed the Commission to promulgate additional guidelines that would reflect Congress' treatment of these crimes as serious offenses warranting serious penalties.

To contend that the Department had a different approach to campaign financing crimes prior to the passage of BCRA is somewhat akin to arguing that the Department had a different approach to organized crime prior to the passage of RICO.  While both statements are true, they do nothing to undermine Congress' authority to change the law to give effect to criminal-justice and other policy considerations it deems important.  While

CHATWAL may find the Department's pre-BCRA position "compelling," Br. at 71, the wisdom of that position was rendered utterly irrelevant once Congress passed BCRA, and the Commission promulgated Section 2C1.8 in response to Congress' statutory directive.

CHATWAL also takes issue with the Commission's efforts, in promulgating Section 2C1.8, to "assure[ ] proportionality with penalties for fraud offenses," Guidelines Supplement at 60. Specifically, CHATWAL argues that "the systemic harm caused by campaign finance violations is not equivalent to the financial loss or gain involved in fraud" because "the non-monetary harm [caused by campaign finance violations] is diffuse and does not correlate to the amounts involved." Br. at 71. CHATWAL cites no authority in support of these contentions, and the government is aware of none. In the absence of such authority, CHATWAL's argument amounts to nothing more than a policy disagreement with both Congress (for passing BCRA) and the Sentencing Commission (for following Congress directive to promulgate a sentencing guideline). The government submits that such disagreements provide no basis for this court to depart downward. Finally, CHATWAL's casual assertion that the harm caused by his crimes is "diffuse" trivializes the seriousness of his conduct. Campaign-finance crimes like CHATWAL's, as many courts have taken pains to underscore, have a corrosive effect on our electoral system.

They undermine the public's confidence in the system and perpetuate a dangerous perception that money buys not just access, but influence as well.  Blithely dismissing that harm as "diffuse" in an effort to secure a substantially reduced sentence only compounds the harm.

> D.    Substantial Variance Is Not Needed To Avoid Unwarranted Sentence Disparities

As the court is well aware, sentencing is conducted on a case-by-case basis. While the defendant has cited several election law cases in which non-custodial sentences were imposed, as the government outlines at pages 30-34, supra, three other cases cited by the defendant, Danielczyk, Magliocchetti, and Whittemore, all resulted in substantial sentences of incarceration.  In addition, the government calls the Court's attention to these cases in which substantial prison sentences were imposed:

- United States v. Joseph Bigica (D.N.J.): On May 9, 2012, Bigica pleaded guilty to, among other things, conspiring to violate the Election Act. Between April 2005 and May 2009, Bigica used 19 straw donors – including family members, business associates and others – to make $98,600 in illegal contributions to the campaign committee of a federal candidate. Bigica reimbursed the straw donors using checks drawn on accounts in the name of his spouse or companies he controlled. Bigica was sentenced to 60 months in prison.

- United States v. Christopher Tigani (D. Del): On June 9, 2011, Tigani, the former President of N-K-S Distributors, Inc. ("NKS"), pleaded guilty to violating the Election Act by soliciting numerous NKS employees to make at least $219,800 in political contributions to two federal campaigns. Tigani used company non-payroll checks to

reimburse the conduits for the contributions they made. Tigani was sentenced to 2 years in prison.

As these cases amply demonstrate, custodial sentences for serious violations of the campaign finance laws are a regular occurrence.

>    1.   Civil Resolution Is Wholly Inappropriate
>         For The Type of Illegal Campaign
>         Contributions at Issue Here

There is a statutory distinction under the Election Act between non-willful violations involving any dollar amount, and knowing and willful violations involving $2,000 or more within a calendar year.  Congress expressly made non-willful violations subject to the exclusive administrative and civil jurisdiction of the FEC.  2 U.S.C. §§ 437g(a), 437d(e).  Congress made the willful violations additionally subject to criminal prosecution by the Department of Justice.  2 U.S.C. §§ 437g(a)(5)(B), 437g(d).

CHATWAL cites certain administrative matters resolved by the FEC in an apparent effort to analogize his case to those that have been resolved civilly.  Specifically, he points to three Matters Under Review ("MUR") by the FEC, claiming that somehow these are relevant to the appropriate sentence for a criminal case.  Br. at 76-77.  Criminal violations—like the one defendant has pleaded guilty to—require both monetary thresholds and, most importantly, a mens rea of willfulness.

Two of the matters CHATWAL cites, Federal Home Loan Mortgage Corporation ("Freddie Mac") (MUR No. 5390) and Centex Construction (MUR No. 5357) involved schemes where there was no finding of willfulness whatsoever, and thus are wholly irrelevant here. In the third matter CHATWAL cites, Apex Healthcare, Inc. and James Chao (MUR No. 5405), the Final Report by the FEC's General Counsel noted that there had been a "reason to believe" willfulness was involved, but there is no indication from that Report whether any such finding was ever ultimately made by the Commission.

Each of the above-cited administrative matters involved distinctly different facts than the scenario presented in this criminal proceeding. As discussed above, the factors associated with CHATWAL's criminal conduct here frequently result in custodial sentences—even in cases that did not involve the witness tampering engaged in by the defendant in this case.

> E.   Deterrence and Punishment Are Important
>       Factors to Consider Here

Finally, in arguing the factors under Section 3553(a), CHATWAL contends that both general and specific deterrence will be satisfied through the imposition of a non-custodial sentence. The government submits that the imposition of a non-custodial sentence would only serve to compound the harm that CHATWAL's criminal conduct has already done to the election process, by

effectively sending the message that this conduct is not really serious.  In recorded conversations, he has already expressed the cynical view that public officials can be bought. He acted with cynicism towards the electoral process by steering illegal campaign contributions through straw donors and instructed others to do the same, all in flagrant violation of laws designed to ensure transparency with regard to the financing of campaigns.  He coached others to avoid detection by reimbursing the straw donors with cash because "cash has no proof." PSR ¶ 31. He instructed others on how to lie to law enforcement.

The severity of such conduct and CHATWAL's disregard for the importance of free, fair, and transparent elections coupled with his disdain for the law by tampering with witnesses warrant punishment with a term of imprisonment.  Such a sentence will provide for a just punishment, will specifically deter CHATWAL should he be tempted to resume his double life, and will allow for general deterrence by sending a loud and clear message that free, fair, and transparent elections are to be cherished and protected from those who would subvert them through illicit campaign contributions.

In sum, none of the factors set forth in 18 U.S.C. § 3553(a) warrant a non-Guidelines sentence.  A sentence of incarceration within the Guideline range set forth in the plea agreement is a reasonable sentence that provides for both

punishment and deterrence. Such a sentence is the one that

fairly reflects the factors described in 18 U.S.C. § 3553(a).

## CONCLUSION

The Court should deny the defendant's sentencing motion and sentence the defendant within the Guidelines range set forth in the plea agreement.

Dated:      Brooklyn, New York
            December 1 , 2014

                                    LORETTA E. LYNCH
                                    United States Attorney
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201

                                    JACK SMITH
                                    U.S. Department of Justice
                                    Public Integrity Section
                                    1400 New York Avenue NW
                                    Washington, D.C. 20005

Martin E. Coffey
Assistant U.S. Attorney

Kevin Driscoll
Trial Attorney

EXHIBIT 1

1

1          UNITED STATES DISTRICT COURT
                DISTRICT OF NEVADA
2       BEFORE THE HONORABLE LARRY R. HICKS
              U.S. DISTRICT COURT JUDGE
3

4
UNITED STATES OF AMERICA,           :
5                                   :
          Plaintiff,                :
6                                   : No. 3:12-cr-58-LRH-WGC
     vs.                            :
7                                   :
F. HARVEY WHITTEMORE,               :
8                                   :
          Defendant.                :
9   _____:

10

11
          TRANSCRIPT OF IMPOSITION OF SENTENCE
12

13

14
                 September 30, 2013
15

16                 Reno, Nevada

17

18

19

20

21

22   Court Reporter:        Donna Davidson, RDR, CRR, CCR 318
                            Certified Realtime Reporter
23                          400 South Virginia Street
                            Reno, Nevada  89501
24                          (775) 329-0132

25

2

1    APPEARANCES:

2    For the Plaintiff:

3    **STEVEN W. MYHRE**
     Assistant United States Attorney
4    100 West Liberty Street
     Suite 600
5    Reno, Nevada 89501

6
     **ERIC G. OLSHAN**
7    Trial Attorney
     Public Integrity Section
8    United States Department of Justice
     1400 New York Avenue, NW
9    Suite 12100
     Washington, DC 20005
10

11

12   For the Defendant:

13   **DOMINIC P. GENTILE**
     Gordon Silver
14   3960 Howard Hughes Parkway
     Ninth Floor
15   Las Vegas, Nevada 89169

16   **JUSTIN J. BUSTOS**
     Gordon Silver
17   100 W. Liberty Street
     Suite 940
18   Reno, Nevada 89501

19

20

21

22

23

24

25

3

1          RENO, NEVADA, SEPTEMBER 30, 2013, 1:33 P.M.

2                           --oOo--

3                    P R O C E E D I N G S

4

5          THE COURT:   Good afternoon.   Have a seat,

6    please.

7          THE CLERK:   Today is the date and time set for

8    imposition of sentence in criminal case

9    3:12-cr-58-LRH-WGC, United States of America versus F.

10   Harvey Whittemore.

11         Dominic P. Gentile and Justin Bustos are present on

12   behalf of the defendant.

13         Steven Myhre and Eric Olshan are present on behalf

14   of the government.

15         THE COURT:   I'd like to welcome everyone here

16   this afternoon.   This matter has been scheduled for the

17   sentencing of Mr. Whittemore following the entry of

18   guilty verdicts by the jury following the jury trial

19   which was conducted in this matter over the middle two

20   weeks of May 2013.

21         At that time the guilty verdicts were for the

22   offenses of:   Count One, Making Excess Campaign

23   Contributions; Count Two, Making Contributions in the Name

24   of Another; and, Count Three, False Statement to a Federal

25   Agency and Aiding and Abetting.

4

1      There was a fourth count upon which the jury did

2   not reach a verdict and has been subsequently dismissed by

3   the Court.

4      Following the entry of those guilty pleas, a

5   presentence investigation and report was ordered by the

6   Court, and that has been completed.  And the Court has

7   before it the date of the revised report, September the

8   5th, 2013.

9      I also have before me many documents in this case.

10   First of all, the defendant's -- I'm going to refer to it

11   as sentencing memorandum and objections.  It's actually a

12   600-page-plus document containing many items that have

13   been argued and presented by the defense in this case.  I

14   am thoroughly familiar with it.

15      A significant part of that same package was some 67

16   letters I received from friends of Mr. Whittemore, many

17   family members, certainly all of his direct family

18   members, members of the business community and Nevada

19   residents acquainted -- familiar with Mr. Whittemore in

20   one capacity or another.

21      I have read everything that has been filed,

22   including those letters as well as several letters that

23   were sent to me outside of that particular package that

24   was provided by the defense, those letters being in

25   support of Mr. Whittemore.

1 will submit on that.

2 THE COURT: I do not.

3 Is there any reason, legal or just, why the Court

4 should not proceed with sentencing at this time?

5 MR. MYHRE: Not from the government, Your

6 Honor.

7 THE COURT: Mr. Gentile, you rose.

8 MR. GENTILE: Your Honor, I wanted to address

9 a couple of points that Mr. Myhre --

10 THE COURT: As long as it's not a repeat of an

11 argument I've already heard.

12 MR. GENTILE: No, it won't be. It won't be.

13 He brought up list number two. There was no --

14 excuse me. We still don't know who created list number

15 two. That was never connected to anybody.

16 Mr. Perry said that that's what he found. And he

17 never examined list number two and the e-mail together, so

18 he couldn't say that they were, in fact, related to each

19 other. That's what was given to him. That's number one.

20 Number two, Mr. Whittemore stood before you and

21 said to you today, just before Mr. Myhre spoke, that he

22 was arrogant in his judgment when these events took place.

23 Arrogant. Arrogant with respect to the way that he dealt

24 with the legal situation at the time.

25 And your instruction to the jury said you could

157

1  either -- you could be guilty if you deliberately disobey

2  the law or if you disregard the law.  Arrogance isn't

3  disregard of the law.  And so I don't think his argument

4  flies.

5      And while it is true that everybody that stands in

6  the courtroom is equal before the law, you are charged,

7  under 3553 and under all the supreme court authority since

8  *Booker*, to make this an individualized sentence.

9      So while we're all equally -- we're all treated

10  equally before the law, the law in this instance, because

11  it's a sentencing, requires you to individualize it.

12      And that's all I have to say.

13          THE COURT:  All right.  Thank you.

14      I'll repeat again, is there any reason, legal or

15  just, why the Court should not proceed with sentencing at

16  this time?

17          MR. MYHRE:  Not from the government, Your

18  Honor.

19          MR. GENTILE:  No, Your Honor.

20          HE COURT:  All right.  I'm not sure that at

21  the time the verdicts were returned, whether I had

22  entered findings of guilt of Mr. Whittemore on the

23  offenses upon which the jury found him guilty.

24      And I certainly do that at this time if I didn't do

25  it then, that I do find him guilty of Making Excessive

Case 1:14-cr-00143-LLG   Document 28   Filed 12/02/14   Page 52 of 81   PageID #: 853
Case 3:12-cr-00058-LRH-WGC   Document 226   Filed 11/15/13   Page 158 of 188

158

1   Campaign Contributions, as set forth in Count One of the

2   Indictment; Making Contributions in the Name of Another,

3   as set forth in Count Two of the Indictment; and making --

4   let's see, Making a False Statement to a Federal Agency

5   and Aiding and Abetting, as set forth in Count Three of

6   the Indictment.  That was relative to the statement that

7   was made to the Federal Election Commission, not the FBI.

8   Count Four, the False Statements to the FBI, the Court has

9   dismissed that charge without prejudice.

10          Where do you start on something like this?  It's

11  obviously a late hour, and we've covered just about every

12  territory that could be covered in this case.

13          I'm sure that there's no one in this courtroom who

14  doesn't recognize that one of the most difficult jobs and

15  responsibilities imposed upon a trial court judge is

16  imposing sentences in criminal cases.  I can't begin to

17  tell you how difficult that is.  But the issue here is not

18  me and my responsibility, the issue is carrying out that

19  responsibility.

20          First of all, it's troubling to the Court that it's

21  almost, in so many of these criminal cases, as though the

22  guideline calculations are just a beginning point in

23  negotiations concerning what the sentence should be.

24  Under our sentencing guidelines they aren't.

25          Our sentencing guidelines are established for

Case 3:12-cr-00058-GRB-WGC Document 28 Filed 12/07/14 Page 53 of 81 Page ID 1854

1  the -- in the interest of defendants who commit similar

2  conduct being treated similarly in our criminal justice

3  system throughout the United States.

4  Under our sentencing guidelines, as the Court has

5  found them in this case, the suggested term of

6  imprisonment is between 41 and 51 months.  Under our

7  sentencing guidelines, there is no probation, or probation

8  should not be considered.

9  The fact is the supreme court, for good reason, has

10  backed off of the requirement, as has Congress not changed

11  it since that was done, that the Court is bound by the

12  sentencing guidelines and bound by the prison sentence

13  that they espouse.

14  But what is recognized is that there's a series of

15  criteria that the Court must consider.  And they've been

16  alluded to throughout the arguments here.  And I'm going

17  to comment on some of those in relative strength as I view

18  them as applying in this particular case.

19  But I have to start with the offenses themselves.

20  These three offenses are all serious felony offenses for

21  which Mr. Whittemore has been convicted, making excessive

22  campaign contributions, making contributions in the name

23  of another, false statement to a federal agency, and

24  aiding and abetting.

25  What those speak to -- if we think a moment for the

Case 1:14-cr-00143-LG  Document 28  Filed 12/02/14  Page 54 of 81  PageID 1855
Case 3:12-cr-00058-LRH-WGC  Document 226  Filed 11/05/13  Page 160 of 183

160

1  likely defendant who's going to appear charged with these
2  felony offenses and convicted of them, either by virtue of
3  a guilty plea or by virtue of having gone to trial and
4  been found guilty by a jury of our peers of these
5  offenses, are likely going to have been committed by
6  someone who was involved in the political processes in
7  varying degrees, I'm sure.

8       But the fact is it almost always is going to be a
9  person who has absolutely no criminal history, who
10  probably is highly respected within either the lobbying
11  community or, in a state like Nevada, where respect and
12  recognition become statewide, because we're a small state,
13  and people like Mr. Whittemore is a classic example, have
14  become known north and south.  And any number of the
15  people who may be involved in this case, known well
16  throughout the State of Nevada.

17       And that person, not referring to Mr. Whittemore,
18  is likely to have no criminal history whatsoever.
19  Moreover, he's likely -- I say he, it could be a she as
20  well, obviously, the cases I've seen have all dealt with
21  men -- a person who is respected in the business
22  community, a person who has a family behind them.  Because
23  with success and with respect come all the things that
24  make for good families and good relationships.  Not
25  always, as we all know, but certainly they lend themselves

1   to that.

2          So in the background of that, you're looking at a

3   defendant -- I'm not referring specifically to

4   Mr. Whittemore, except that he falls within this

5   profile -- to be not a criminal in the ordinary sense of

6   criminality and not a threat of any kind of violence,

7   obviously, and in a case like this, of course, no further

8   threat of criminal activity.  I can't believe that after

9   what Mr. Whittemore has gone through in this case -- just

10  given the nature of it and the felony conviction, there's

11  no threat of future criminal activity.

12         So this individual, the type of individual I'm

13  talking about, under the sentencing guidelines, which are

14  designed to be imposed across the United States as a

15  starting point for sentencing, in this case call for --

16  make sure I don't make a mistake here, 41 to 51 months in

17  prison.

18         We started, when we came in here, with a very

19  thorough and well-written presentence investigation and

20  report, where the probation officer felt that there was --

21  because of the issue concerning misstatements to the FBI

22  law enforcement agencies, felt that there should be

23  enhancements that would have caused this to be a

24  51-to-63-month sentence.

25         I didn't agree.  And I'm sure the probation officer

Case 1:14-cr-00143-LG  Document 28   Filed 12/02/14   Page 56 of 81  PageID #: 857
Case 3:12-cr-00056-LRH-WGC   Document 226   Filed 11/15/13   Page 162 of 188

162

1  understands why.  And I'm sure that everyone in the
2  courtroom understands why.  I didn't feel that that should
3  be applied because these -- the statements were
4  inconsistent, we had credible witnesses both ways, they
5  were made in a period of minutes without any advance
6  notice or warning, and they covered a course of conduct
7  that occurred some four years earlier, at a time when
8  Mr. Whittemore was completely unsuspecting that he might
9  be coming in that morning to be interrogated about three
10  felony offenses.

11       So I didn't apply that guideline.  And the
12  guideline I applied was the one that came out of -- these
13  calculations, I know, drive people crazy.  But I can tell
14  you that, as a sentencing judge, they serve a real value
15  because they serve that value of attempting to achieve
16  some uniformity and fair treatment of any defendant.  And
17  they have come out, by the Court's calculations, at 41 to
18  51 months.

19       Now, before me I have this man, Harvey Whittemore,
20  who I personally have known over the years and known the
21  family, or known of the family, not close personal
22  friends, but at least to the level of being people who you
23  say hello to when you pass in the hallway and you
24  appreciate seeing them.

25       But the fact is that these laws are created for a

1   reason. I have a man here who he and his wife have -- I

2   mean, the way they've treated their family, the way

3   they've treated their friends, are reflected in the

4   letters that have been received by the Court, I think I

5   said 67 letters received by the Court, letters from the

6   family members that -- you can imagine how many letters

7   the Court sees in the course of criminal sentencings.

8   It's not just hundreds for me, I think it's probably

9   between 500 and 1,000. You can imagine how many of those

10   cases I've received letters from family and friends. And

11   I've seen some incredible ones. But none that would

12   exceed the type of letters I've received here.

13       I've received letters from people who I know in the

14   community to be the respected, respected people in the

15   community, leaders, people who you just respect, people

16   who are the worker bees that work behind organizations and

17   do great jobs and are never recognized by names. And I

18   see friends and neighbors and the family members who have

19   written to me here.

20       And I can tell you that those letters are

21   absolutely incredible. This man is a fine family man.

22   This man has done great things in this community. And

23   these are not things that are to be treated lightly.

24       And, I mean, simple examples are president of South

25   Reno Babe Ruth, University of Nevada Reno Foundation. He

Case 1:14-cr-00143-ILG Document 28 Filed 12/02/14 Page 58 of 81 PageID #: 859
Case 3:12-cr-00058-LRH-WGC Document 226 Filed 11/15/13 Page 164 of 188

164

1   was chairman. Airport Authority of Washoe County, a board

2   member. Athletic Association of the University of Nevada,

3   chairman.

4        If I recall Mr. Trechok's letter correctly,

5   Mr. Whittemore and his wife are identified as in the top

6   10, and I believe it was number 7, of all-time

7   contributors to the University of Nevada.

8        It goes on from there. He's been honored by the

9   Desert Research Institute, given the award for alumnae of

10  the year of University of Nevada, Reno, in 2001, annual

11  honoree for the American Lung Association, American Heart

12  Association, Juvenile Diabetes Research Foundation, and a

13  list of charitable contributions which the math reflected

14  exceeded $12 million over the period of years that were

15  involved, to just about every charity that you could think

16  of, most of which this man never sought recognition or

17  credit for.

18        So it's in that vacuum that this Court has to

19  approach sentence. I will say that the sentencing

20  guidelines in this case, I believe, deserve some variance

21  by virtue of the extreme accomplishments of this defendant

22  in the community, what he has given, what he represents to

23  his family, what he represents in many ways throughout the

24  state of Nevada.

25        But the backdrop of all of that is the criminal

1   offense which is committed here.  These offenses go to the

2   very heart of our electoral processes.  If we cannot have

3   faith -- and this was said by one of the other judges in

4   one of the cases that was cited, words to the effect that:

5   If we cannot have faith in our election process, then we

6   can't have faith in the strength of our democracy.

7           That's true.  That's why these offenses are viewed

8   as so serious and why even a man of no criminal

9   background, respected in the community, intelligent,

10  strong peer group, strong business support, is no less

11  responsible when he has done something that goes to the

12  very heart of our democratic process, when there's

13  criminal undermining of the electoral process.

14          As recognized by our United States Supreme Court --

15  and this is disturbing throughout this case that

16  there's -- someone suggests that because -- as a result of

17  the United States Supreme Court's decision in *Citizens*

18  *United* in 2010, there now are no limitations on super

19  PACs, anyone can contribute any amount of money to a super

20  PAC without a limitation.  The super PAC is the entity

21  that's responsible for reporting.

22          But that law hasn't replaced these laws.  These

23  laws are still in force and effect, just as they were in

24  2007.  *Citizens United* came three years later than what

25  occurred in this particular case.  And it did nothing to

1    undermine or devalue or decriminalize the criminal

2    offenses which we are dealing with in this case.

3         The supreme court has commented on these laws and

4    recognized in the *Valeo* decision, which is some years ago

5    now, that the primary purpose of these campaign laws, be

6    it conduit contributions or limitations on campaign

7    contribution, is to impose limitations upon the giving and

8    spending of money in political campaigns for federal

9    office.  A primary purpose is to limit the actuality and

10   the appearance of corruption resulting from large

11   individual financial contributions.

12        If ever we had a case where there was such clear

13   proof, clear evidence -- I reviewed the evidence carefully

14   in this case, and it was undisputed -- I mean,

15   Mr. Whittemore knows the law.  He's been recognized as one

16   of the authorities in the law, promises a United States

17   Senator that he'll raise $150,000 for him by the end of

18   March 2007.

19        On March 21st or March 22nd, he's reminded by the

20   campaign committee that he hasn't brought the money in

21   yet.  And by the end of the week, there is, roughly, a

22   total of 149,000 and something in the senator's campaign

23   fund.

24        We've talked a lot here about these particular

25   violations.  There were 29 conduit contributors; in other

1  words, people who were funded by Mr. Whittemore, who were

2  given the money for the contribution to the Reid campaign,

3  and who then turned it over virtually immediately.  These

4  people were all approached one day, and the next day the

5  money was transferred, paid over, and then transferred by

6  Mr. Whittemore's office to the Reid campaign.

7  That was $133,400 of the money.  But on top of that

8  was Mr. Whittemore's personal funds of $4,300 -- $4,300,

9  Mrs. Whittemore's personal funds of $4,300, his sister's

10  contribution of I believe it was $4,300.  So it was there

11  right, roughly, at the $150,000 level.

12  Of course, there's nothing wrong with them

13  contributing in their own name and in their own right.

14  It's just at the same time and part of this incredibly

15  intentional criminal act.

16  And when you think about the appearance of this,

17  the Court is not here making findings that there was --

18  this money was advanced because Mr. Whittemore had a

19  30,000 acre pending development in southern Nevada or that

20  the Whittemore Peterson Institute needed X amount of money

21  or that Mr. Whittemore needed X amount of recognition or

22  prestige within the business and political community of

23  the state of Nevada.

24  The fact is, no matter how you look at this, the

25  appearance of impropriety, of corruption which arises from

Case 1:14-cr-00466-GRB Document 28 Filed 12/02/14 Page 62 of 81 PageID #: 863

1  such a clear violation of the law committed so quickly, so

2  clearly in knowing violation of the law where $133,400

3  in -- literally one day's paid over to the Reid campaign

4  is astounding.

5      There's some question here about the list.  But

6  when the funds are forwarded to the Reid campaign -- we

7  had Exhibit, I think it was, 6 that was the memorandum

8  prepared by Mr. Whittemore's secretary Roxanne -- I keep

9  forgetting her last name -- Doyle, I believe, and it

10  listed -- the money was forwarded, and the names of all

11  the contributors were listed.

12      And out of the 29 of them, 11 key members, who were

13  conduit contributors in this case, were identified as

14  coming from either Wingfield Nevada Group or from -- well,

15  the simple -- the simple example would be Mr. Whittemore

16  himself.  When that list was submitted, it was submitted

17  indicating that Mr. Whittemore was the chairman of

18  Wingfield Nevada Group.

19      It indicated that his partner -- or, excuse me, one

20  of his key managers in Wingfield Nevada Group, Bradley

21  Mamer, was the Chief Executive Officer of Wingfield Nevada

22  Group, that his wife was the Vice President of Human

23  Resources of Wingfield Nevada Group.  Well -- and it goes

24  on from there.  I don't need to go through it ad nauseam.

25      But the point is that someone somewhere -- the

169

1  inference would be it probably came from someone at -- who

2  had received this list who said, you know, it appears that

3  it's one contributor making all these contributions,

4  Wingfield Nevada Group is identified 11 times out of 29,

5  30 contributors here.

6      Well, a new list was submitted. And, no, the

7  evidence didn't show that it came from Mr. Whittemore.

8  But the information on the new list, the changes certainly

9  suggest that Mr. Whittemore was somehow involved in

10  sending those out or approving their being sent out.

11  Because all of a sudden, instead of Mr. F. Harvey

12  Whittemore being the chairman of Wingfield Nevada Group,

13  he was now partner of Lionel Sawyer & Collins.

14      Mr. Mamer, who had been the Chief Executive Officer

15  of Wingfield Nevada Group, was now identified as Chief

16  Executive Officer Coyote Springs Investment, LLC. His

17  wife, Christina, was identified as the Vice President of

18  Resources of Whittemore Seeno Company, not -- no longer

19  Wingfield Nevada Group.

20      It goes on from there. But the point is, this was

21  intentional misrepresentation that if not committed by

22  Mr. Whittemore at least, by inference, was approved

23  somehow by himself.

24      It was willful concealment. We were beyond the

25  point of just making contributions which were knowing

170

1   violations of the law.

2       This Court is in the position of saying, well, if

3   I'm not going to impose a guideline sentence, why?  I need

4   to express the reasons why.

5       Well, insofar as the offense itself is considered

6   and these felony offenses are considered, the knowing,

7   voluntary thought process that's behind 29 conduit

8   contributors in a one-day period of time, totalling

9   $133,000 would say that sentence should be right within

10  the sentencing guidelines.

11      But still I am influenced, as I've said, by

12  Mr. Whittemore personally, his individual accomplishments,

13  his family relationships, what his family means to him,

14  what they all think of him, what he thinks of them, what

15  he's accomplished in this community, and what he's done in

16  this community causes me to conclude that there needs to

17  be a downward variance.

18      But I do not view this as a probation case.  It is

19  simply too aggravated under the circumstances.  It is too

20  severe in the nature of the conduct.  It would be an

21  insult, in the Court's view, to the purpose of complete

22  and accurate disclosure of contributions to campaigns in

23  our federal elections.

24      I wanted to fall back on the primary criteria that

25  the Court is to pass on in imposing sentence in a case

171

1 like this. The first one, of course, is to reflect the

2 seriousness of the crime.

3      As I've indicated, this is a serious, serious

4 felony offense, committed three ways. One, conduit

5 contributions, clearly fraudulent. Two, excessive

6 contributions, clearly prohibited by law. By law

7 Mr. Whittemore could have contributed $4,600. And under

8 the law that -- facts that were proven in this trial, he

9 contributed $133,400 on top of his $4,600 contribution.

10      When you consider that -- the Court's view, that

11 these offenses go to the very heart of our electoral

12 process and they go to the strength of our democracy and

13 they go to the prevention of the appearance of corruption

14 within our political elective process, the seriousness of

15 these crimes is of the utmost magnitude.

16      The next consideration is the promotion of respect

17 for the law. As I said, I'm not making findings in this

18 case that there was some quid pro quo, that this was money

19 raised so that Coyote Springs would be approved in all of

20 its glory.

21      What I'm more concerned about is the appearance.

22 Here's a man with this wealth, with this kind of a

23 business operation underway, involving property that

24 involved numerous federal concerns, who's willfully

25 committing a violation of law wherein he's -- which I

172.

1    don't need to comment further on, and it's going right to

2    one of the most powerful senators, certainly the most

3    powerful United States Senator the State of Nevada has

4    ever known, and I would say probably the most powerful

5    United States Senator in the United States.  A man who

6    was, by law, supposed to contribute no more than $4,600

7    and submitting something in the neighborhood of 138 or

8    $139,000 and covering it by listing other contributors.

9          What's that say about the respect for the law -- if

10   this individual was given, as the defense would argue,

11   probation, what's it say for the respect of the law if the

12   Court is to depart so seriously from the guidelines that

13   have been established under our law?  That doesn't make

14   sense.

15         The next consideration is to provide just

16   punishment.  That's a variation of a couple of the

17   concepts I've been talking about.  But I wanted to say,

18   too, there's two things that I think everyone appreciates.

19   It's respect -- it's from every citizen in this state,

20   probably in the United States, believes that there must be

21   just punishment for criminal conduct.

22         And here we have three felony offenses willfully

23   committed by a person who clearly knew they were

24   violations of law that are aggravated and they're gross.

25   And the appearance that arises from them is about as ugly

Case 3:12-cr-00058-ERK Document 38 Filed 12/02/14 Page 67 of 81 PageID 1868

1  as it can get, whether or not there was anything factual
2  underneath it to support illegality. There has to be just
3  punishment for this kind of a violation of our law.

4        The other principle and concept that we all agree
5  on is that no one is above the law. And you take a person
6  who, with this education and training, commits this kind
7  of offense, who jeopardizes his family, who jeopardizes
8  himself, who is led to, I can only guess, sheer
9  speculation, the kind of financial loss which has fallen
10 on Mr. Whittemore as a result of what has happened here.

11       But how do you afford adequate -- provide just
12 punishment and afford adequate deterrence to criminal
13 conduct if you -- you don't follow these laws which are
14 intended to cover this very type of conduct when it's
15 committed in an aggravated fashion and where the evidence
16 was so clear concerning the manner in which it was
17 committed.

18       The other consideration, protect the public from
19 further crimes of the defendant, I think it's clear that
20 we don't need to worry about that one. And I think it's
21 clear that any defendant comparably charged in any of
22 these other cases, you can bet they have suffered similar
23 personal crisis and humiliation, and there will never be
24 further crimes from them.

25       There's a couple of others, providing defendant

1  with needed education or training and avoiding sentencing

2  disparities.

3       I would say there's been some reference here to the

4  *Rhodes* case, which was a Nevada case involving conduit

5  contributions.  But that was never prosecuted by the

6  Department of Justice.  It was never treated as a criminal

7  offense.  It involved much lesser sums of money per -- I'm

8  not sure, as I sit here, what the details were.

9       But it was treated by the Federal Election

10 Commission.  It was not treated as the criminal offense

11 which was prosecuted here.

12      And I might add, on that note, certainly there's an

13 implication in some of the letters I've seen, some of the

14 comments I've heard, that the government's overreacting in

15 this case?

16      Tell me.  You take this serious of a law that goes

17 to our campaign financial disclosures and our reliability

18 and how much faith we can place in our electoral process

19 and in our democracy itself, and take examples of all of

20 these conduit contributions, in one day family, friends,

21 business associates, every one of those was a separate

22 felony offense.  Combined is what makes it as grave as it

23 is.

24      But when you take that -- and the evidence given to

25 the government, admittedly provided by a competitor --

Case 3:12-cr-00058-ECR Document 28 Filed 12/02/14 Page 69 of 81 Page ID #870

1   competitor isn't the right word, a former business
2   associate, business entity, the evidence shows black and
3   white where the money came from, Mr. Whittemore's personal
4   account; who it went to, his employees, his relatives, and
5   their spouses, all for the purpose of them making a phony
6   contribution to Harry Reid's campaign.

7          The evidence was unassailable.  And it's handed to
8   the government.  And all of this is done in a two-day
9   period.

10          What is the government to do?  Are they to say
11  these criminal offenses that strike at the heart of our
12  electoral process and arguably affect our democracy
13  itself, that we should turn this over to the Federal
14  Election Commission and have it handled civilly?  It just
15  doesn't work that way.

16          No one is above the law.  And there simply must be
17  just punishment for criminal conduct involving intentional
18  felony offenses such as these, which many would argue that
19  the Court should not depart from the sentencing guidelines
20  that are the beginning point for the Court to consider
21  sentence in this case.

22          However, I'm doing that.  What I'm going to, to
23  finish this -- I should take a further look at my notes to
24  make sure that I haven't overlooked something I wanted to
25  say.

Case 1:14-cr-00143-LC Document 28 Filed 12/02/14 Page 70 of 81 PageID #: 871
Case 3:12-cr-00058-ERH-WCC Document 226 Filed 11/25/19 Page 176 of 188

176

1      I'm going to grant a downward variance.  The

2   sentencing guidelines are at level --  offense level 22.

3   I'm going to grant a five-level -- five levels downward

4   variance.  I do so because, aside from this criminal

5   conduct, I respect this man, I respect his family, I

6   respect what he has done for this state and what he's done

7   for this community, what he's done for our university.

8      Five levels is huge.  It takes it down to a

9   24-month sentence of imprisonment.  I am of the view that

10  that's absolutely as far as the Court could or should go

11  in a case such as this, for the very reasons that I have

12  cited.  And many other reasons too.  The evidence in this

13  case will speak for itself from here on out.  And there

14  clearly will be an appeal.

15     I would mention, too, there's been reference to

16  other cases where some defendant was treated differently

17  or lighter or more severe.  I would tell you that every

18  one of those cases involved a plea agreement and a guilty

19  plea, where the defendant came in the courtroom, waived

20  all rights of appeal, took complete acceptance of

21  responsibility for what he did.

22     And in every case -- I'm not aware of any off the

23  top of my mind where the offense was as aggravated that,

24  well, they pled to or the amount was as great.  Perhaps --

25  there were *Danielczyk* and *Magliocchetti*.  Mr. Gentile

1   knows how to pronounce his name and I don't.  But even

2   those men received sentences that are greater than

3   Mr. Whittemore.  And they entered all their pleas,

4   accepted all of their responsibility on a plea agreement.

5   They didn't go to trial.

6          With regard to a fine in this case, Count Two,

7   which is the making contributions in the name of another

8   offense, the conduit contribution offense, calls for

9   triple fine of the amount contributed.  That would be a

10  maximum of -- or, excuse me, a minimum of $400,000,

11  $400,200, if I followed that law.

12         I have some discretion there, for the simple reason

13  that I'm entitled to take into consideration the

14  defendant's ability to pay.  And I -- it clearly is the

15  case that he's suffered immeasurable financial and

16  personal loss as a result of everything that's happened to

17  him, in large part due to this, but other factors as well,

18  that all bear upon his ability to pay.  But he is still a

19  wealthy man, and he is still a man who the Court views as

20  a responsible individual.

21         I'm going to impose a fine of $100,000.

22         MR. GENTILE:  Your Honor, may I address that?

23         I'm not trying to talk you out of it, but I just

24  want to clear the record up.  You only have to follow the

25  trebling if you give him probation.  It allows one, the

178

1   other, or both.

2          THE COURT:  All right.  Well, then, I stand

3   corrected on that.  And I accept that.  But I -- and I

4   appreciate your bringing that to the Court's attention

5   because I had overlooked that.

6          MR. GENTILE:  Well, to the extent that that

7   weighed in on your decision at a hundred, that's why I

8   wanted to clarify it.

9          THE COURT:  No, that's fair.

10      But I'm going to impose a fine of $100,000.  That

11  will apply as to all three of the counts, not just as to

12  the one.  That, of course, is the total amount of the fine

13  for all three offenses.

14      A special assessment of $300 is required, $100 per

15  count.  And that is imposed.

16      Supervised release is -- I'm not going to follow

17  the recommendation.  I just don't see that supervised

18  release is a big issue in this case.  I'm going to order a

19  two-year term.  And that will be concurrent on all three

20  counts of conviction.

21      With regard to the conditions applicable to

22  supervised release, this is the period of time after the

23  prison time is served.  There are obviously terms and

24  conditions which apply to it.  Under the -- the law

25  mandates that the -- four mandatory conditions.  I'm going

1  to suspend two of them because they're simply not at issue

2  here.

3       But certainly Mr. Whittemore shall not commit

4  another federal, state, or local crime during the term of

5  supervision.

6       The law requires submission of DNA collection and

7  analysis.  That's ordered in every case.  That will be

8  imposed.

9       There's two others.  One, not to possess illegal

10  controlled substances.  And to submit to drug testing.

11  That's just simply not an issue in this case.  The Court

12  will suspend both of those requirements.

13       If at any time the probation department ever felt

14  that there was some reasonable grounds upon which those

15  should be activated and the suspension should be lifted,

16  the Court would do that.

17       The special conditions which have been recommended:

18       Possession of weapons.  He's already prohibited

19  from having any firearms.  But this is a little more

20  specific.  The Court will impose it because we regularly

21  do.  Shall not possess, have under his control, or have

22  access to any firearm, explosive, device, or other

23  dangerous weapons as defined by federal, state, or local

24  law.

25       Warrantless search.  The Court doesn't see the need

1  to impose the warrantless search requirement in this case.

2  I'm not going to do that.

3      Mental health treatment.  Based upon all of the

4  information that's been provided concerning some of the

5  medical problems that Mr. Whittemore has been suffering

6  and is suffering and the stress obviously that's

7  associated with this case cause me to conclude that the

8  mental treatment requirement is a reasonable requirement

9  for supervised release and will be imposed as set forth

10  within the presentence report.

11      Access to financial information.  He shall

12  provide -- because of the penalty imposed here by the

13  Court, the financial penalty, he shall provide the

14  probation office with access to requested financial

15  information, including personal income tax returns,

16  authorization for release of credit information, and any

17  other business financial information in which he has a

18  control or interest.

19          MR. GENTILE:  Your Honor, will that apply

20  after the fine is paid?

21          THE COURT:  After what?

22          MR. GENTILE:  After the fine is paid?

23          THE COURT:  No.  That will be -- that's a

24  good -- I'm pleased that you raise that.  Once the fine

25  has been paid in full, that condition will be exonerated

Case 1:14-cr-00100-GBR Document 28 Filed 12/02/14 Page 75 of 81 PageID# 876

1   and nullified.

2          He will be required to contribute -- or to report

3   to the probation office in the district to which he's

4   released within 72 hours of his discharge from custody.

5          And I'm going to also impose a requirement of

6   community volunteer service of a minimum of 100 hours.

7          And I'm doing that -- Mr. Whittemore obviously has

8   a lot to give others.  And recalling that I've come down

9   from a sentencing guideline of 41 months to 24 months, it

10  doesn't take a mathematician to compute how many days that

11  is --

12         MR. GENTILE:  Community service is not a

13  punishment to him.

14         THE COURT:  -- 100 hours of community service,

15  do it with a smile on your face, Mr. Whittemore.  It's

16  probably the only positive note I've been able to give

17  you here this evening.

18         MR. GENTILE:  I have two requests of the

19  Court.

20         THE COURT:  All right.

21         MR. GENTILE:  Mr. Whittemore has an active law

22  practice.  It's going to take a little bit of time to

23  wind it down.  Can we -- obviously we're going to be

24  notified as to a place for surrender.

25         I'm going to ask that you recommend Herlong as the

1   facility because it's going to be easiest for his family

2   to get to.

3       And the second thing is that it's probably going to

4   take him 120 days to wind down that practice.  It's no

5   easy thing to do.  And we do have to deal with the bar

6   during that time.

7       So I would ask that you make the surrender about

8   first of February.

9           THE COURT:  All right.

10          MR. GENTILE:  That's exactly 120 days, by my

11  calculation.

12          THE COURT:  All right.

13      Let me hear from the government.

14          MR. MYHRE:  Well, Your Honor, traditional

15  practice is around 60 days, as I recall, 60 to 90 days.

16  So we don't see any reason why the Court should vary

17  from its usual practice for report date.  We're not

18  seeking remand.  We agree to the same terms and

19  conditions as before.

20      Mr. Whittemore's known of this sentencing date for

21  quite some time to get his affairs in order.

22          THE COURT:  All right.  I appreciate the

23  government's position.  But he's not going to report

24  before the Christmas holidays.  And the additional month

25  that's requested beyond that, given the nature of

Case 1:14-cr-00143-JLC   Document 28   Filed 12/02/14   Page 77 of 81   PageID #: 878
Case 3:12-cr-00058-ERP-WGC   Document 226   Filed 11/05/13   Page 183 of 188

183

1  everything from his law practice to his business

2  relationships, to his family situation, cause the Court

3  to conclude that an additional 30 days is a reasonable

4  request.  So the Court will agree to a self-surrender.

5       And I assume, Mr. Myhre, you're not objecting to

6  him self-surrendering; is that correct?

7            MR. MYHRE:  That's correct, Your Honor.

8            THE COURT:  All right.

9            MR. GENTILE:  We do need the recommendation,

10  if the Court's willing to do so.

11            THE COURT:  Well, I'll certainly give the

12  recommendation to FCI Herlong.  That's the closest

13  Federal Correctional Institute to Reno, Nevada.

14       I've also personally toured it.  It's an impressive

15  facility.  But it's also not one that's typically

16  designated by white-collar defendants.  So,

17  notwithstanding that, it is closest to here.  I recognize,

18  because of family considerations, that's probably the

19  primary reason -- the reason for the request.  I think

20  it's reasonable.  I certainly will recommend that.

21       But if for some reason he doesn't qualify for

22  Herlong, I would recommend one of the light-security

23  facilities that may be available.

24            MR. GENTILE:  Well, I believe -- but if you've

25  just recently toured it, you'd know better, that there

Case 3:12-cr-00058-GRB-WGC Document 28 Filed 12/07/14 Page 78 of 81 Page ID #879

1   is a camp at Herlong.

2            THE COURT:  There is a camp.  And I'm not

3   familiar with it.

4            MR. GENTILE:  Well, that's really the

5   designation.

6            THE COURT:  All right.

7            MR. GENTILE:  Because that's a -- that fits

8   within that security level.

9            THE COURT:  The Court will make that

10  recommendation.

11       And that's not binding on the Bureau of Prisons.

12  But many times they can accommodate it.

13       There was another point -- or was that everything

14  you wanted, Mr. Gentile?

15            MR. GENTILE:  No, I wanted a designation and a

16  February 1st surrender date.

17            THE COURT:  All right.

18       Mr. Myhre, was there an issue you wanted to raise?

19            MR. MYHRE:  Yes, Your Honor.  Just for

20  clarification purposes.

21       Since Count Two does not allow discretion to go

22  below the $400,000, is the Court's ruling that the

23  $100,000 fine applies to Counts One and Three?  So that

24  this isn't an issue on appeal.

25            THE COURT:  It's -- it wasn't clear to me

185

1   concerning the mandatory nature of Count Two.  It was

2   clear to me that under the circumstances that are before

3   me, based on these offenses and Mr. Whittemore's

4   personal situation, and for all the reasons I've

5   commented on, that $100,000 fine should be imposed.

6   So --

7           MR. GENTILE:  Your Honor, I would agree with

8   the government that if you were to impose it on Count

9   One and Three and impose no fine on Two, that that would

10  comply.

11          THE COURT:  All right.  Well, I will impose --

12  in light of the fact that everyone's in agreement on

13  that, I will impose it that way.

14      Probation is not being granted.  It's definitely

15  being denied.  And no fine will, therefore, be imposed on

16  Count Two.

17          MR. MYHRE:  Thank you, Your Honor.

18          THE COURT:  Finally, the Court will say this,

19  that I find that this sentence imposed, considering the

20  history and characteristics of the defendant, is

21  sufficient but not greater than necessary to comply with

22  the purposes of sentencing as set forth in Title 18,

23  United States Code, Section 3553(a).  And the Court has

24  considered all of the factors identified in

25  subparagraphs (a)(1)-(7) of that section of law.  I've

Case 1:14-cr-00143-JLG  Document 28  Filed 12/02/14  Page 80 of 81 PageID #: 881
Case 3:12-cr-00058-LRH-WGC  Document 226  Filed 11/15/13  Page 186 of 188

186

1    commented on a number of them.

2        And I also -- I agree with the sentencing

3    justifications which are also set forth at paragraphs 119

4    to 124 of the presentence report.  I do adopt those as

5    additional sentencing justifications with the modification

6    that the prison sentence portion of this be 24 months.

7        Mr. Whittemore, I know you're very aware of your

8    rights of appeal in this case.  But I still have to tell

9    you, notice of appeal would have to be filed within 14

10   days or you would lose that right of appeal.

11       Do you understand that?

12            THE DEFENDANT:  Yes, I do, Your Honor.

13            THE COURT:  All right.

14       Is there anything further that either counsel would

15   like the Court to -- well, wait a minute.  My clerk

16   reminds me I didn't make the record clear.

17       With regard to the 24-month sentence, it is 24

18   months on each one of the three counts of conviction to be

19   served concurrently; as is the term of supervised release

20   of two years.  The record will so show.

21       And is there anything further?

22            THE CLERK:  The report date.

23            THE COURT:  Oh, we do need to finalize that

24   report date.  February 1st of 2014 is a Saturday.  So

25   I'm going to move it up a day to Friday, January 31st,

187

1    2014, before noon.

2              MR. GENTILE:  Thank you, Your Honor.

3              THE COURT:  All right.

4              MS. BECKNER:  Your Honor, may I please present

5    the defendant with the conditions in this case?

6              THE COURT:  Yes, would you do that, please.

7              MS. BECKNER:  Thank you, sir.

8              THE COURT:  That's a routine matter.  And I

9    overlooked it.  And I apologize.

10        It appears that there's nothing further.

11        Mr. Whittemore, I wish you the best.

12             THE CLERK:  Please rise.

13                  (The proceedings were concluded at

14                  7:14 p.m.)

15                       *    *    *

16

17

18

19

20

21

22

23

24

25

DONNA DAVIDSON, RDR, CRR, CCR #318 - (775) 329-0132
(775) 329-0132